In re **ROYAL AHOLD N.V. SECURITIES & ERISA LITIGATION.**

No. CIV.1:03–MD–01539.

United States District Court, D. Maryland.

Dec. 21, 2004.

Seth D. Goldberg, Seth D. Goldberg PC, Steven J. Toll, Daniel Stephen Sommers, Robert Joseph Barton, Cohen Milstein Hausfeld and Toll PLLC, Washington, DC, Andrew J. Entwistle, Robert Nicholas Cappucci, Stephen David Oestreich, Entwistle and Cappucci LLP, Robert Ira Har-

wood, Wechsler Harwood LLP, Robert S. Schachter, Zwerling Schachter and Zwerling LLP, Lester Levy, Wolf, Popper, Ross, Wolf & Jones, Fred Taylor Isquith, Wolf, Haldenstein, Adler, Freeman and Herz LLP, Ralph M. Stone, Lee S. Shalov, Shalov, Stone and Bonner LLP, Steven G. Schulman, Milberg, Weiss, Bershad and Schulman LLP, Daniel L. Berger, Hannah Greenwald, Jeffrey Neil Leibell, Bernstein, Litowitz, Berger and Grossmann, Edward J. Schindler, Bernstein, Liebhard and Lifshitz LLP, Jonathan M. Plasse, Goodkind, Labation, Rudoff and Sucharow LLP, Christopher Lometti, Frank R. Schirripa, Schoengold and Sporn PC, New York, NY, Gregory M. Kline, Howard Scott Jones, Adelberg, Rudow, Dorf and Hendler LLC, Charles J. Piven, Marshall N. Perkins, Law Offices of Charles J. Piven PA, Steven Donald Silverman, Silverman and Thompson, Robert K. Jenner, Janet and Jenner LLC, Baltimore, MD, Samuel Howard Rudman, Robert Michael Rothman, Cauley, Geller, Bowman and Rudman LLP, Melville, NY, Conor R. Crowley, Much, Shelist, Freed, Denenberg, Ament and Rubenstein PC, Chicago, IL, Ronald B. Rubin, Rubin and Rubin Chtd., Rockville, MD, Marc A. Topaz, Schiffrin, Craig and Barroway LLP, Bala Cynwyd, PA, for Plaintiffs.

Douglas P. Baumstein, Glenn M. Kurtz, Joseph B. Schmit, White and Case LLP, Elizabeth Ann Quinlan, William Andrew Krohley, Kelley, Drye and Warren LLP, Amy Neuhardt, Shearman and Sterling LLP, George A. Salter, Richard Bloom, Steven F. Barley, Tracey A. Tiska, Hogan and Hartson LLP, New York, NY, Andrew Gendron, G. Stewart Webb, Jr., Gabrielle S. Moses, Venable, Baetjer and Howard LLP, Gerard J. Gaeng, David Matthew Wyand, Rosenberg, Martin, Funk and Greenberg LLP, Stephen J. Nolan, Law

Offices of Stephen J. Nolan Chartered, Baltimore, MD, John Arak Freedman, Angela Joy Showalter, Leslie Wharton, Scott B. Schreiber, Arnold and Porter, Alexandre de Gramont, Richard J. Morvillo, Crowell and Moring LLP, Richard L. Brusca, Skadden, Arps, Slate, Meagher and Flom LLP, Kevin Marcus Colmey, Laurin H. Mills, Nixon Peabody LLP, Washington, DC, Carolyn G. Nussbaum, Richard A. McGuirk, Nixon Peabody LLP, Rochester, NY, for Defendants.

Robert Joseph Barton, Cohen, Milstein, Hausfeld and Toll PLLC, Washington, DC, Charles J. Piven, Marshall N. Perkins, Law Offices of Charles J. Piven PA, Virginia B. Evans, Office of the United States Attorney, Thomas M. Dibiagio, Baltimore, MD, Jeffrey Alan Barrack, Barrack, Rodos and Bacine, Philadelphia, PA, Robert N. Kaplan, Kaplan, Fox and Kilsheimer, James G. Cavoli, United States Attorneys Office, Stephen R Diprima, Wachtell, Lipton, Rosen and Katz, Sander Bak, Scott Alexander Edelman, Milbank, Tweed, Hadley and McCloy LLP, New York, NY, John Christopher Pasierb, Cohen, Gettings and Caulkins PC, Arlington, VA, for Movants.

### MEMORANDUM

BLAKE, District Judge.

Multiple motions to dismiss are pending in these consolidated securities fraud actions transferred here by the Judicial Panel on Multidistrict Litigation. The claims arise out of an approximately $ 1.1 billion restatement of earnings, together with a $24.8 billion reduction in revenue, announced in 2003 by Royal Ahold N.V. ("Royal Ahold"), a Netherlands company heavily involved in the supermarket and food service business in the United States.

A voluminous amended complaint names as defendants various Royal Ahold entities, including its Maryland-based subsidiary U.S. Food Service, Inc. ("USF"), as well as accountants, underwriters, and individuals, alleging violations of the securities laws.

Preliminarily, I will state a summary of my rulings on the various motions.

The Fed.R.Civ.P.12(b)(2) motions to dismiss for lack of personal jurisdiction submitted by foreign individual defendants Fahlin, Boonstra and de Ruiter will be *granted.* The motions to dismiss for lack of personal jurisdiction submitted by foreign individual defendants Van der Hoeven, Meurs, and Andreae will be *denied.*

The Fed.R.Civ.P. 12(b)(1) motions submitted by all defendants to dismiss the claims of foreign purchasers of Royal Ahold shares on foreign exchanges for lack of subject matter jurisdiction will be *denied.*

The global underwriter defendants' Fed. R.Civ.P. 12(b)(1) motion to dismiss the § 11 and § 12(a)(2) claims for lack of subject matter jurisdiction will be *granted.*

The Fed.R.Civ.P. 12(b)(6) motions submitted by all defendants to dismiss all allegations concerning conduct that predates July 30, 1999 as barred by the statute of limitations will be *granted.*

The Fed.R.Civ.P. 12(b)(6) motions to dismiss the § 10(b) and Rule 10b–5 claims submitted by defendants Tobin, Grize, Resnick, Deloitte & Touche LLP ("Deloitte U.S."), Deloitte & Touche Accountants ("Deloitte Netherlands"), Ahold USA and Ahold USA Holdings will be *granted.* The motions to dismiss the § 10(b) and Rule 10b–5 claims submitted by defen-

dants Kaiser, Lee, Andreae, and Meurs will be *denied.* Van der Hoeven's motion to dismiss the § 10(b) and Rule 10b–5(b) claims will be *denied;* his motion to dismiss the § 10(b) and Rule 10b–5(a) and (c) claims will be *granted.* Miller's motion to dismiss the § 10(b) and Rule 10b–5(b) claims will be *granted,* but his motion to dismiss the Rule 10b–5(a) and (c) claims will be *denied.*

The Deloitte & Touche LLP ("Deloitte U.S.") Fed.R.Civ.P. 11 motion to strike certain allegations will be *granted.*

The Royal Ahold defendants' (along with individual defendants Van der Hoeven and Meurs) Fed.R.Civ.P. 12(f) motion to strike all allegations concerning misconduct at Ahold USA subsidiaries Tops and Giant–Carlisle and allegations concerning the realization of synergies and the integration of acquisitions will be *denied;* their motion to strike all allegations concerning accounting irregularities with the Argentine subsidiary Disco will be *granted.*

The Fed.R.Civ.P. 12(b)(6) motions to dismiss the § 11 and § 12(a)(2) claims submitted by Royal Ahold, the lead underwriters, the Deloitte defendants, and the individual defendants will be *granted.* The plaintiffs are granted 60 days to seek leave to amend the § 12(a)(2) claims.

The Fed.R.Civ.P. 12(b)(6) motions to dismiss the control person liability claims under § 20(a) submitted by defendants Miller, Resnick, Kaiser, Van der Hoeven, Meurs, Andreae, Tobin and Grize will be *denied.* Lee's motion to dismiss the § 20(a) claim will be *granted.* All motions to dismiss the § 15 claims will be *granted;* the plaintiffs are granted 60 days to seek leave to amend the § 15 claims.

## TABLE OF CONTENTS

I. Background

 A. Factual History

 B. Prior and Related Proceedings

 C. The Parties

 1. The Plaintiffs

 2. The Corporate Defendants

 3. The Auditors

 4. The Lead Underwriters and Global Underwriters

 5. The Foreign Individual Defendants

 6. The Domestic Individual Defendants

II. Discussion

 A. Standard of Review

 B. Personal Jurisdiction

 1. Cees Van der Hoeven, Michiel Meurs, Jan Andreae

 2. Roland Fahlin

 3. Cor Boonstra

 4. Henny de Ruiter

 C. Subject Matter Jurisdiction

 1. Foreign Purchasers of Royal Ahold Securities on Foreign Exchanges

 2. The Global Underwriters ("Dutch Banks")

 D. Statute of Limitations

 E. Section 10(b) and Rule 10b–5 Claims

 1. Cees Van der Hoeven and Michiel Meurs

 2. Jan G. Andreae

 3. Mark Kaiser and Timothy J. Lee

 4. James L. Miller

 5. Michael Resnick

 6. Robert G. Tobin

 7. William J. Grize

 8. The Deloitte Defendants

 9. Ahold USA

 10. Ahold USA Holdings

 F. Royal Ahold Defendants' Motions to Strike

 1. Disco

 2. Tops and Giant–Carlisle

 3. Statements Concerning Royal Ahold's Integration of its Acquisitions

 G. Section 11 and Section 12

 H. Control Person Liability Under Section 20(a) and Section 15

III. Conclusion

## I. BACKGROUND

### A. Factual History

On February 24, 2003 Royal Ahold announced that it was restating its reported earnings by $ 500 million for fiscal years 2001 and 2002 due to a series of accounting inaccuracies related to promotional allowances at its U.S. Foodservice, Inc. ("USF") division. (*See* Compl. ¶ 184.)[1] The announcement also advised investors that Royal Ahold would be adjusting historical

---

[1] Unless otherwise indicated, all further parenthetical references refer to the consolidated amended securities class action complaint.

financial statements to no longer fully consolidate its joint ventures and that the company was investigating "the legality of certain transactions" at its Argentine subsidiary Disco. (*Id.*) The announcement caused the price of Royal Ahold common stock trading on foreign exchanges to drop 63% and the price of Royal Ahold ADRs trading on the New York Stock Exchange ("NYSE") to fall 61%. (¶ 1.) Since the February 2003 announcement, Royal Ahold has made additional restatements of earnings totaling $ 24.8 billion in revenues and approximately $ 1.1 billion in net income. (¶¶ 1, 30.)

Regulators in the United States and Europe have launched civil and criminal investigations of individuals and entities associated with Royal Ahold. Among the agencies conducting such investigations are: the United States Department of Justice, the United States Attorney's Office for the Southern District of New York, the Securities and Exchange Commission ("SEC"), the NYSE, the National Association of Securities Dealers, the Office of the Dutch Public Prosecutor, the Euronext Amsterdam Exchange, and the Dutch Authority for Financial Markets. (¶¶ 209–228.) Investigations by these entities as well as Royal Ahold have revealed that the accounting discrepancies stemmed mainly from two company practices: (1) inflated reporting of income from vendor rebates or promotional allowances; and (2) improper attribution of revenue (or "consolidation" of revenue) by Royal Ahold from joint ventures in which Royal Ahold did not have a controlling stake. The promotional allowances problem arose primarily from Royal Ahold's Maryland based

USF. Promotional allowances, also known as vendor rebates, are payments made by manufacturers to retailers to encourage them to promote their products to consumers. Royal Ahold determined that USF prematurely recognized promotional allowance income in violation of U.S. and Dutch generally accepted accounting principles ("GAAP").[2] (¶ 39.) The forensic investigation conducted by the company also revealed that certain individuals had colluded with outside vendors to falsely inflate vendor rebate amounts. (¶ 47) (citing Royal Ahold's 2002 Form 20–F). On May 8, 2003 Royal Ahold announced that the total income restatement attributable to USF would be $ 880 million for the period from April 2000 to December 28, 2002.[3] (¶ 28.) In addition, on May 26, 2003 Royal Ahold announced that its investigation had uncovered $ 29 million in intentional accounting irregularities at its Tops subsidiary. (¶ 250.)

On May 16, 2003 Royal Ahold announced that it would reduce its revenue totals for the last two years by the sum of $ 24.8 billion dollars to properly reflect proportionate consolidation of its joint ventures, ICA, JMR, Bompreco, Paiz Ahold, and DAIH. (¶ 248.) Previously, Royal Ahold had fully consolidated these joint ventures even though it did not control them; this practice did not comport with U.S. and Dutch GAAP. (¶ 249.) After an investigation, the company determined that so-called "control letters" purporting to grant Royal Ahold decision-making authority over the ICA, Bompreco, DAIH and Paiz Ahold joint ventures, thereby providing a basis to fully consolidate the joint ven-

**2.** Generally Accepted Accounting Principles "are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 546, n. 4 (6th Cir.1999) (citation omitted).

**3.** Royal Ahold later announced that the total earnings restatement attributable to its United States operations amounted to $ 885 million. (¶ 32.)

tures' revenue, were negated by secret "side letters." (¶ 305.) These side letters, which were concealed from the Deloitte & Touche auditors, rescinded the control letters by stating that Royal Ahold would not actually retain decision-making authority over its partners. (¶¶ 304–06.) The plaintiffs allege that Meurs, Andreae, and Fahlin drafted and executed the conflicting side letters for the ICA joint venture. (¶¶ 338–39.)

The plaintiffs contend that Royal Ahold's improper consolidation of its joint ventures and allegedly fraudulent accounting of promotional allowance income enabled the company to maintain artificially inflated revenues and strong credit ratings. (¶ 23.) They allege that Royal Ahold senior executives repeatedly misled investors regarding the company's financial strength in press releases, with comments such as the one made by CEO Cees Van der Hoeven in a June 7, 2001 press release: "Once again our operating companies generated excellent results in the first quarter. In the United States, both our food retail and foodservice activities boosted earnings substantially." (¶ 579.) According to the plaintiffs, Royal Ahold's apparent financial strength supported favorable market reviews from Wall Street analysts and kept Royal Ahold stock trading at relatively high prices. This in turn enabled the company to raise capital on domestic and foreign stock exchanges in order to fund a series of ambitious acquisitions aimed at expanding the company's global reach. For example, Royal Ahold executed the September 2001 Global Offering, the offering on which plaintiffs base their § 11 and § 12(a)(2) claims, in order to fund its acquisition of Bruno's Supermarkets and USF's acquisition of Alliant Foodservice, Inc. (¶ 595.) During the claimed class period, March 10, 1998 to February 24, 2003, Royal Ahold and its subsidiaries spent billions of dollars ac-

quiring over fifty food retail and service operations in the United States, Europe, Central and South America, and Asia Pacific. (¶¶ 131–180.) The plaintiffs allege that Royal Ahold and the individual defendants misled investors by repeatedly overstating earnings and claiming that Royal Ahold was successfully integrating its numerous acquisitions, when in reality several of the individual defendants knew there were problems with USF's internal controls and later the company admitted that it failed to manage adequately the integration of its many acquisitions. (See, e.g., ¶ 594.) The shareholder plaintiffs now bring suit to recover financial losses they claim are directly attributable to the allegedly false and misleading statements made by Royal Ahold and the associated defendants during the claimed class period.

## B. Prior and Related Proceedings

On June 18, 2003, the Judicial Panel on Multidistrict Litigation transferred twenty-one class action securities and ERISA actions to the District of Maryland. Since then, additional related actions also have been transferred here. On November 4, 2003, I entered an order consolidating the pending securities actions and appointing COPERA and Generic as lead plaintiffs. See In re Royal Ahold N.V. Securities and ERISA Litigation, 219 F.R.D. 343 (D.Md. 2003). In parallel proceedings, the SEC filed enforcement actions in the United States District Court for the District of Columbia against Royal Ahold and individual defendants Cees Van der Hoeven, Michiel Meurs, Roland Fahlin, and Jan Andreae; some of these parties have since settled with the SEC. In addition, the United States Attorney's Office filed charges in United States District Court for the Southern District of New York against individual defendants Michael Resnick,

Mark Kaiser, and Timothy Lee. Lee pled guilty to one count of conspiracy to commit securities fraud, to make false statements in filings with the SEC, and to falsify USF's and Royal Ahold's books and records, and to one count of securities fraud.

On February 18, 2004, the lead plaintiffs filed a 430 page Consolidated Amended Securities Class Action Complaint ("Complaint").[4] Count I of the complaint charges Royal Ahold, Ahold USA, Ahold USA Holdings, United States Foodservice, Inc., Deloitte & Touche LLP, Deloitte & Touche Accountants, and individual defendants Cees Van der Hoeven, Michiel Meurs, Henny de Ruiter, James L. Miller, Michael Resnick, Timothy Lee, Mark Kaiser, Jan G. Andreae, Roland Fahlin, Robert G. Tobin, William J. Grize, and Cor Boonstra with violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5(b), 17 C.F.R. § 240.10b–5, promulgated thereunder. Count II of the complaint charges the same defendants with violations of § 10(b) and Rule 10b–5(a) and (c). Counts III and VI of the complaint charge each of the named individual defendants with control person liability under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, and § 15 of the Securities Act of 1933, 15 U.S.C. § 77o.[5] Count IV of the complaint charges Royal Ahold, Deloitte Netherlands, the underwriter defendants, and individual defendants Van der Hoeven, Meurs, de Ruiter, Miller, Lee, Andreae, Fahlin, Tobin, and Grize with violations of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Count V of the complaint charges Royal Ahold, the underwriter defendants, and individual defendants Van der Hoeven and Meurs with violations of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2).

Each of the defendants filed motions to dismiss and motions to strike the various charges asserted against them. While the individual motions differ, all defendants move to dismiss claims asserted by foreign purchasers of Royal Ahold shares for lack of subject matter jurisdiction, as well as all claims predicated on conduct prior to July 30, 1999, as barred by the statute of limitations. After the issues were fully briefed, oral argument was heard on September 23, 2004. This Memorandum and Order grants in part and denies in part the motions to dismiss and motions to strike filed by the various defendants.

## C. The Parties

### 1. *The Plaintiffs*

Plaintiffs are members of a class of persons, including both U.S. and European citizens, who purchased or acquired the common shares or American Depository Shares ("ADSs" also known as American Depository Receipts or "ADRs") of Royal Ahold, N.V. ("Royal Ahold" or the "Company") between March 10, 1998 and February 24, 2003 (the claimed "Class Period"). lead plaintiff COPERA (Public Employees' Retirement Association of Colorado) purchased Royal Ahold common shares on foreign exchanges during the class period and claims losses of more than $ 16 million (¶ 55), and lead plaintiff Generic Trading of Philadelphia, LLC ("Generic"), a large institutional trading firm, purchased Royal Ahold ADRs on the NYSE and claims losses of more than $ 1.1 million. (¶ 56.)

---

4. While the plaintiffs' motions briefing has been relatively succinct, the complaint is unfortunately lengthy and repetitive, requiring substantial time to sift through as to each defendant.

5. Boonstra is charged only with violating § 20(a).

## 2. The Corporate Defendants

Royal Ahold N.V. ("Royal Ahold") is a supermarket and foodservice company incorporated under the laws of the Netherlands. Through its subsidiaries, Ahold USA, Ahold USA Holdings, and U.S. Foodservice, Inc. ("USF"), Royal Ahold operates a number of chain grocery stores and food services in the United States. Royal Ahold ADRs trade on the NYSE and its common stock trades on the Euronext exchanges of Paris, Brussels, and Amsterdam. Royal Ahold also has a secondary listing on the Swiss Exchange in Zurich. Royal Ahold and USF do not challenge the plaintiffs' § 10(b) and Rule 10b–5 claims, but Ahold USA and Ahold USA Holdings move to dismiss the § 10(b) and Rule 10b–5 claims for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Royal Ahold moves to dismiss the § 11 and § 12(a)(2) claims and moves to strike allegations pertaining to its subsidiaries Tops and Giant–Carlisle, and its Argentine subsidiary Disco, as well as statements in the complaint regarding the integration of company acquisitions and synergies.

## 3. The Auditors

Deloitte & Touche LLP ("Deloitte U.S.") and Deloitte & Touche Accountants ("Deloitte Netherlands") served as the auditors for Royal Ahold and USF. The Deloitte defendants move to dismiss the plaintiffs' § 10(b), Rule 10b–5, § 11, and § 12(a)(2) claims.

## 4. The Lead Underwriters and the Global Underwriters ("Dutch Banks")

Lead underwriters ABN AMRO Rothschild, Goldman Sachs International, and Merrill Lynch International provided commercial and investment banking services to Royal Ahold and served as underwriters for the September 2001 Global Offering.

The global underwriters ("Dutch Banks") ING Bank N.V., Rabo Securities N.V., and Kempen & Co. N.V. acted as underwriters for Royal Ahold during the class period and for the September 2001 Global Offering. The underwriter defendants move to dismiss the plaintiffs' § 11 and § 12(a)(2) claims.

## 5. The Foreign Individual Defendants

Cees Van der Hoeven served as Royal Ahold's Chief Executive Officer from 1993 until February 24, 2003. Michiel Meurs served as Royal Ahold's Executive Vice President and Chief Financial Officer from 1997 until February 24, 2003. Henny de Ruiter was Chairman of Royal Ahold's Supervisory Board from 1994 until 2003. Cor Boonstra served as a member of Royal Ahold's Supervisory Board from 2000 until September 3, 2001. Roland Fahlin was a member of Royal Ahold's Supervisory Board from 2001 until June 2, 2004. Jan G. Andreae was a member of Royal Ahold's Executive Board from 1997 until February 20, 2004. Each of the foreign individual defendants moves to dismiss the claims for lack of personal jurisdiction and for failure to state a claim.

## 6. The Domestic Individual Defendants

James L. Miller founded USF in 1989. He served as Chief Executive Officer of USF from 1994, and Chairman of the Board of Directors and President of USF from 1997, until May 13, 2003. Miller joined Royal Ahold's Executive Board on or about September 1, 2001. Mark Kaiser served in a variety of senior sales positions at USF since 1989. He served as the Executive Vice President of Sales, Marketing and Procurement at USF from 1993 until May 9, 2003. Timothy J. Lee served as a purchasing executive for USF and worked closely with Mark Kaiser until he

resigned from the company on May 9, 2003. Michael Resnick joined USF in October 2000 in a financial position and served as Chief Financial Officer of USF from 2001 to May 14, 2003. Robert G. Tobin joined Royal Ahold in 1996 and was appointed to Royal Ahold's Executive Board in 1998. Tobin also served as President and CEO of Ahold USA until September 1, 2001. On that date he resigned from Royal Ahold's Executive Board and joined Royal Ahold's Supervisory Board. William J. Grize was appointed to Royal Ahold's Executive Board and became President and CEO of Ahold USA on September 1, 2001. Each of the domestic individual defendants moves to dismiss the claims asserted against them for failure to state a claim.

## II. DISCUSSION

### A. Standard of Review

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (internal quotation marks and alterations omitted). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir.1997). Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957); *see also Edwards,* 178 F.3d at 244. Securities fraud claims are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4(b)(1)(B), (b)(2) which are discussed in more detail below. *See infra* Part II(E).

In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiffs' legal conclusions. *See, e.g., Young v. City of Mount Ranier,* 238 F.3d 567, 577 (4th Cir.2001) (noting that the "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions); *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995) (affirming Rule 12(b)(6) dismissal with prejudice because the plaintiff's alleged facts failed to support her conclusion that the defendant owed her a fiduciary duty at common law).

In considering a motion to dismiss a securities fraud complaint, "the Court is entitled to rely on public documents quoted by, relied upon, incorporated by reference or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment." *In re USEC Sec. Litig.,* 190 F.Supp.2d 808, 813 (D.Md.2002).

### B. Personal Jurisdiction

▮▮▮ In federal securities actions, personal jurisdiction extends to the limits of the due process clause of the Fifth Amendment. There are two primary factors to consider in evaluating personal jurisdiction under the due process clause: (1) whether the defendant has sufficient minimum contacts with the United States[6] and (2)

---

**6.** In considering the personal jurisdiction arguments of the foreign individual defendants,

"the question becomes whether the party has sufficient contacts with the United States, not

whether the exercise of jurisdiction over the defendant would "offend traditional notions of fair play and substantial justice." *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 942 (4th Cir.1994) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The plaintiffs bear the burden of establishing personal jurisdiction for each defendant individually. Because there was no evidentiary hearing, however, the plaintiffs are "required only to make a prima facie showing of personal jurisdiction" at this point. *Harte–Hanks Direct Marketing/Baltimore, Inc. v. Varilease Tech. Fin. Group, Inc.,* 299 F.Supp.2d 505, 511–512 (D.Md.2004) (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396 (4th Cir.2003)). *See also Mylan Laboratories Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993) ("In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.").

■ To satisfy the minimum contacts test, a plaintiff must demonstrate that a defendant either (1) engages in systematic or continuous activities in the United States (general jurisdiction) or (2) purposefully directs his actions at the United States and the litigation arises from or is related to those actions (specific jurisdiction). Essentially, it is a question of fairness: if the defendant can "reasonably anticipate being haled into court there," *In re CINAR Corp. Sec. Litig.,* 186 F.Supp.2d 279, 305 (E.D.N.Y.2002) (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)), that court's jurisdiction comports with due process. It also must be

noted that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (citation omitted).

■ Each of the foreign individual defendants moves to dismiss the plaintiffs' claims for lack of personal jurisdiction. There is no claim of general jurisdiction over the foreign defendants, who live outside the United States and work for a foreign corporation based in the Netherlands. Rather, the question is whether this forum has specific jurisdiction. The Fourth Circuit recently stated, "[i]n determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed [himself] of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst,* 334 F.3d at 397. In interpreting these factors, many courts apply an effects test to evaluate whether a defendant's purposeful availment is sufficient and causally related to the plaintiff's alleged injuries. "This 'effects test' of personal jurisdiction is typically construed to require that the plaintiff establish that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Id.* at 398 n. 7 (citing *IMO Indus., Inc. v.*

any particular state." *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.

1993) (citations omitted); *see also SEC v. Carrillo,* 115 F.3d 1540, 1544 (11th Cir.1997).

*Kiekert AG,* 155 F.3d 254, 265–66 (3rd Cir.1998)).

■ Before examining each foreign individual defendant's contacts with the United States, it must be determined whether the fiduciary shield doctrine applies. That doctrine protects individuals from personal jurisdiction in a forum where their only contacts with the forum arise from acts carried out within the scope of their employment. *See Birrane v. Master Collectors Inc.,* 738 F.Supp. 167, 169 (D.Md.1990). The foreign individual defendants rely on the fiduciary shield doctrine to contend that this court lacks personal jurisdiction because all of the allegations against them pertain to actions taken in their corporate capacity. As the Fourth Circuit has made clear, however, "the fiduciary shield rule is solely a matter of statutory construction under state law and is not required under the due process clause." *Western Contracting Corp. v. Bechtel Corp.,* 885 F.2d 1196, 1200 (4th Cir.1989). While a forum cannot establish personal jurisdiction over foreign defendants based solely on their status as officers in a corporation that is alleged to have committed fraud in the United States, *see Columbia Briargate Co. v. First Nat. Bank in Dallas,* 713 F.2d 1052, 1064–65 (4th Cir.1983), if the complaint sufficiently alleges that the defendants "had a direct personal involvement in a tort committed in the forum state," *id.* at 1064, then personal jurisdiction over the defendants does not conflict with the fundamental notions of fairness required by the due process clause. This analysis comports with the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), which noted that while personal jurisdiction over an employee is not conferred simply by the corporation's contacts with a forum, "their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." *See also SEC v. Carrillo,* 115 F.3d 1540, 1547 (11th Cir.1997). Accordingly, in deciding the personal jurisdiction question, I will not simply examine acts taken by a corporation and attribute them to the corporate executives, but I will consider an individual defendant's actions directed at the forum, even if those acts were done in that defendant's corporate capacity.

■ Consistent with this analysis, an individual's status as a control person of a corporation that has jurisdictional contacts with the United States, standing alone, is insufficient to establish personal jurisdiction. Equating "the broad understanding of control person liability adopted by the Securities Act" with personal jurisdiction "impermissibly conflates statutory liability with the Constitution's command that the exercise of personal jurisdiction must be fundamentally fair." *In re Baan Co. Sec. Litig.,* 245 F.Supp.2d 117, 129 (D.D.C. 2003); *see also Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 86, 99 (D.Del.2002) (stating "[p]ersonal jurisdiction is an independent threshold consideration to the question of liability"); *In re CINAR,* 186 F.Supp.2d at 306 n. 18; *but see McNamara v. Bre–X Minerals,* 46 F.Supp.2d 628, 636 (E.D.Tex.1999) (establishing control person liability is sufficient to establish personal jurisdiction). An individual's status as a control person is a factor to be considered, however, in the jurisdictional analysis.

Applying the above principles, United States courts frequently have asserted personal jurisdiction over individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be

relied on by U.S. investors. For example, the court in *In re CINAR* observed that:

it is perfectly reasonable to exercise jurisdiction over [the defendant] based solely on her signing the 1999 Registration Statement ... There is no clearer example of purposeful availment of the privilege of doing business in the United States than this ... [The defendant] must have known that the statement was made to comply with the laws governing securities offerings in the American markets and, as such, it would be used and relied upon by American investors. [The defendant] could have reasonably foreseen that, were there to be litigation concerning the Statement, she would be haled to court in the United States.

186 F.Supp.2d at 305–06. *See also Itoba Ltd. v. LEP Group PLC,* 930 F.Supp. 36, 41 (D.Conn.1996) (holding that personal jurisdiction existed over a foreign defendant who approved forms knowing they would be filed with the SEC and relied on by investors in the U.S.); *Derensis v. Coopers & Lybrand,* 930 F.Supp. 1003, 1014 (D.N.J.1996); *Landry v. Price Waterhouse,* 715 F.Supp. 98, 101 (S.D.N.Y.1989).

### 1. *Cees Van der Hoeven, Michiel Meurs, and Jan Andreae*

■ The complaint alleges that defendants Van der Hoeven, Meurs, and Andreae signed false and misleading documents on behalf of Royal Ahold that were filed with the SEC. (*See, e.g.,* ¶¶ 73, 77, 104, 534, 636, 688.) By signing SEC filings, these three individuals directed their actions at the United States and could reasonably anticipate being haled into court here. In addition, the required nexus between the defendants' contacts and the plaintiffs' injuries exists because "the plaintiffs' claims arise out of those activities directed at the [United States].'" *Carefirst of Md., Inc.,* 334 F.3d at 397. Therefore, based on the numerous SEC filings they signed, this court finds that Van der Hoeven, Meurs, and Andreae have sufficient minimum contacts with the United States.[7]

■ Even though Van der Hoeven, Meurs and Andreae have sufficient minimum contacts with the United States, the court must determine whether the exercise of jurisdiction over these individuals is reasonable, *Lesnick,* 35 F.3d at 942, and must use particular caution before extending "personal jurisdiction into the international field." *Asahi Metal,* 480 U.S. at 115, 107 S.Ct. 1026. The Fourth Circuit has explained that: " 'The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders'.... But, '[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.' " *Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory,* 283 F.3d 208, 214 (4th Cir.2002) (quoting *Asahi Metal,* 480 U.S. at 114, 107 S.Ct. 1026). The weaker the contacts, however, the less likely it is that jurisdiction is reasonable.

7. Andreae signed fewer SEC documents than defendants Van der Hoeven and Meurs. Among the documents signed by Andreae, however, is the Royal Ahold May 18, 2001 Form 6–K (¶ 104), which plaintiffs allege contained false and misleading financial results for fiscal year 2000 (¶ 636). This SEC filing, therefore, includes improperly consolidated joint venture revenue. As discussed later in Part II(E)(2), Royal Ahold was able to improperly consolidate joint venture revenue in part because of Andreae's direct involvement in the "side letter" scheme.

*Ticketmaster–N.Y. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994) (stating "the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction").

The plaintiffs argue that jurisdiction over the foreign individuals is reasonable because "(1) it imposes only a slight burden on the Defendants; (2) the Lead Plaintiffs and the United States have a substantial interest in keeping the litigation in the United States; (3) it is necessary for the efficient administration of justice; and (4) public policy demands it." (*See* Pls.' Opp'n to Foreign Defs.' Motions to Dismiss at 64.) To further support their claim of reasonableness, the plaintiffs note that the burden on the foreign defendants in litigating in the U.S. is slight when compared to the harm allegedly suffered by the class. The plaintiffs also argue that the court must afford the plaintiffs' choice of forum some degree of deference, *Ticketmaster–New York,* 26 F.3d at 211, and that the U.S. is the most efficient place to litigate the dispute: the wrong occurred here, most of the plaintiff class resides in the U.S., most of the evidence and witnesses are here, U.S. law governs, and it would avoid piecemeal litigation. In response, the defendants argue that jurisdiction here is unreasonable because the burden on the defendants from litigating in the U.S. is high, the proceedings may conflict with ongoing investigations and actions in the Netherlands, and due to joint and several liability among all defendants, the plaintiffs' ability to recover will not be affected by the absence of the foreign defendants.

Even with modern advances in communications and travel, the foreign defendants are correct that the burden for them of defending litigation in the United States is significant. In this case, however, " 'the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant[s],' " *Base Metal Trading,* 283 F.3d at 214 (quoting *Asahi Metal,* 480 U.S. at 114, 107 S.Ct. 1026), because the burden on the defendants is outweighed by the interests of the United States and the plaintiffs in resolving the dispute in American courts. While courts in the Netherlands have a strong interest in preventing fraud in the Netherlands, the United States has a similar interest in preventing fraud here, in protecting the integrity of its stock markets, in promoting investor confidence, and in providing relief under federal statutes to those harmed by securities fraud. In *In re CINAR,* 186 F.Supp.2d at 305, the court held that the exercise of personal jurisdiction over a foreign individual was reasonable "based solely on her signing the 1999 Registration Statement." Likewise, in *Carrillo,* 115 F.3d at 1547, the court held that jurisdiction over two foreign individuals was reasonable because "[t]he record shows that [they] were primary participants in the alleged contacts with the United States." Similarly, by signing SEC filings, Van der Hoeven, Meurs, and Andreae were primary participants in Royal Ahold's contacts with the United States. While Royal Ahold is domiciled in the Netherlands, it has become "a primarily United States based company with 74% of its sales generated in the United States." (¶ 57.) Consequently, in light of the defendants' contacts with the U.S., the alleged harm that resulted to investors in the U.S., and the interests of the U.S. in enforcing its securities laws to protect investors, this court can reasonably and legitimately exercise jurisdiction over Van der Hoeven, Meurs, and Andreae. The plaintiffs' claims are causally related to the defendants' pur-

poseful contacts with the United States, and jurisdiction over these individuals does not offend traditional notions of fair play and substantial justice.

## 2. *Roland Fahlin*

■ The complaint alleges that Fahlin signed the December 29, 2000 Registration Statement. (¶¶ 103, 833.) An examination of the actual document filed with the SEC on December 29, 2000, however, demonstrates that this allegation is not correct.[8] (*See* Andreae Mem., Brusca Decl. Ex. A.) The plaintiffs do not allege that Fahlin signed any other documents filed with the SEC. Consequently, SEC filings cannot be the source of personal jurisdiction over Fahlin.

The most significant allegations concerning Fahlin relate to his involvement in May 2000 as a signatory on a "control" letter and a contradictory "side" letter concerning Royal Ahold's joint venture with ICA. (¶¶ 264, 339, *see infra* Part II(E)(1) and (8), which discuss the side letters in greater detail.) These letters, sent by a foreign employee of a foreign corporation to another foreign corporation, lack a direct connection to the U.S. The control/side letter scheme did have an impact in the U.S. because it allowed Royal Ahold to artificially inflate the revenue included in its financial statements, which were incorporated into Royal Ahold's SEC filings and relied upon by American investors. Unlike Andreae, however, Fahlin signed no SEC filings. Despite the fact that Fahlin's acts ultimately had an impact in the U.S., the U.S. cannot be fairly characterized as the focal point of either Fahlin's acts or the harm suffered because his allegedly fraudulent acts were directed to-wards the Netherlands, and globally, but not specifically towards the U.S. *See Carefirst of Maryland,* 334 F.3d at 398 n. 7 (stating that specific jurisdiction over a foreign defendant is "typically construed to require that...the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity") (citing *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 265–66 (3rd Cir.1998)). As a result, Fahlin lacks sufficient minimum contacts with the United States for this court to exercise specific jurisdiction over him.

## 3. *Cor Boonstra*

■ The complaint fails to allege that Boonstra had any "direct personal involvement" in acts directed at the United States; instead it attempts to establish minimum contacts by relying on conclusory allegations and Boonstra's status on the Royal Ahold Supervisory Board. While the complaint states that Boonstra was a "direct and substantial participant in the fraud," it does not offer any specific factual allegations to support this claim. (¶ 81.) The plaintiffs include Boonstra in their broad group pleadings and allege that he acted as a control person, but they fail to note a single specific act taken by Boonstra directed at the U.S. (¶ 824.) Consequently, this court lacks personal jurisdiction over defendant Boonstra and must dismiss all claims against him.

## 4. *Henny de Ruiter*

■ As with Boonstra, the plaintiffs allege that de Ruiter was a "direct and

---

**8.** At the hearing on September 23, 2004, counsel for Fahlin stated that Fahlin was not serving on Royal Ahold's Supervisory Board in December 2000 and did not sign the docu-ments that the complaint alleges he signed. This fact was not disputed by the plaintiffs at the hearing.

substantial participant in the fraud" without providing any factual allegations to support their claim. Unlike Van der Hoeven, Meurs, and Andreae, there are no supported allegations that de Ruiter signed any documents filed with the SEC.[9] While the plaintiffs allege that de Ruiter "engaged in a $19 billion freewheeling acquisition spree... focused primarily on the United States" and orchestrated Royal Ahold's acquisition of USF (¶¶ 13, 15), the complaint fails to offer any factual basis to support its conclusory allegations that de Ruiter personally assisted Royal Ahold in any of the alleged fraud. Personal jurisdiction over de Ruiter cannot be based solely on the fact that he was on the supervisory board of a corporation with sufficient contacts in the U.S., *Calder v. Jones*, 465 U.S. at 790, 104 S.Ct. 1482, which is essentially what the plaintiffs are alleging against de Ruiter. Accordingly, because there are no factual allegations that de Ruiter directed his actions towards the U.S. and that those acts are causally related to the harm suffered by the plaintiffs, the claims against him must be dismissed for lack of personal jurisdiction.

## C. Subject Matter Jurisdiction

Plaintiffs have the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir.1999). In reviewing a Fed.R.Civ.P. 12(b)(1) motion, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir.1991). A court should grant a Rule 12(b)(1) mo-

tion "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d at 647. When the jurisdictional facts are intertwined with questions of law, however, it may be appropriate to resolve the entire factual dispute at a later proceeding on the merits. *See United States v. North Carolina*, 180 F.3d 574, 580–581 (4th Cir. 1999); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982); *Bryant v. Clevelands, Inc.*, 193 F.R.D. 486, 488 (E.D.Va.2000).

The Royal Ahold defendants and the individual defendants seek to dismiss all claims asserted by foreign class members who purchased Royal Ahold shares on foreign exchanges for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The Global Underwriter or Dutch Bank defendants contend that their involvement as underwriters in the September 2001 Global Offering did not involve any conduct or activity in the United States or with United States parties and therefore there is no basis for this court to exercise subject matter jurisdiction over the plaintiffs' § 11 and § 12 claims asserted against them.

The Securities Act of 1933 and the Securities Exchange Act of 1934 are silent as to whether they apply extraterritorially, and Congress has provided little guidance on the issue. *See, e.g., Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 30 (D.C.Cir. 1987) ("If the text of the 1934 Act is relatively barren, even more so is the legislative history. Fifty years ago, Congress did not consider how far American courts should have jurisdiction to decide cases involving predominately foreign securities transactions with some link to the United States. The web of international connec-

---

**9.** As with Fahlin, the complaint incorrectly alleges that de Ruiter signed the December 29, 2000 Registration Statement. (*See* ¶ 833 and Andreae Mem., Brusca Decl. Ex. A) (demonstrating that de Ruiter did not sign the statement).

tions in the securities market was then not nearly as extensive or complex as it has become."). Despite the general presumption against jurisdiction unless explicitly conferred by statute, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994), most of the federal circuits have adopted a "conduct" and "effects" framework for determining when the federal securities laws reach overseas transactions. In deciding whether the "conduct" or "effects" of the fraudulent activity support jurisdiction, courts weigh "whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [disputes arising from predominantly foreign activity] rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.1975); *see also, Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 906 (5th Cir.1997) (noting that the primary purpose of the federal securities laws is to protect U.S. investors and U.S. markets); *Interbrew S.A. v. Edperbrascan Corp.*, 23 F.Supp.2d 425, 429 (S.D.N.Y.1998) (observing that "[a] proper analysis should focus on the policy considerations that led to the extraterritorial application of these laws in the first place-protecting or punishing U.S.-parties and markets.").

■ Under the "conduct" and "effects" tests, in order for courts to exercise subject matter jurisdiction over foreign transactions, the defendant's allegedly fraudulent conduct that contributed to the securities violation must have occurred within the United States or its overseas conduct must have caused a substantial

adverse effect in the U.S. market. *See, e.g., Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 665 (7th Cir.1998). The Fourth Circuit has not yet adopted a conduct or effects framework in the context of the extraterritorial application of the securities laws.

The defendants urge the court to exercise judicial restraint and decline to apply the conduct and effects tests adopted by other courts, but not yet recognized by the Fourth Circuit. While the Supreme Court has not commented on the conduct and effects test in the securities law arena, it recently ruled that under the antitrust laws, federal courts lack subject matter jurisdiction over foreign plaintiffs' claims that are based solely on the foreign effect of the defendant's conduct and independent from any domestic effect caused by the defendant's conduct. *See F. Hoffman–La Roche Ltd. v. Empagran S.A.*, —— U.S. ——, ——, 124 S.Ct. 2359, 2363, 159 L.Ed.2d 226 (2004). The defendants further argue that the *Hoffman–La Roche* decision should be read to preclude subject matter jurisdiction in cases such as this, where foreign purchasers of securities on foreign exchanges seek a remedy under the U.S. securities laws. While the *Hoffman–La Roche* case provides important guidance to federal courts about how to weigh the comity concerns implicated by the extraterritorial application of U.S. laws, I find it both legally and factually distinguishable from the present dispute. Accordingly, its holding will not be applied here to bar subject matter jurisdiction over the foreign purchasers of Royal Ahold securities.[10]

10. While the securities laws are silent as to extraterritoriality, in the antitrust arena Congress has explicitly stated when the Sherman Act reaches foreign activity. The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) provides that the Sherman Act "shall

not apply to conduct involving trade or commerce . . . with foreign nations." 15 U.S.C. § 6a. The FTAIA also provides exceptions to this rule, making the Sherman Act applicable where the foreign conduct has a "direct, substantial and reasonably foreseeable effect" on

The Royal Ahold defendants also argue that general principles of comity weigh against U.S. court involvement in this case given that foreign purchasers can seek relief from European courts; indeed, Dutch authorities and the Euronext are investigating Royal Ahold and at least one Royal Ahold related judicial proceeding is underway in the Netherlands. (*See* Royal Ahold Defs.' Mot. to Dismiss at 20.) Like the Netherlands, however, this court has a significant interest in the claims of the foreign purchasers, given the plaintiffs' substantial allegations concerning Royal Ahold's allegedly fraudulent conduct in the U.S. The complaint states that Royal Ahold's U.S. operations accounted for 74% of the company's total net sales in fiscal year 2002. (¶ 49) (citing Royal Ahold's 2002 Form 20–F at 37). Further, the complaint alleges, and Royal Ahold has admitted, that the majority of the accounting prob-

lem stemmed from the improper recognition of vendor allowances by its U.S. subsidiaries, including Maryland based USF. (*See, e.g.*, ¶¶ 3, 39.) In fact, Royal Ahold's United States based operations accounted for $ 885 million, or 80.5%, of the company's approximately $ 1.1 billion earnings restatement. (¶ 32.)

The substantial allegations submitted by the plaintiffs concerning U.S. based securities fraud warrant scrutiny by a U.S. court, even though many of the parties to this dispute are foreign and some of the relevant conduct occurred overseas. *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir.1972) ("[W]hen ... there has been significant conduct within the territory, a statute cannot properly be held inapplicable simply on the ground that, absent the clearest language, Congress will not be assumed to

domestic commerce. *Id.* The Court was interpreting this particular provision in *Hoffman–La Roche* when it held that plaintiffs whose claims arise *solely* from independent foreign effects could not take advantage of the fact that the defendant's conduct had some domestic effects in order to come under the FTAIA exception. 124 S.Ct. at 2363. The Court based its holding on the statute's language and history, as well as comity concerns. *Id.* at 2369. The Court emphasized that comity counseled against expanding the FTAIA exception to include foreign plaintiffs harmed only by foreign felt effects because doing so would unnecessarily interfere with other nations' administration of their own antitrust laws. *Id.* at 2368. In particular, many countries filed amicus briefs with the Court arguing that applying the treble damages remedial scheme of the American antitrust system to overseas claimants would "unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody." *Id.* at 2368. Even if the Supreme Court's interpretation of an antitrust statute were applicable to the securities statutes, the facts in this case are distinguishable from those in *Hoffman–La Roche*. Whereas the

foreign plaintiffs in *Hoffman–La Roche* sought to establish subject matter jurisdiction based solely on the foreign effects of the defendant's overseas conduct, the plaintiffs in this case do not assert that subject matter jurisdiction exists under the effects test for foreign purchasers on foreign markets. (*See* Pls.' Mem. in Opp'n to the Royal Ahold Defs.' Mot. to Dismiss at 15.) Rather, the lead plaintiffs contend that the Royal Ahold defendants' conduct within the United States is sufficient to justify subject matter jurisdiction over the foreign purchasers' claims. In regard to the Global Underwriter defendants, the lead plaintiffs argue that there are sufficient *domestic* effects and conduct by virtue of the filing of SEC registration and offering documents in the United States. (*See* Lead Pls.' Mem. in Opp'n to the Global Underwriters' Mot. to Dismiss at 5.) The merit of these legal arguments should be scrutinized according to the standards developed for securities claims, not those based on wholly distinct antitrust laws. *See, e.g., Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 123 (2d Cir.1998) ("The analysis of jurisdiction to prescribe rules governing foreign transactions is guided by 'the nature and source of the claim asserted.' ")(quoting *Zoelsch*, 824 F.2d 27, 33, n. 4).

have meant to go beyond the limits recognized by foreign relations law."). Notwithstanding the fact that the securities laws do not provide guidance as to their extraterritorial reach, seven courts of appeals and several district courts have determined that, in certain circumstances, the securities laws should apply to overseas transactions because "Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners." *Bersch,* 519 F.2d at 987. At a minimum, where, as here, there is significant U.S. involvement alleged in an otherwise foreign transaction, it is appropriate to engage in the judicially created "conduct" and "effects" analysis to determine whether subject matter jurisdiction exists over claims brought by overseas plaintiffs as well as claims against foreign defendants.

Those courts that have applied the conduct test have formulated somewhat different standards for evaluating when foreign transactions have a sufficient nexus with the United States to justify subject matter jurisdiction by an American court. The Second, Fifth, Seventh and D.C. Circuits have applied the most stringent formulation of the conduct test. Under their standard, "a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (2d Cir.1995) (citing *Bersch,* 519 F.2d at 987, and *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991)). *Accord Rob-*

*inson v. TCI/US West Communications,* 117 F.3d 900, 905–06 (5th Cir.1997) (agreeing that the domestic conduct must have been of "material" importance or "directly caused" the fraud complained of); *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 31 (D.C.Cir.1987) (same). Among these circuits, the D.C. Circuit has adopted the strictest version of the conduct test, requiring that "the domestic conduct [comprise] all the elements of a defendant's conduct necessary to establish a violation of section 10(b) and Rule 10b–5: the fraudulent statements or misrepresentations must originate in the United States, must be made with scienter and in connection with the sale or purchase of securities, and must cause the harm to those who claim to be defrauded, even though the actual reliance and damages may occur elsewhere." *Zoelsch,* 824 F.2d at 31 (citing *IIT v. Cornfeld,* 619 F.2d 909, 920–921 (2d Cir.1980)).[11] The Seventh Circuit essentially adopted the Second Circuit's test, stating that jurisdiction is appropriate when "the conduct occurring in the United States *directly causes* the plaintiff's alleged loss in that the conduct forms a *substantial part* of the alleged fraud and is *material* to its success." *Kauthar SDN BHD,* 149 F.3d at 667 (emphasis added). The Seventh Circuit distinguished its holding from the D.C. Circuit test by clarifying that "we do not go so far as to require that the conduct occurring domestically must itself satisfy the elements of a securities violation." *Id.*

In deciding what qualifies as "merely preparatory" conduct rather than that which is material and directly causes the complained of loss, the Second, Fifth, Sev-

---

**11.** The D.C. Circuit based its holding on its interpretation of the Second Circuit standard. The Fifth Circuit, however, has characterized the D.C. Circuit's interpretation as "a bit of an overstatement" of the Second Circuit test, explaining that "a close examination of the Second Circuit's caselaw reveals that the real test is simply whether material domestic conduct directly caused the complained-of loss." *Robinson,* 117 F.3d at 905, n. 10. *See also Kauthar SDN BHD,* 149 F.3d at 666 n. 10 (same).

enth and D.C. circuits all examine where the underlying securities transaction took place, the nationality and/or domicile of the parties, and where the alleged fraudulent activity and misrepresentations occurred. The latter issue is particularly critical. For example, Second Circuit courts have at times held that the relevant conduct is the actual publication and/or dissemination of the prospectuses. *See, e.g., Bersch,* 519 F.2d at 987 ("The fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands. Here the final prospectus emanated from a foreign source..."); *Froese v. Staff,* No. 02 CV 5744, 2003 WL 21523979 at *2, (S.D.N.Y., July 7, 2003) ("[T]he fraud itself occurred, if at all, when the allegedly fraudulent statements were conceived, engineered and published in Germany. It is these misstatements and not any activity which lead to the alleged misrepresentations which 'directly caused' the financial losses."). At other times Second Circuit courts have held that the decisive factor is whether the relevant fraudulent conduct underlying the false or misleading statements took place in the United States, regardless of the fact that the false or misleading statements relied upon were issued in overseas prospectuses or press releases. *See, e.g., Alfadda,* 935 F.2d at 478 (reversing the district court's ruling that there was no subject matter jurisdiction because "the fraud was perpetrated by placing the misleading prospectus in the plaintiffs' hand outside of the United States," holding instead that there was subject matter jurisdiction because the "conduct consummating the fraud" took place in the United States) (internal citations omitted); *Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452, 480 (S.D.N.Y. 2001) ("Although the named plaintiffs are foreign citizens, and the Fund operated as an offshore-fund, the fraud was run from

the United States and it was the decisions made in the United States that led directly to the investors' losses."). Similarly, the Second Circuit also has found that the making of SEC filings in the U.S. by a foreign corporation was not merely preparatory to the fraud, and therefore could confer subject matter jurisdiction. *See Itoba Ltd.,* 54 F.3d at 123 ("When [SEC filings in the United States] include substantial misrepresentations, they may be a predicate for subject matter jurisdiction."). The Fifth and Seventh Circuits emphasize where the bulk of the substantive fraudulent activity took place, rather than where the document containing the false statement was released or relied upon. *See Robinson,* 117 F.3d at 907 (holding that although much of the material conduct took place in England, the fraudulent scheme was directed from the United States and the preparation and mailing of one letter in the United States which purposely undervalued the plaintiff's stock was "more than merely preparatory-it directly triggered the injury of which [the plaintiff] now complains"); *Kauthar SDN BHD,* 149 F.3d at 667 (finding subject matter jurisdiction where foreign defendants had used the United States as a base of operations for their fraudulent scheme, including preparing various documents containing fraudulent misrepresentations on which the plaintiff relied).

The Third, Eighth, and Ninth Circuits have relaxed this standard slightly, holding that the domestic conduct must be a "significant" contributor or "material" to the fraudulent scheme. In the most relaxed version of the conduct test, the Third Circuit found jurisdiction where "at least *some activity* designed to further a fraudulent scheme occurs within this country." *SEC v. Kasser,* 548 F.2d 109, 114 (3d Cir.1977) (emphasis added). The Eighth Circuit relied on a Second Circuit

decision to hold that jurisdiction is possible "whenever there has been *significant conduct* with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange." *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 524 (8th Cir. 1973) (emphasis added) (citing *Leasco Data Processing Equip. Corp.*, 468 F.2d at 1334). Finally, the Ninth Circuit held that the "conduct in the United States cannot be 'merely preparatory'... and must be *material*, that is, *directly cause* the losses." *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424 (9th Cir.1983) (emphasis added) (citing *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 420 (8th Cir.1979)).

■ Under the effects test, courts have subject matter jurisdiction over foreign transactions related to securities if the transactions resulted in direct, adverse injury to specific American investors and parties within the United States. *See Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 (2d Cir.1998); *Bersch*, 519 F.2d at 989; *Schoenbaum v. Firstbrook*, 405 F.2d 200, 208 (2d Cir.1968). Allegations that the foreign conduct generally affected the U.S. market will not satisfy the effects test. *See, e.g., Bersch*, 519 F.2d at 989 ("[T]here is subject matter jurisdiction of fraudulent acts relating to securities which are committed abroad only when these result in injury to purchasers or sellers of those securities in whom the United States has an interest, not where acts simply have an adverse affect on the American economy or American investors generally.").

It is not necessary to satisfy both the conduct and the effects test in order to find subject matter jurisdiction; meeting just one test is enough. *See Robinson*, 117 F.3d at 905. At least two courts, however, have used a combination of both tests in order to decide whether it makes sense for an American court to hear the case. *See Itoba Ltd.*, 54 F.3d at 122 ("an admixture or combination of the two [tests] often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court"); *Kauthar SDN BHD*, 149 F.3d at 665, n. 8 ("[s]ince the aim of this inquiry is to measure the degree of United States involvement in the transaction in question, the joint assessment of conduct and effects seems appropriate because it permits a more comprehensive assessment of the overall transactional situation").

Judge Lee of the Eastern District of Virginia recently adopted the so-called "middle ground" approach of the Seventh, Eighth and Ninth Circuits, rejecting the Third Circuit as "too lenient," and the D.C., Second and Fifth Circuits as "too rigid." *In re Cable & Wireless*, 321 F.Supp.2d 749, 762–63 (E.D.Va.2004).[12] In his formulation of the middle ground approach, a defendant's United States based conduct must be "(1) significant and (2) substantial or material to the larger scheme." *Id.* at 763 (citing *Kasser*, 548 F.2d at 114; *Kauthar SDN BHD*, 149 F.3d at 666–67; *Travis*, 473 F.2d at 524; *Grunenthal GmbH*, 712 F.2d at 425).

■ I agree with Judge Lee that the Third Circuit standard is not sufficiently strict, but the D.C. Circuit standard, with its emphasis on the conduct itself constituting a securities violation, is too strict. Of the "middle ground" circuits, I believe the Seventh Circuit's standard as articulated in *Kauthar SDN BHD*, 149 F.3d at 667,

12. Judge Lee characterized the Seventh Circuit's standard as closer to the Eighth and Ninth Circuits, rather than the stricter version offered by the Second Circuit.

best captures the competing need to be "cautious" in applying the U.S. securities laws to overseas transactions with the obligation to recognize Congress's desire that the United States not be used "as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." *Itoba Ltd.*, 54 F.3d at 122 (citations omitted). The Seventh Circuit situated itself with the Second and Fifth Circuits when it determined that:

> federal courts have jurisdiction over an alleged violation of the antifraud provisions of the securities laws when the conduct occurring in the United States *directly causes* the plaintiff's alleged loss in that the conduct forms a *substantial part* of the alleged fraud and is *material* to its success. This conduct must be *more than merely preparatory* in nature; however, we do not go so far as to require that the conduct occurring domestically must itself satisfy the elements of a securities violation.

*Kauthar SDN BHD*, 149 F.3d at 667 (emphasis added). The *Kauthar* standard will be applied to determine whether subject matter jurisdiction exists as to the claims of foreign purchasers of Royal Ahold

shares on foreign exchanges and the § 11 and § 12 claims against the Global Underwriters.[13]

### 1. *Foreign Purchasers of Royal Ahold Securities on Foreign Exchanges*

■ The plaintiffs argue that subject matter jurisdiction exists for the claims of foreign purchasers of Royal Ahold shares on foreign exchanges due solely to Royal Ahold's conduct within the United States, not because of any domestic effects. Specifically, plaintiffs allege and defendants have admitted in Royal Ahold's 2002 Form 20–F filed with the SEC that the accounting fraud uncovered at USF as well as Tops and Giants stores in the U.S. related to "fictitious and overstated vendor allowances and improper or premature recognition rates" for such allowances which "intentionally caused the incorrect accounting for and mischaracterization of vendor allowance cash receipts and intentionally caused the misapplication of Dutch GAAP and U.S. GAAP." (¶ 3) (citing 2002 Form 20–F at 69). Approximately $885 million of the overall $1.1 billion earnings restatement made by Royal Ahold was attributable to the improper recognition of pro-

**13.** The Dutch Banks argued in their motion to dismiss that the plaintiffs' § 11 and § 12(a)(2) claims should be evaluated using a "modified" conduct and effects test employed by the Second Circuit in *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir.1998) to address the extraterritorial application of the registration requirements of the Securities Act of 1933. (*See* Dutch Banks' Mot. to Dismiss at 11; Dutch Banks' Resp. in Supp. of Mot. to Dismiss at 8, n. 13). The plaintiffs countered that the *EOC* court used a narrower conduct and effects test only to evaluate the registration requirements of § 5, and that the standard conduct and effects test used for the antifraud provisions of the securities acts should apply to the § 11 and § 12 claims. (*See* Pls.' Mem. in Opp'n to the Global Underwriters' Mot. to Dismiss at 4.) Plaintiffs are

correct that there is no need to apply a modified conduct and effects test to the § 11 and § 12 claims. The *EOC* court itself suggested, without needing to decide the issue, that claims based on false or misleading statements in violation of § 12(a)(2) could be evaluated using the standard conduct and effects test applicable to claims under § 10(b). 147 F.3d at 127, n. 10. Likewise, other courts have used the same conduct and effects test to evaluate both § 12(a)(2) and § 10(b) claims. *See, e.g., Itoba Ltd.*, 54 F.3d at 121–22; *Nikko Asset Management Co. v. UBS AG*, 303 F.Supp.2d 456, 464–66 (S.D.N.Y.2004). Because § 11 claims are also based on the issuance of a false statement or omission of a material fact, it is appropriate to apply the same test to the § 11 claims as to the § 12(a)(2) and § 10(b) claims.

motional allowances in its U.S. operations. (¶ 32.) The plaintiffs' complaint also cites Royal Ahold's report that its internal investigation concluded that "certain senior officers of USF and other employees were involved in the fraud" and that these accounting irregularities extended to the Royal Ahold parent company. (¶ 35.) Additionally, Royal Ahold admitted in its 2002 Form 20–F that its "reported growth rate was illusory and based in material respects on the improper accounting treatment of its subsidiaries and accounting irregularities in the recognition of [promotional allowance income]." (¶ 39.) Plaintiffs aver that all of the accounting, financial, and administrative services for Royal Ahold's U.S. operations were conducted in the United States. (¶ 50.) Moreover, the plaintiffs allege that a "significant portion of defendants' false and misleading statements were initially made in the United States and are contained in Ahold's SEC filings." (¶ 51.)

The defendants contend that such statements could not "directly cause" the foreign plaintiffs injury because they purchased Royal Ahold shares on the Euronext pursuant to corporate information ("press releases, conference calls and financial reporting") which was disseminated from the Netherlands. (*See* Royal Ahold Defs.' Mot. to Dismiss at 17.) As the plaintiffs point out, however, many of the allegedly false financial results and misrepresentations issued by Royal Ahold originated in the United States and were filed with the SEC. It is well recognized that "SEC filings generally are the type of 'devices' that a reasonable investor would rely on in purchasing securities of

the filing corporation," *Itoba Ltd.*, 54 F.3d at 123 (holding that SEC filings that include substantial misrepresentations may establish subject matter jurisdiction).[14]

Taken as true, as they must be at the motion to dismiss stage, the plaintiffs' allegations sufficiently demonstrate that Royal Ahold's conduct within the United States was more than "merely preparatory" to the alleged securities fraud associated with the overseas purchase of Royal Ahold shares by foreign plaintiffs. The documented accounting fraud related to the overstatement of vendor allowances by Royal Ahold's U.S. based subsidiaries substantially contributed and indeed was material to Royal Ahold's success in attracting shareholders both in the U.S. and abroad. According to the plaintiffs, Royal Ahold was able to maintain artificially inflated share prices and fund an ambitious acquisition campaign in part by improperly recognizing income from vendor allowances in its U.S. operations. When Royal Ahold made its first restatement of $500 million because of the U.S. based vendor allowance accounting fraud on February 24, 2003, the Royal Ahold share price trading on foreign exchanges lost 63% of its value, directly causing a financial injury to the foreign plaintiffs. Therefore, the plaintiffs have adequately demonstrated sufficient U.S. based conduct by the Royal Ahold defendants to justify asserting subject matter jurisdiction over the claims of foreign purchasers.

### 2. The Global Underwriters ("Dutch Banks")

 The plaintiffs' allegations concerning the Dutch Banks' involvement in the

---

**14.** The plaintiffs also allege that the Royal Ahold defendants conducted "United States based investor conferences...in order to publish its false and misleading financials and to assure Ahold's continued access to United States capital and financial markets." (¶ 51.) The current record does not indicate whether

any foreign plaintiffs actually attended any such "road shows" in the United States and subsequently made their purchase in reliance on what they heard, but whether that turns out to be the case is not dispositive to the question of subject matter jurisdiction at this stage.

September 2001 Global Offering, even when viewed in the light most favorable to the plaintiffs, do not pass muster under either the conduct or effects test. The plaintiffs only allege generally that the defendants' conduct "clearly effected [sic] ADRs registered in the United States and. listed on a United States national securities exchange as well as common stock listed on foreign exchanges that was purchased by Investors including those who are United States citizens or who are domiciled in the United States. The interests of all Investors were affected adversely by Ahold's misconduct." (¶ 53.) These are precisely the types of "generalized" effects that have been deemed insufficient to confer subject matter jurisdiction. *See, e.g., Bersch,* 519 F.2d at 989 ("[S]ubject matter jurisdiction of fraudulent acts relating to securities which are committed abroad [does not exist] where acts simply have an adverse affect on the American economy or American investors generally."). The plaintiffs have not pled facts demonstrating that the Dutch Banks' overseas involvement in the registration and filing of offering documents resulted in injury to specific American investors. The plaintiffs' conduct allegations are similarly deficient. The plaintiffs argue that the Dutch Banks' participation in the September 2001 Global Offering pursuant to United States-filed registration statements and offering documents, "as well as their other United States-based business activities, other work for Ahold and analyst coverage" satisfies the conduct test. (*See* Pls.' Mem. in Opp'n to the Global Underwriters' Mot. to Dismiss at 5.) Yet, notably, the plaintiffs do not identify any United States conduct by the Dutch Banks in the complaint nor any overseas conduct which caused an injury to specific U.S. parties.

In fact, the record demonstrates that the Dutch Banks had a minimal role in the September 2001 Global Offering, one which was limited to the overseas placement of Royal Ahold shares with private European clients. The affidavits submitted by the Dutch Bank defendants declare that the Dutch Banks engaged in no conduct within the United States and that they did not place or sell any Royal Ahold shares with United States parties when they participated in the September 2001 Global Offering. Each Global Underwriter defendant declares that it privately placed Royal Ahold Shares only outside the United States under Regulation S, an SEC regulation that exempts shares sold outside the United States from registration. (*See* Global Underwriters' Mot. to Dismiss, Koning Aff., Ex. A; Hopman Aff., Ex. B; Bakker Aff., Ex. C.) The September 2001 Prospectus Supplement clearly states that "[t]he underwriters will offer our common shares outside the United States in reliance on Regulation S under the Securities Act." (July 28, 2004 Entwistle Aff., Ex. 3 at S–29.) As such, the Global Underwriters did not expect their transactions to be within the reach of the Securities Act. Stef Koning, Director of Corporate Finance for Kempen & Co. N.V., declares that his firm was invited to participate by ABN AMRO Rothschild in London via a phone call and fax from London on September 4, 2001, the night before the offering. (*See* Koning Aff., Ex. A., ¶ 4.) Mr. Koning declares that "[w]e were allocated fewer than 500,000 of the 80 million Royal Ahold shares, and no ADSs. We sold the allocated common shares to 16 of our European institutional clients. We were barred from any direct sales efforts to the United States. We did not have any contact with the United States either in our preparatory efforts to participate in the Global Offering or in our sales efforts." (*Id.* at ¶ 2.) Maarten Hopman, Managing Director for ING Bank, affirms virtually the same facts: ING Bank was invited on September 4, 2001 via

fax from ABN AMRO Rothschild in London to participate in the Global Offering, the terms of the agreement barred them from having any contact with the United States or selling to any United States investors, and ING Bank placed their allocation of fewer than 500,000 shares with fewer than 25 of its European institutional clients and Dutch retail investors. (*See* Hopman Aff., Ex. B, ¶¶ 2, 4.) Finally, H.G.M. Bakker, Head of Syndication for Rabo Securities N.V., avers the same facts related to his company's participation in the Global Offering, noting that Rabo Securities was allocated "only 31,500 of the 80 million Royal Ahold shares...[which were] sold to five of our European institutional clients." (*See* Bakker Aff., Ex. C, ¶ 3.)

The plaintiffs do not contest the affidavits.[15] Instead, they argue that the September 2001 Global Offering should be viewed as a single, unified offering made pursuant to the underlying "shelf" registration statement from December 29, 2000 and the September 2001 Prospectus Supplement. Therefore, the plaintiffs contend, the Dutch Banks participated in the offering of shares registered in the United States and subject to the Securities Act. This argument ignores the plain language of the September 2001 Prospectus Supplement, which declared that "[o]ffers and sales of common shares and ADSs outside the United States are being made pursuant to this prospectus supplement and the attached prospectus pursuant to Regulation S under the Securities Act *and not pursuant to the Registration Statements.*" (July 28, 2004 Entwistle Aff., Ex. 3, September 2001 Prospectus Supplement at S–30) (emphasis added). Moreover, the Sep-

tember 2001 Prospectus Supplement stated that "[e]ach underwriter has acknowledged and agreed that offers and sales in The Netherlands will be made on a private placement basis, including private placements to institutional investors and retail clients of the underwriters in The Netherlands." (*Id.* at S–31.) The SEC adopted Regulation S to cover precisely this type of transaction, that is, an offer or sale that occurs outside the United States. *See Offshore Offers and Sales,* Securities Act Release No. 33–6863 (April 24, 1990). The Dutch Banks apparently complied with the terms of the September 2001 Prospectus Supplement and with Regulation S when they made only overseas placements of Royal Ahold shares with European investors in September 2001. In summary, the plaintiffs have failed to allege specific conduct or effects within the United States that would justify exercising subject matter jurisdiction over the § 11 and § 12 claims against the Dutch Banks. These claims will be dismissed.

## D. Statute of Limitations

The court also must decide whether any of the plaintiffs' claims are time-barred under the applicable statute of limitations. Prior to enactment of the Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204,116 Stat. 745, 801, codified in part at 28 U.S.C. § 1658, the Exchange Act contained a statute of limitations period which required a claimant to file suit within one year of discovery of the alleged fraud or three years from the date of the alleged fraud, whichever was earlier. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363–64, 111 S.Ct. 2773, 115

---

**15.** The plaintiffs' only objection to the affidavits is that they do not definitively indicate "the extent to which the securities were purchased by or on behalf of investors in the United States." (*See* Pls.' Mem. in Opp'n to the Global Underwriters' Mot. to Dismiss at 5, n. 5.) This conjecture fails to satisfy the requirement that the pleadings demonstrate specific injury or effects to particular American investors.

L.Ed.2d 321 (1991) (noting that the three year period of repose served as an absolute cutoff for bringing claims). When the Sarbanes–Oxley Act was enacted on July 30, 2002, it amended the statute of limitations period to require that securities fraud claims be brought within the earlier of either two years from discovery of the alleged fraud or five years from the date of the alleged fraud.[16]

The claimed class period in this case runs from March 10, 1998 to February 24, 2003. The plaintiffs allege numerous materially false and misleading statements by defendants during this timeframe. The question before the court is whether plaintiffs can rely on alleged statements and conduct occurring before July 30, 1999 as a basis for their § 10(b) and Rule 10b–5 claims, under the theory that the new Sarbanes–Oxley two year-five year limitations period applies retroactively.

The Royal Ahold defendants argue that any of plaintiffs' claims that are based on alleged conduct occurring before July 30, 1999, three years before the Sarbanes–Oxley Act became effective, were and are time-barred. In other words, if at the time the Sarbanes–Oxley Act became effective the plaintiffs' claims would already have been time-barred under the one year-three year framework, then such claims would still be time-barred after the effective date of the Sarbanes–Oxley Act, and not somehow revived under the new two year-five year limitations period. Therefore, plaintiffs should not be permitted to rely on any conduct that predates July 30, 1999. The plaintiffs contend that according to the plain language of § 804(b), the new statute of limitations applies to all "proceedings...commenced on or after the date of enactment of this Act." Because the alleged fraud was brought to their attention after July 30, 2002, and their claims were filed on February 26, 2003, after the effective date of the Sarbanes–Oxley Act, the plaintiffs argue that all claims stemming from relevant conduct within the last five years should be permitted to go forward.[17]

**16.** Section 804(a) of the Sarbanes–Oxley Act provides: "[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78(c)(a)(47)), may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or
(2) 5 years after such violation. 28 U.S.C. § 1658. Sections 804(b) and (c) also state that its provisions "shall apply to all proceedings addressed by this action that are commenced on or after the date of enactment of this Act.... Nothing in this section shall create a new, private right of action." Sarbanes–Oxley Act §§ 804(b) and (c); 28 U.S.C. § 1658(b) and (c). This provision applies to claims which are fraud-based, such as § 10(b) and Rule 10b–5 claims, but not to § 11 or § 12 claims which do not sound in fraud and therefore are governed by the original one

year-three year regime. *See In re WorldCom, Inc. Sec. Litig.*, No.02 Civ. 3288, 03 Civ. 9499, 2004 WL 1435356, *4 (S.D.N.Y.2004)."

**17.** The plaintiffs' argument appears to rest in part on the mistaken understanding that the one year-three year statute of limitations period means that claims can be brought within one year of the discovered wrongdoing, regardless of when the underlying wrongful conduct occurred. (*See* Pls.' Mem. in Opp'n to the Motions of the Royal Ahold Defs. at 27.) ("the claims at issue here arose following the February 24, 2003 announcement and since the first action was filed on or about February 26, 2003 there is no possibility that such claims were time barred when filed even if the old statute of limitations applied."). The Supreme Court ruled in *Lampf*, however, that the three year period of repose served as an absolute limit to when a claim could be brought after the alleged wrongdoing occurred. 501 U.S. at 363–64, 111 S.Ct. 2773. *See also Brumbaugh v. Princeton Partners*, 985 F.2d 157, 161 (4th Cir.1993) (citing *Lampf* for

■ There is a "presumption against retroactive legislation," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and therefore "[a] statute may not be applied retroactively... absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr*, 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Accordingly, the Supreme Court has only found retroactive application when the "statutory language...was so clear that it could sustain only one interpretation." *Id.* at 316–317, 121 S.Ct. 2271 (citation omitted). Under the prevailing standards, if the statutory language does not clearly indicate whether it covers pre-enactment conduct:

the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483.

■ While the Supreme Court has recognized that Congress "might constitutionally provide for retroactive application of [an] extended limitations period," *Int'l Union of Electrical Radio and Machine Workers, AFL–CIO v. Robbins & Myers, Inc.*, 429 U.S. 229, 244, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976), the Court also has observed that such an expansion would affect the substantive rights of a party and therefore the presumption against retroactivity applies. *Hughes Aircraft Co. v. United States, ex rel. Schumer*, 520 U.S. 939, 950, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) ("extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action.") In *Hughes Aircraft*, the Court approvingly cited the Ninth Circuit's reasoning in *Chenault v. U.S. Postal Service*, 37 F.3d 535, 539 (9th Cir.1994) that "a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme because to do so would alter the substantive rights of a party and increase a party's liability." 520 U.S. at 950, 117 S.Ct. 1871. *See also In re Apex Exp. Corp.*, 190 F.3d 624, 642–643 (4th Cir.1999) (holding that a shortened statute of limitations period could not apply retroactively absent an express command from Congress); *Million v. Frank*, 47 F.3d 385, 390 (10th Cir.1995) (holding that reviving previously time-barred claims had an impermissible retroactive effect); *FDIC v. Belli*, 981 F.2d 838, 842–843 (5th Cir.1993) (same). Furthermore, statutes of repose, such as the one at issue here, have been considered substantive statutes, suggesting an even greater need for clear congressional language directing that the new

the proposition that claims brought pursuant to § 10b and Rule 10b–5 must be commenced "within three years after such violation"); *In re WorldCom*, 2004 WL 1435356 at *6 (noting that the "one-year/three-year regime.. made any claim brought more than three years after the occurrence of the alleged violation untimely"); *L–3 Communications Corp. v. Clevenger*, No. 03–CV–3932, 2004 WL 1941248, *3 (E.D.Pa.2004) ("Under the *Lampf* statute of limitations, plaintiff was required to file by

the earlier of one year after discovery or three years after the fraud."); *In re Heritage Bond Litig.*, 289 F.Supp.2d 1132, 1149 (C.D.Cal. 2003) ("The three-year limit is a period of repose which serves as an outside limit and is not subject to equitable tolling."). Therefore, any of the plaintiffs' claims that are based on conduct occurring three years prior to the effective date of the Sarbanes–Oxley Act would have been time-barred under the existing statute of repose.

statute of repose should have retroactive effect. *L–3 Communications Corp. v. Clevenger*, No. 03–CV–3932, 2004 WL 1941248, *5, n. 6 (E.D.Pa.2004).

The overwhelming majority of courts that have examined § 804 of the Sarbanes–Oxley Act have held that it lacks clear language indicating that Congress intended the new two year-five year limitations period to apply retroactively to claims that were already time-barred. *See, e.g., In re Enterprise Mortgage Acceptance Co., Sec. Litig.*, 391 F.3d 401, 405–07 (2d Cir.2004) (affirming district courts' decisions that neither the language nor the legislative history of § 804 dictated that previously stale claims be revived); *In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, 03 Civ. 9499, 2004 WL 1435356, at *7 (S.D.N.Y.2004) (holding that claims based on research reports issued before July 30, 1999 were time-barred because "[t]here is no explicit language in the statute stating that it applies retroactively or that it operates to revive time-barred claims."); *L–3 Communications Corp.*, No. 03–CV–3932, 2004 WL 1941248 at *5–6 (finding the statute's language to be ambiguous and therefore unable to "overcome the presumption against applying it to previously time-barred claims"); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. MDL–1446, *12, 2004 WL 405886 (S.D.Texas Feb.25, 2004) (holding that the new limitations period "does apply to subsequently filed actions based on underlying conduct that occurred before the enactment of the Sarbanes–Oxley Act as long as such claims were not time-barred by the *Lampf* statute of limitations and/or repose controlling before July 30, 2001"[sic] ); *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va.2003) (holding that "Congress did not unambiguously provide that the two-year limitations period would apply retroactively."); *In re Heritage Bond Litig.*, 289 F.Supp.2d 1132, 1148 (C.D.Cal.2003)

(holding that plaintiffs' claims which were time-barred as of July 30, 2002, the date of enactment of the Sarbanes–Oxley Act, cannot be revived by the amended statute of limitations). *But see Roberts v. Dean Witter Reynolds, Inc.*, No. 8:02–CV–2115–T–26EAJ, 2003 WL 1936116 (M.D.Fla.2003) (relying on the statutory language and the legislative history to conclude that the Sarbanes–Oxley Act has retroactive effect.).

I agree that Congress did not clearly indicate that the Sarbanes–Oxley Act revives previously time-barred claims. The statutory language of § 804(b) directs that the new limitations period "shall apply to all proceedings addressed by this action that are commenced on or after the date of enactment of this Act." While this language would permit claims based on conduct occurring in the months prior to the Sarbanes–Oxley Act, it does not clearly define the extent of the statute's temporal reach and it does not express Congress's unambiguous intent that the statute apply to claims that were already stale under the three year period of repose. *Cf.*, Riegle–Neal Interstate Banking and Branching Efficiency Act of 1994, 12 U.S.C. § 1821(d)(14)(C)(i) (1994) (Congress amended the Act and clearly stated "the Corporation may bring an action…on such claim without regard to the expiration of the statute of limitations applicable under State law"). Moreover, allowing an expanded limitations period to apply retroactively would upset the defendants' substantive rights by making them defend against claims that they reasonably relied upon as being expired. *In re Enterprise Mortgage*, 295 F.Supp.2d 307, 315 (S.D.N.Y.2003), *aff'd*, 391 F.3d 401 (2d Cir. 2004). *See also Million*, 47 F.3d at 390 (reasoning that applying a new statute of limitations period to revive previously moribund claims would affect the substantive rights of both the plaintiff and the defen-

dant). Because the Sarbanes–Oxley Act does not specifically express a Congressional intent to revive stale claims, the plaintiffs may not rely on any conduct occurring prior to July 30, 1999 to support their § 10(b) and Rule 10b–5 claims.

### E. Section 10(b) and Rule 10b–5 Claims

■ The individual defendants, Deloitte U.S., Deloitte Netherlands, Ahold USA, and Ahold USA Holdings have filed motions to dismiss the plaintiffs' complaint for failure to state a claim under § 10(b) and Rule 10b–5. "To state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege that '(1) the defendant made a false statement or omission of material fact [18] (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'" *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 342 (4th Cir.2003) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir.1999)).

To survive a motion to dismiss, Fed. R.Civ.P. 9(b) requires that plaintiffs plead all of the elements of fraud with particularity. "Particularity of pleading is required with regard to the time, place, speaker, and contents, as well as the manner in which statements are false and the specific acts raising an inference of fraud—the 'who, what, where, why and when.'" *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 884 (W.D.N.C.2001) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir.1999)). *See also In re Criimi Mae Sec. Litig.*, 94

F.Supp.2d 652, 657 (D.Md.2000). Furthermore, the Private Securities Litigation Reform Act ("PSLRA") requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ottmann*, 353 F.3d at 344 (quoting 15 U.S.C.A. § 78u–4(b)(2)).

The Fourth Circuit has held that scienter under the PSLRA may be alleged by "pleading not only intentional misconduct, but also recklessness," *Ottmann*, 353 F.3d at 344, and has defined recklessness as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 343 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d at 621.) In evaluating recklessness, the Fourth Circuit applies:

> a flexible, case-specific analysis...in examining scienter pleadings .... courts should not restrict their scienter inquiry by focusing on specific categories of facts, such as those relating to motive and opportunity, but instead should examine all of the allegations in each case

---

**18.** A fact is material when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted). "With respect to 'contingent or speculative information or

events,' materiality 'will depend...upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir.1994) (quoting *Basic Inc.*, 485 U.S. at 238, 108 S.Ct. 978).

to determine whether they collectively establish a strong inference of scienter. And, while particular facts demonstrating a motive and opportunity to commit fraud (or lack of such facts) may be relevant to the scienter inquiry, the weight accorded to those facts should depend on the circumstances of each case.

*Ottmann*, 353 F.3d at 345–46. In sum, to survive the defendants' motions to dismiss the plaintiffs must successfully plead with particularity facts specific to each individual defendant that create a strong inference the defendant acted knowingly or recklessly in making material misrepresentations or omissions, though the plaintiffs are not required to plead motive or opportunity.[19]

The individual defendants challenge various aspects of the complaint, including what they view as plaintiffs' reliance on impermissible "group pleading," an attempt to establish "non-speaker" aiding and abetting liability, and the plaintiffs' reliance on statements that the defendants argue are not actionable because they are either forward looking or immaterial puffery. These issues will be discussed generally before turning to the specific allegations against each defendant.

Essentially, "the group pleading presumption (sometimes known as the 'group-published information' presumption) is not a prohibition on forms of pleading; rather it serves as a presumption that may be invoked *in favor* of a plaintiff." *Dunn v. Borta*, 369 F.3d 421, 434 (4th Cir.2004) (emphasis in original). Under the group published information doctrine:

corporate officers and directors who are alleged to be in day-to-day control of the company may be presumed, for pleading purposes, to be collectively responsible for a company's 'group published' information such as prospectuses, registration statements, annual reports, press releases and other public filings. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). Thus, the plaintiffs need not set forth with particularity which corporate officers conveyed a misrepresentation when the misleading information is contained in group publications.

*In re Criimi Mae*, 94 F.Supp.2d at 657 n. 4. The plaintiffs attempt to rely on the group published information doctrine and allege that:

Defendants Van der Hoeven, Andreae, de Ruiter, Meurs, Miller, Resnick, Lee, Kaiser, Tobin, Grize and Fahlin are liable for the false statements in SEC filings and press releases as such statements represent "group-published" information, disseminated to the public as a result of the collective actions of these defendants. It is appropriate to treat these defendants as a group and to presume that the false and misleading information conveyed in the public filings, press releases and other publications, as alleged herein, are the collective actions of this narrowly defined group of defendants. By virtue of their high level positions within Ahold, defendants Van der Hoeven, Andreae, de Ruiter, Meurs, Miller, Resnick, Lee, Kaiser, Tobin, Grize and Fahlin directly participated in the management of the Company, were directly involved

---

**19.** As *Ottmann* noted, motive and opportunity are *factors that should be considered collectively with the other allegations in evaluating whether a complaint successfully alleges scienter, but they are not essential. 353 F.3d at 345–46. While motive may be a good* indication of scienter, simply alleging a defendant's desire to protect his job and compensation is not sufficient, because these motives may be seen as common to all corporate executives. *In re Criimi Mae*, 94 F.Supp.2d 652, 660 (D.Md.2000).

with the day-to-day operations and were privy to confidential non-public information concerning the operations of Ahold, as alleged herein. These defendants were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued by Ahold, approved or ratified these statements and, therefore, adopted them as their own. (¶ 785.)

In *Dunn*, the Fourth Circuit noted that "[w]e have never addressed the issue of whether the group pleading presumption should be recognized in this Circuit.. . ." 369 F.3d at 434.[20] The court found it unnecessary to decide the issue in *Dunn*, relying instead on the First Circuit's approach in *Bielski v. Cabletron Systems, Inc.*, 311 F.3d 11, 40–41 (1st Cir.2002).[21] I will follow the sound reasoning of other district courts in this Circuit that have addressed the issue and decline to apply the group published information doctrine, because it is inconsistent with the particularity and specificity required by the PSLRA and Rule 9(b). *See Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 734 (E.D.Va.2003); *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 888 (W.D.N.C.2001); *In re CIENA Corp. Sec. Litig.*, 99 F.Supp.2d 650, 663 n. 11 (D.Md. 2000); *Medimmune, Inc. Sec. Litig.*, 873 F.Supp. 953, 960–61 n. 7 (D.Md.1995). *But see Andrews v. Fitzgerald*, 823 F.Supp. 356, 373–74 (M.D.N.C.1993) (using the group published information doctrine to find scienter where plaintiffs had alleged

specific facts of "day-to-day involvement" in company affairs that supported an inference of knowledge or reckless disregard of fraud).

Another preliminary issue is that of "non-speaker" or aiding and abetting liability. For liability to attach under Rule 10b–5(b), a defendant must make a public misrepresentation. The Supreme Court has held that such liability does not attach for aiding and abetting another's misrepresentation. *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 369 (4th Cir.2004). Since the Supreme Court's decision in *Central Bank*, the circuits have developed somewhat different tests for determining whether a nonspeaker may be held liable as a primary violator of Rule 10b–5(b).

In *Gariety*, the Fourth Circuit expressed its preference for the test stated by the Tenth Circuit in *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir.1996), which explained that "[t]he critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff." While the alleged violator need not "directly communicate misrepresentations to plaintiffs for primary liability to attach," *id.* at 1226, for a "misrepresentation to be actionable as a primary violation, there must be a showing that [the defendant] knew or should have known that his representation would be

---

**20.** For that reason, little weight should be attached to the unpublished opinion in *Juntti v. Prudential–Bache Securities, Inc.*, No. 92–2066, 1993 WL 138523 (4th Cir.1993), as a predictor of the Circuit's position on this issue.

**21.** In *Dunn*, a case involving Virginia securities law, the Fourth Circuit found sufficient to

satisfy Rule 9(b) a complaint which alleged that the individual defendant had access to information contrary to the company's public statements, and "participated in the drafting, preparation, and/or approval of the written and oral statements complained of herein." 369 F.3d at 434. *Dunn* did not address the PSLRA standard.

communicated to investors ..." *Id.; see Gariety*, 368 F.3d at 369. An alternative interpretation of *Central Bank* holds that "a secondary actor can be primarily liable under § 10(b) if the actor 'played a significant role' in the preparation of fraudulent statements." *Gariety*, 368 F.3d at 369 (quoting *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 n. 3 (9th Cir.1994)). In light of *Gariety*, this court will follow the *Anixter* test and require that a defendant be alleged to have made a misrepresentation which he knew or should have known would be communicated to investors.

A third preliminary issue concerns protected forward looking statements and puffery. Certain statements that might otherwise be actionable are protected by the Reform Act's safe harbor provision, which protects forward looking statements from liability under Rule 10b–5(b). 15 U.S.C. § 78u–5(a)(2). The Fourth Circuit has noted that " '[p]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws,' " *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993) (quoting *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir.1993)), however, "we recognize that expressions of belief or opinion concerning *current* facts may be material." *Raab*, 4 F.3d at 290 (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)).[22] The Fourth Circuit has also stated that "[m]isstatements or omissions regarding actual *past* or *present* facts are

far more likely to be actionable than statements regarding projections of *future* performance. Generally the latter will be deemed actionable under § 10(b) and Rule 10b–5 only if they are supported by specific statements of fact or are worded as guarantees." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir.1994).[23] In addition, there is also a category of statements that are not actionable because they are immaterial puffery or are accompanied by cautionary language. *See, e.g., Gasner v. Board of Sup'rs of the County of Dinwiddie*, 103 F.3d 351, 358 (4th Cir.1996) (under the "bespeaks caution" doctrine, securities fraud claims may be subject to dismissal if cautionary language in the offering document negates the materiality of the alleged misrepresentations or omissions). Like future projections, soft "puffing" statements are not actionable; they "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.' " *Hillson*, 42 F.3d at 211 (quoting *Raab*, 4 F.3d at 289–90). This standard will be applied to any statement relied on as a violation of Rule 10b–5(b).

In addition to the plaintiffs' claims based on material misstatements under Rule 10b–5(b), the plaintiffs also contend that the individual defendants have violated subsections (a) and (c) of

---

**22.** "We distinguished expressions of belief or opinion 'concerning *current* facts,' that 'may be material,' *see Sandberg*, 501 U.S. at 1090–97, 111 S.Ct. 2749, from opinions as to uncertain future events, to which the *Sandberg* analysis does not 'extend [ ] so easily.' " *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 211 (4th Cir.1994) (quoting *Raab*, 4 F.3d at 290).

**23.** Omissions will only be actionable under certain circumstances. It is true that "[m]ere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir.1995) (citing *Chiarella v. U.S.*, 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)). However, "[i]f one speaks, he must speak the whole truth." *Id.* at 1331.

Rule 10b–5.[24] (¶¶ 814–22.) Rule 10b–5(a) and 10b–5(c) prohibit an individual from using "any device, scheme, or artifice to defraud" or engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c). Unlike 10b–5(b), which requires a false statement or omission, claims under 10b–5(a) and (c) "are not so restricted." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). There is no requirement that claims under Rule 10b–5(a) and (c) allege illegal trading or market manipulation by the defendants. Instead, subsections (a) and (c) are far broader and "encompass much more than illegal trading activity: they encompass the use of '*any* device, scheme or artifice,' or '*any* act, practice, or course of business' used to perpetuate a fraud on investors." *In re Global Crossing*, 322 F.Supp.2d at 336–37 (stating "[s]chemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of section 10(b) and its broad purpose, to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities trad-

ed'") (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)). To survive a motion to dismiss the Rule 10b–5(a) and (c) claims, the plaintiffs must plead that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *In re Global Crossing*, 322 F.Supp.2d at 329 (citing *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 385 (S.D.N.Y.2003)). Like Rule 10b–5(b), claims under 10b–5(a) and (c) are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA[25] and, as a result, the plaintiffs must specify, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *In re Blech Sec. Litig.*, 961 F.Supp. 569, 580 (S.D.N.Y. 1997).

While the individual defendants argue that the complaint impermissibly relies on group published information and lacks the required particularity, the plaintiffs contend that their complaint also "sets forth a number of specific allegations demonstrating that each of these defendants had a

**24.** "It is apparent from Rule 10b–5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.... Claims for engaging in a fraudulent scheme and for making a fraudulent statement or omission are thus distinct claims, with distinct elements." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 335–36 (S.D.N.Y.2004) (citations omitted).

**25.** The plaintiffs mistakenly argue that the PSLRA particularity requirements do not ap-

ply to Rule 10b–5(a) and (c) claims. (*See* Pls.' Mem. in Opp'n to the Domestic Defs.' Motions to Dismiss at 38, n. 24). While paragraph (b)(1) of the PSLRA, which provides the particularity requirements for alleging misleading statements or omissions, does not apply, paragraph (b)(2) of the PSLRA, which requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," does apply to the Rule 10b–5(a) and (c) claims. *In re Initial Public Offering*, 241 F.Supp.2d at 384–85.

role in the preparation of Ahold's public statements, including specific documents they signed, statements they made, and statements made on behalf of the Executive Board on which they sat." (Pls.' Mem. in Opp'n to Domestic Defs.' Motions to Dismiss at 34.) The task at hand is to examine the complaint and determine whether it is "sufficiently particular with respect to each defendant," as the plaintiffs claim, or whether it fails to meet the heightened pleading requirements of the PSLRA and merely relies on group published information, as the defendants claim.[26]

### 1. *Cees Van der Hoeven and Michiel Meurs*

■ The complaint alleges that Van der Hoeven and Meurs (the CEO and CFO, respectively, of Royal Ahold) signed several SEC filings (¶¶ 73, 77) and made numerous public statements in press releases, analyst presentations, and conference calls that were materially false and misleading (*see, e.g.,* Compl. Part XIII.). Specifically, the plaintiffs contend that Van der Hoeven and Meurs materially misrepresented Royal Ahold's financial strength, including the fact that its financial statements comported with U.S. and Dutch GAAP, and repeatedly omitted material facts related to the company's problems with internal controls and the integration of its many acquisitions. Relying on Royal Ahold's own admissions in its 2002 Form 20–F, as well as statements from company officials describing the results of the internal investigations, the plaintiffs have adequately alleged that many of the defendants' statements were false or materially misleading.[27] For example, in an August 30, 2001 press release Van der Hoeven reported on the company's second quarter 2001 financial results and stated "[e]arnings at U.S. Foodservice, in particular, were extremely strong..." (¶ 583) and that "[t]he integration process of PYA/Monarch has been swift and successful...[i]t shows the ability of U.S. Foodservice to integrate new businesses flawlessly (¶ 586.)" The plaintiffs allege these statements were materially false, noting that Royal Ahold's 2002 Form 20–F announced that USF's net income reported by Royal Ahold in fiscal year 2001 was materially overstated by $260 million as a result of " 'fictitious and overstated' " as well as " 'improper or premature recognition' " of vendor rebates. (¶ 594(c).) Likewise, Anders Moberg, the company's current chief executive officer, explained during a September 4, 2003 shareholder's meeting that " '[t]he company has grown very fast but failed to integrate at the same pace, and failed to have adequate financial controls.' " (¶ 594(e).) On September 17, 2002, Van der Hoeven responded to questions from reporters and investors about accounting practices at Royal Ahold by saying "[t]here are no

---

**26.** The plaintiffs submitted a 41 page statement of facts in opposition to the defendants' motions to dismiss, perhaps in an effort to more succinctly set forth the factual allegations contained in their 430 page amended complaint. In their opposition briefs, the plaintiffs frequently cite to the paragraphs contained in the statement of facts, rather than the amended complaint. Although the statement of facts itself cites to paragraphs in the complaint, the defendants objected to plaintiffs' practice because the allegations in the statement of facts were not always supported by the allegations in the complaint. Because my task in reviewing the motions to dismiss is to assess the sufficiency of the complaint, I have relied exclusively on the amended complaint, as well as the exhibits and public documents attached thereto, and not the plaintiffs' statement of facts.

**27.** Because Van der Hoeven and Meurs' statements are too numerous to discuss individually, I will focus on a few illustrative examples from the plaintiffs' complaint.

accounting issues in Ahold. We never booked anything wrong. We have been in full compliance throughout the whole process." (¶ 678.) Yet plaintiffs allege that a number of red flags had already been raised by then and that a full investigation into Royal Ahold's accounting practices was launched that fall. (¶ 683.) Similarly, during a November 19, 2002 conference call ("Third Quarter 2002 Analyst Presentation"), Meurs reported that Royal Ahold's foodservice operations (including USF) had seen "sales grow by 43.3% to a touch over $4b"(¶ 692), and that their working capital numbers were lower because "the promotion allowances in Foodservice...accrue over the quarters and are almost at the highest point at the end of the third quarter. And we start collecting those allowances in the fourth quarter and in the first quarter of next year." (¶ 694.). The plaintiffs' have adequately alleged that Meurs' statement was false and misleading. They quote from the company's 2002 Form 20–F which announced that the USF net income reported by Royal Ahold during fiscal year 2002 was overstated by $510 million as a result of " 'fictitious and overstated vendor allowance receivables and improper or premature recognition of vendor allowances' " and that the company's internal investigation identified " '[o]ver 275 items relating to internal control weaknesses.' " (¶ 705(a) and (d)(i).)

The critical issue with respect to Van der Hoeven and Meurs, then, is whether, and at what point in time, they made false and misleading statements with the requisite scienter. There are a number of significant factors that lead to the strong inference that both Meurs and Van der Hoeven made at least some of the misleading public statements alleged in the complaint with the requisite scienter. First, there were a number of red flags that should have alerted Van der Hoeven and

Meurs to the alleged fraud at USF. One of these red flags arose when Miller informed Royal Ahold's Executive Board of the inadequate internal controls at USF on April 1, 2000. (¶¶ 15–16, 272–74.) A second red flag came from Deloitte, which warned Royal Ahold's Executive Board of USF's weak internal controls in a memo on July 24, 2000. Deloitte alerted Royal Ahold's Executive Board to "deficiencies in the design or operation of the Company's internal control that, in our judgment, could adversely affect the Company's ability to record, process, summarize, and report financial data consistent with the assertions of management in financial statements." (July 13, 2004 Entwistle Aff. Ex. 5.) While these two alone might not be sufficient, a third red flag that should have alerted Van der Hoeven and Meurs to the problems at USF arose when Smith, then the CFO for USF, warned them that USF's earnings had been manipulated by overstating allowance income. (¶¶ 4, 8, 19, 229–230.) The warnings from Smith included an April 12, 2001 memo by Smith sent directly to Meurs stating that he wished to bring certain "matters to the board of Royal Ahold," including the fact that "[t]here is a tremendous amount of pressure to book allowances with no support to make the earnings targets." (See July 13, 2004 Entwistle Aff. Ex. 8. at 2.) Smith explained that "USF is to deliver $ 592 million in corporate allowance income for the year. As of April less than $ 50 million has been billed or collected while we have recognized $ 125 million in income." (Id.) Smith opined that he was facing "open resistance" to setting up a better promotional allowance tracking system and that "there is very limited acquisition integration even though acquisitions are a corner stone for growth." (Id.)

There were two follow-up memoranda regarding Smith's departure. The first

was a March 5, 2001 e-mail message from Paul Eckelschot to Meurs, in which Eckelschot relayed Smith's concerns and warned that if they were true, "the Board might be accused of mismanagement in handling the case," and that the Board needed to conduct a "detailed inquiry" headed by Deloitte & Touche rather than merely trusting Jim Miller "on the rightfulness of the PA accounting now and in the past." (*See* July 13, 2004 Entwistle Aff., Ex. 9). The second was a May 23, 2001 memo from Thijs Smit to Meurs reporting on Royal Ahold Internal Audit's follow-up investigation concerning Ernie Smith's departure and the promotional allowance problem at USF. While the memo did not confirm Smith's allegations, it did state that "the risk associated with the timeliness and accuracy of the promotional allowance numbers are above average" and that USF management would, "closely monitor the internal control improvement program and report progress to Ahold on a quarterly basis." (*See* July 13, 2004 Entwistle Aff., Ex. 6.) Though not all of these memos were specifically addressed to Van der Hoeven, some of them did go to the Royal Ahold Executive Board, and given Van der Hoeven's role as CEO of Royal Ahold, it is reasonable to infer that he was aware of the significance and magnitude of the problem at USF, particularly since beginning in 2001 USF was reporting on internal control issues to Royal Ahold on a quarterly basis. These red flags regarding USF provide a strong inference that by May 2001, Van der Hoeven and Meurs were at least reckless in reporting on USF's net income and growth, as well as touting its success at integrating acquisitions, without qualification, given their knowledge that the internal controls were not reliable and that integrations were not progressing smoothly.

Second, the complaint sufficiently alleges facts indicating that Meurs knew, or was reckless in not knowing, that Royal Ahold was improperly consolidating the financial results of joint ventures it did not control, specifically, ICA, DAIH, Bompreco, Paiz Ahold and JMR, and as a result, Royal Ahold was able to artificially inflate its financial statements. These improper consolidations and inflated financial statements were incorporated into SEC filings that portrayed a materially false picture of Royal Ahold's finances. The complaint alleges that on April 13, 2000, Deloitte & Touche sent a letter to Meurs and the Royal Ahold Executive Board expressing concern about consolidating the joint venture revenues unless Royal Ahold had sufficient proof of control. (¶ 337.) (*See* July 13, 2004 Entwistle Aff., Ex. 3.) Shortly thereafter, in May 2000, the complaint alleges Meurs drafted "two contemporaneous conflicting side letters," which were signed by Andreae and dated May 2, 2000 and May 5, 2000, respectively. (¶ 338.) The first "control letter," submitted to the Deloitte auditors stated that "although the ICA joint venture was a partnership, in the event of a dispute, Ahold's view would govern." (*Id.*) The second "side letter," which was concealed from the Deloitte auditors, "confirmed that ICA and Canica did not agree that Ahold had the right to impose its views in the event of a disagreement over the operations of the ICA joint venture... effectively neutralizing the initial side letter." (¶ 339.) Following the control letter drafted by Meurs and signed by Andreae, "Deloitte approved full consolidation of the financial results of the ICA joint venture with Ahold's financial results for fiscal 2000 and fiscal 2001." [28] (¶ 341.)

---

28. According to the complaint, "Ahold's improper consolidation of ICA, also artificially inflated Ahold's net income. Specifically, Ahold's net income was overstated by EUR 10

If the plaintiffs' allegations are true, then Meurs would have known by May 2000 that Royal Ahold's financial statements were materially overstated because they included improperly consolidated joint venture revenue.[29] As for Van der Hoeven's awareness of the side letter scheme, the complaint alleges that "as early as October 2002, the Company's Audit Committee became aware of a 'side letter' indicating that Ahold should not have been fully consolidating the financial results." (¶ 304.) The complaint also alleges that Van der Hoeven had the company's internal audit team report directly to him, rather than to the board (¶ 22), providing additional support to the inference that Van der Hoeven was aware of or was recklessly disregarding the significant audit problems with both USF and the joint venture consolidation.

A third factor that contributes to the inference of scienter stems from the positions held by Meurs, the Vice–President and CFO of Royal Ahold, and Van der Hoeven, the CEO of Royal Ahold, and the massive fraud that took place under their watch. While the size of the fraud and an individual's position, standing alone, are insufficient to create a strong inference of scienter, they are factors that may be considered in light of the totality of the circumstances. In *In re MicroStrategy Inc. Sec. Litig.*, 115 F.Supp.2d 620, 635–637 (E.D.Va.2000), the court noted that while the "misapplication of GAAP and the acknowledged need to restate MicroStrategy's financial" would be insufficient on its own, the magnitude, pervasiveness, and repetitiveness of the violations "serves to amplify the inference of scienter to be drawn." The court reasoned that "common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *Id.* at 636 (citations omitted). *See also In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010, 1030 (N.D.Ohio 2000) (stating "allegations of obvious 'red flags,' or warning signs that financial reports are misstated, can, where the misstatements are of a substantial magnitude, give rise to a strong inference of fraudulent intent"); *Rehm v. Eagle Fi-*

million in fiscal 2000 because restructuring costs associated with Ahold's acquisition of its 50 percent interest in ICA in April 2000 were improperly accrued rather than expensed in the periods in which they were incurred. As Ahold admits in its 2002 Form 20–F, and as explained in detail below, the failure to treat these costs in the periods in which they were incurred violated Dutch and U.S. GAAP because Ahold lacked control over ICA during fiscal 2000." (¶¶ 463, 485.)

29. Meurs argues that unlike the USF financial restatement, the joint venture deconsolidation had no impact on Royal Ahold's net income, earnings per share, or shareholder equity, and therefore the improper consolidation of the joint ventures could not have caused the plaintiffs' losses. (*See* Meurs' Mot. to Dismiss at 2.) This argument is unpersuasive. The complaint alleges that in part by consolidating the joint venture revenue, Royal Ahold was able to present a misleading portrait of the company's financial strength. This in turn contributed to favorable ratings from analysts and aided in the company's ability to access capital markets to fund its global acquisitions. (*See, e.g.,* ¶¶ 5, 532, 635, 703.) Moreover, it is undisputed that when Royal Ahold announced on February 24, 2003 that it was restating its financial statements due to both USF and the need to proportionally consolidate the joint ventures, the price of Royal Ahold common stock fell 63% and Royal Ahold ADRs lost 61% of their value. (¶¶ 183–184.) Following the announcement, Standard & Poor's rating agency cut the company's debt rating to junk status. (¶ 191.) Other analysts issued similar reports cutting their earnings forecast for Royal Ahold. (¶¶ 192–198.) One such report noted that there was "a total lack of visibility," and that the dramatic drop in share price "reflects investors' disappointment and their total loss of confidence in the stock." (¶ 194.)

*nance Corp.*, 954 F.Supp. 1246, 1256 (N.D.Ill.1997) (stating "[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy"); *In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192, 203 (E.D.N.Y.1997) (stating "the allegations of [the defendant's] ignorance of all of these red flags present evidence of its fraudulent intent"). In this case, the complaint portrays a fraud so massive and pervasive throughout Royal Ahold and USF that it strongly supports "an inference that fraud or recklessness was afoot" and this "serves to amplify the inference of scienter to be drawn." *In re MicroStrategy*, 115 F.Supp.2d at 636–37. Additional support for the inference of scienter are the comments of Royal Ahold's interim CFO Dudley Eustace, who stated "I find it inconceivable that such a fraud can remain undetected for so long. . . . [I]t does seem to me also quite extraordinary that a business can go on so long with the creation of fraudulent receivables and they are not picked up, either, by the way, by management or by the auditors." (¶ 271.) Eustace also explained that the fraudulent income reporting at USF "would have benefited quite a large number of people at the top of the company, including the whole management Board," because bonuses were tied to earnings targets and stock price performance. (¶¶ 269, 261.) Indeed, a year after Van der Hoeven and Meurs resigned on February 24, 2003, "in view of" the restatement and accounting inves-

tigations, they returned part of the bonuses they earned in 2000 and 2001.[30]

Accordingly, when all of the factors above are considered collectively, it is clear that the allegations set forth in the complaint create a strong inference that Van der Hoeven and Meurs knew their statements were misleading or, at the very least, were reckless in not knowing.

 The allegations in the complaint also are sufficient to state a claim under Rule 10b–5(a) and (c) based on Meurs's involvement in a fraudulent scheme to artificially inflate Royal Ahold's financial statements by improperly consolidating financial results from the joint ventures with ICA, DAIH, Bompreco, Paiz Ahold and JMR, which Royal Ahold did not control. As discussed above, Meurs allegedly drafted the control letter and rescinding side letter for ICA, and thereby played a significant role in enabling Royal Ahold to fraudulently inflate its revenues. Consequently, Meurs' motion to dismiss the Rule 10b–5(a) and (c) claims will be denied. The complaint does not, however, allege any facts specifically demonstrating Van der Hoeven's role in "any device, scheme or artifice to defraud," and therefore his motion to dismiss the Rule 10b–5(a) and (c) claims will be granted.

### 2. *Jan G. Andreae*

 The complaint alleges that Andreae, like many of the other individual defendants, signed materially false and misleading documents filed with the SEC. (¶¶ 104, 451, 636.) Only one of these documents, the May 18, 2001 Form 6–K, may be considered.[31] The complaint states this

---

**30.** Van der Hoeven and Meurs collectively earned bonus compensation of 9.4 million euros in 2001 and 7.6 million euros in 2000. (¶ 262.) The company's corporate governance officer had deemed these bonuses "unjustly received" because they were based on

Royal Ahold's overstated financial results for those years. (¶ 261.)

**31.** Royal Ahold's Form F–4 and S–4 filed August 17, 2001, a registration statement for "pass-through certificates," and Form S–8

document was materially misleading because it contained fiscal year 2000 financial results (which incorporated inflated USF income and joint venture revenues), and that the plaintiffs relied on these documents. (¶¶ 636, 812, 819.) Furthermore, the factual allegations described above concerning Andreae's participation in creating the control and side letters for ICA create a strong inference that Andreae knew or was reckless in not knowing that the SEC document he signed contained fraudulent financial data, which presented a materially misleading portrayal of Royal Ahold's financial results to investors. (¶ 485(e).) There is a strong inference that Andreae was aware of the fraud because the side letter to ICA, which was concealed from Deloitte, directly contradicted the control letter. (¶¶ 336–342, 463.) At the very least, even if Andreae did not know his side letter enabled fraudulent financial statements, including the SEC document he signed, he was reckless in not knowing because such a failure to know amounts to "an extreme departure from the standard of ordinary care." *Ottmann*, 353 F.3d at 343.[32] In addition to An-

dreae's participation in the control letter scheme, there are other factors that contribute to a strong inference of scienter, such as the massive size of the resulting restatement and Andreae's service on Royal Ahold's Executive Board, which would have exposed him to warnings regarding both the internal control problem at USF and Deloitte's concerns regarding consolidation of the joint ventures.[33] Therefore, Andreae's motion to dismiss the § 10(b) and Rule 10b–5(a), (b), and (c) claims will be denied.

### 3. Mark Kaiser and Timothy J. Lee

 The complaint repeatedly alleges Kaiser's direct and substantial involvement in the fraud at USF, stating that he deliberately inflated rebate totals and created two sets of books, telling suppliers they did not need to pay as much in rebates as they had previously agreed to pay. (¶¶ 91, 212, 237–42). Officials at USF's suppliers Sara Lee and ConAgra colluded with USF officials to supply false confirmations of the vendor rebate amounts in order to perpetuate the scheme. (¶¶ 232–234.)

filed October 1, 2001, a registration statement for USF's 401(k) plan (¶¶ 104, 636), documents which were also signed by Van der Hoeven and Meurs, will not be considered because the plaintiffs have not alleged they relied on these filings when purchasing Royal Ahold common shares and ADRs.

32. In his Motion to Dismiss and Reply to Response to the Motion to Dismiss, Andreae disputed some of the facts alleged in the plaintiffs' complaint and offered alternative explanations in an effort to negate the inference of scienter. While important to the case, resolution of this factual dispute is inappropriate when ruling on a motion to dismiss, because the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir.1997). The court can,

however, consider the alternatives proposed by the defendant in evaluating whether the plaintiffs' allegations create a strong inference of scienter.

33. In addition to the SEC documents signed by Andreae, Rule 10b–5(b) liability might also attach based on the control and side letters he signed for ICA. The complaint alleges with sufficient particularity the ways in which the control letters were false and misleading, and primary liability under 10b–5(b) might be appropriate because Andreae knew that the letters would enable Royal Ahold to inflate the financial results communicated to investors. At this point, I will not decide whether the side letters signed by Andreae constitute actionable statements under Rule 10b–5(b) because Andreae can still be held liable for the SEC document he signed and the side letters are sufficient to trigger liability as a fraudulent scheme under Rule 10b–5(a) and (c).

There is no question the complaint sufficiently alleges Kaiser's awareness of the fraud at USF; the real question concerning Kaiser is whether he made any false or misleading statements that were relied on by investors.

Unlike many of the other individual defendants, Kaiser, a marketing manager for USF, did not serve Royal Ahold in an executive capacity and was not responsible for any of Royal Ahold's or USF's press releases.[34] Kaiser, however, still may be held primarily liable for false statements communicated to others with the knowledge that those statements would ultimately reach and be relied on by investors. Primary liability under § 10(b) will attach if an individual makes "a false and misleading statement (or omission) that [he] know[s] or should know will reach potential investors," even if the statement reaches investors indirectly. *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997) (citing *Anixter*, 77 F.3d at 1226).

The totality of the allegations in the complaint create a strong inference that Kaiser was the original source of information he knew would be communicated to and relied upon by investors and that he knew this information was materially false. Further, even if Kaiser did not make any actionable statements under Rule 10b–5(b), he would still be subject to the Rule 10b–5(a) and (c) claims against him be-

cause the plaintiffs have alleged with particularity Kaiser's role in the fraudulent scheme to inflate the rebate totals, which led to fictitious financial statements and a falsely inflated stock price.[35]

Similarly, the complaint alleges that Timothy Lee, a USF purchasing executive, worked closely with Kaiser to create false promotional allowance figures and to inflate USF's earnings. (¶¶ 237–242.) Lee did not submit a brief in support of his motion to dismiss the § 10(b) and Rule 10b–5 claims, electing instead to rely on the arguments set forth by his co-defendants. Consistent with my ruling concerning Kaiser, Lee may be primarily liable under § 10(b) if he created false or misleading information knowing it would be communicated to and relied upon by investors, and he may be subject to liability under Rule 10b–5(a) and (c) for his role in the scheme to artificially inflate USF's earnings. Accordingly, his motion to dismiss the § 10(b) and Rule 10b–5 claims will be denied.

### 4. *James L. Miller*

■■■ The plaintiffs fail to state a § 10(b) or Rule 10b–5(b) claim against Miller because they do not allege any false or misleading statements or omissions of material fact attributable to Miller. The plaintiffs have, however, stated a Rule 10b–5(a) and (c) claim against Miller be-

---

**34.** It should be noted that the complaint does in fact allege that Kaiser signed 16 SEC documents. (¶ 92.) Each of these documents, however, were USF filings which pre-date Royal Ahold's acquisition of the company, and therefore cannot be considered. *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir.2004).

**35.** In his Motion to Dismiss, Kaiser relies on Deloitte Netherlands' argument that the plaintiffs have failed to allege that the defendants' misrepresentations were the proximate

cause of the plaintiffs' loss. *See also supra* note 29. The complaint alleges that the defendants' misleading statements, upon which the plaintiffs relied directly and indirectly, caused the plaintiffs to purchase Royal Ahold stock at artificially inflated prices and suffer damages thereby. (*See, e.g.*, ¶¶ 70, 811.) Such allegations are sufficient at this stage. *See In re MicroStrategy*, 115 F.Supp.2d at 658 ("the relevant inquiry is whether the misstatement, in some reasonably direct way, 'touches upon' the reason for the investment's decline in value.") (*citations omitted*).

cause they have adequately alleged facts supporting a strong inference that Miller engaged in manipulative or deceptive conduct, with knowledge, or at least with reckless disregard for, its deceptive nature.

The plaintiffs charge Miller with signing numerous materially false and misleading SEC documents and issuing materially false and misleading statements regarding USF and Royal Ahold's performance. The majority of the SEC documents relied on by plaintiffs, however, cannot be considered, either because they are barred by the statute of limitations or because they pre-date Royal Ahold's acquisition of USF in April 2000. *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir.2004) (stockholders do not have standing to sue under § 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively affected by the material misstatement of another company, whose stock they did not purchase). The only remaining SEC document signed by Miller is the October 1, 2001 Form S–8, a registration statement for USF's 401(k) plan, which plaintiffs allege contained false and misleading financial results for Royal Ahold's fiscal years 2000 and 2001. (¶ 636.) According to Miller, however, this document only pertains to USF's 401(k) plan. Plaintiffs have not alleged they are shareholders or participants in USF's 401(k) plan or that they relied on this document when they purchased Royal Ahold securities, and therefore it will not be considered.

The remaining eight statements by Miller are taken from press releases or conference calls with analysts.[36] The plaintiffs contend that Miller repeatedly misrepresented current or past facts about the success of USF's and Royal Ahold's acquisitions and misled investors about USF's and Royal Ahold's financial condition. The statements, however, are most accurately described as puffery and/or forward looking, and therefore they are not actionable. For example, in a March 2000 press release announcing Royal Ahold's acquisition of USF, Miller stated "[t]earning up with Ahold is a magnificent step forward for U.S. Foodservice. The new economies of scale now available, the financial means and the sharing of know-how and experience will greatly help U.S. Foodservice..." (¶ 461). Morgan Stanley Dean Witter reported that "Jim Miller, head of USF indicated on the company sponsored conference call that USF was close to making an acquisition."(¶ 532). Miller stated in a March 2, 2001 press release "[w]e look forward to welcoming Mutual into the U.S. Foodservice family..." (¶ 547.) In the second September 4, 2001 press release, Miller stated "[t]he planned acquisition of Alliant goes hand-in-glove with our growth strategy...we should become a key a player in 15 new states...Alliant's business-to-business e-commerce platform complements other ongoing initiatives within U.S. Foodservice."(¶ 591.) During the Third Quarter 2002 analyst presentation, Miller stated "as we're getting the Alliant sales force integrated and trained, I think you will see us coming into '03 and you'll see a gradual improvement with the entire business..."(¶ 699.) Such "soft" projections are not material; more-

---

**36.** Two of the alleged "statements" are actually excerpts from analyst reports paraphrasing what Miller said during conference calls. (*See* ¶¶ 532, 635.) Under Fourth Circuit standards, it is doubtful that Miller could be held liable for these "statements" by third parties even if they were materially misleading. *See Raab*, 4 F.3d at 288; *Hillson*, 42 F.3d at 216 n. 10.

over, the complaint does not allege how the above statements are misleading.

The other statements relate to USF and Royal Ahold's operations and projected sales growth strategy. Morgan Stanley Dean Witter reported that "Jim Miller, CEO of USF...Gave An Upbeat Presentation on Ahold's Foodservice Outlook on October 23, 2001...indicating a 10% minimum annual sales growth...[based on Ahold's goal] to increase higher margin street account sales." (¶ 635.) In the Third Quarter 2002 Analyst Presentation, Miller talked about narrowing the gap between USF and its competitor Sysco, stating "...I think probably next year, as we put our IT systems together, we'll have one platform across the United States. And at that point in time the metrics will match up almost identical." (¶ 697.) In the same presentation, in response to an analyst question about whether to expect more sales declines because of the restructuring and integration of Alliant, Miller stated that looking back, "[w]e probably lost $200m just because of some things that we didn't do properly..." but that "..I think as we end up this year you're going to see that our business is stabilized....we're getting back to selling again, we're getting back to marketing...you're going to see organic sales totally grow...in the next two to three weeks our marketing department is going to announce several very major contracts..." (¶ 698). The plaintiffs argue in their opposition brief that these statements misled investors because Miller failed to reveal that USF was having problems with its internal controls. (*See* Pls.' Mem. in Opp'n to the Domestic Defs.' Motions to Dismiss at 23–24.) The comments made by Miller, however, are primarily forward-looking statements about USF's operations and projected sales numbers, and therefore are not actionable. Plaintiffs attempt to rely on statements made by Van der Hoeven and Meurs, who often participated in the same conference calls as Miller, regarding Royal Ahold's and USF's financial results, and attribute these to Miller. This pleading approach fails to satisfy the requirements of the PSLRA and Rule 9(b). Likewise, while Miller's response to the question about the integration of Alliant partially refers to past facts, the plaintiffs have failed to allege with particularity how this statement was false or misleading.

Although plaintiffs fail to allege any false or misleading statements by Miller, they have stated a claim for violations of Rule 10b–5(a) and (c) by alleging that Miller recklessly inflated USF's earnings by manipulating the promotional allowance income. As described above, USF was able to manipulate its earnings to meet its targets by booking promotional allowance income before it had been earned, by inflating the promotional allowance amounts, and by interfering with the confirmation process in order to sustain the scheme. Investigations revealed that Kaiser, described by the plaintiffs as Miller's "right-hand man," falsified many of the promotional allowance records. (¶¶ 88–91.) Kaiser worked with Miller as a senior executive in sales and procurement since at least 1989, when Miller founded USF. (¶ 88.) The close and long-standing relationship between Kaiser and Miller, and the fact that Royal Ahold has determined that USF overstated its pre-acquisition revenues by more than $97 million (¶ 17), support the plaintiffs' allegation that Miller "substantially participated in the preparation of Ahold's false financial results...in providing USF's financial results to Ahold." (¶ 87.) *See e.g., In re MicroStrategy,* 115 F.Supp.2d at 636 (holding that the magnitude, pervasiveness, and repetitiveness of the accounting

irregularities served to amplify the inference of scienter.)

The plaintiffs provide other facts supporting their allegation that Miller was a "direct and substantial participant" in the fraud. (¶ 83.) The plaintiffs quote David F. McAnally, a former CFO of a company that merged with USF in 1997, who claimed that USF was using a "smoke and mirrors approach" to booking promotional allowance income since at least 1997, and perhaps since the company was founded in 1989. (¶ 231.) According to McAnally, "Jim Miller's approach was to book [the promotional allowance income] based on a history of being able to push those volumes through the distribution cycle" and that this approach "overstat[ed] their values by an awful lot of money."[37] (Id.) If these allegations are true, then Miller may be liable for his role in setting up a scheme "to artificially inflate the price of stocks by creating phantom revenue," and thereby running afoul of § 10(b) and Rule 10b–5(a) and (c)'s broad purpose to "prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded." In re Global Crossing, 322 F.Supp.2d at 337 (citations and quotations omitted) (holding that the accounting firm which created misleading accounting practices used to inflate the company's financial statements could be liable

under Rule 10b–5(a) and (c) even for years in which the firm did not issue audit opinions).[38]

The plaintiffs also focus on statements from Royal Ahold that indicate Miller played a role in and/or recklessly disregarded the promotional allowances scheme. On May 13, 2003 the company announced Miller's resignation, stating that the decision had been made "in light of the results of the forensic accounting work ... which had identified total overstatements of pre-tax earnings of approximately USD 880 million." (¶ 244.) When asked later that day how the company had failed to detect the earnings overstatements throughout the three-year period, de Ruiter responded: "The explanation lies in the word 'fraud.'" (¶ 246.) Indeed, Royal Ahold's Statement of Defense filed with the Enterprise Chamber of the Amsterdam Court of Appeals states that in response to the accounting fraud disclosure, the company had taken several measures, including the resignation of Jim Miller, and the institution of a lawsuit against Miller to recover damages in connection with the fraud committed. (See July 13, 2004 Entwistle Aff., Ex. 1 at 64.)

Finally, Miller's position as founding CEO of USF, and the fact that he reaped unusual financial awards as a result of the earnings overstatements, contribute to the strong inference that Miller participated in with knowledge of, or at least reckless

---

37. McAnally resigned after his company rejected his concerns and went through with the merger with USF.

38. In addition, the complaint alleges that Miller knew of Ernie Smith's concerns regarding USF's accounting practices. (See, e.g., ¶ 19.) These allegations are supported by the memorandum sent by Smith to Meurs, in which Smith explained that he was resigning because it was apparent that the USF management "was not as eager to have the financial

records of the company at an acceptable Ahold level and that the team lacks integrity." (See July 13, 2004 Entwistle Aff., Ex. 8.). Similarly, the memorandum from Eckelshot to Meurs stated that Smith was not comfortable with the promotional allowance accounting in part "because he did not get the right information about it from Jim Miller and Mark Kaiser (he stated that Mark lied about it to him)." (See July 13, 2004 Entwistle Aff., Ex. 9.)

disregard for, the deceptive nature of the promotional allowance income manipulation at USF. During a May 8, 2003 conference call with analysts, Royal Ahold's interim CFO Dudley Eustace explained that Kaiser and Lee were most likely motivated to commit the fraud out of "loyalty to the company and their boss with respect to meeting targets and . . . to the extent that targets were met bonuses were paid." (¶ 269.) In their complaint, the plaintiffs have described misleading bookkeeping practices that were allegedly set up by Miller, and fraudulent vendor rebate confirmations that were recklessly disregarded or encouraged by Miller. Miller also gained financially when USF met its earnings targets. According to plaintiffs, USF's bonus structure provided that when earnings targets were met, certain employees would receive bonuses of 33% or 50% of their salary. (¶ 783.) In 2002 for example, Miller allegedly earned a 1.516 million euro bonus. (¶ 82.) As Eustace explained, as a result of the earnings manipulation at USF, "[b]onuses were paid that would not have been under normal circumstances." (¶ 221.)

In his motion to dismiss and in his reply brief, Miller does not specifically challenge the plaintiffs' Rule 10b–5(a) and (c) claims. Instead, Miller argues that all of the plaintiffs' § 10(b) and Rule 10b–5 allegations fail to create a strong inference that he acted with scienter. In particular, Miller argues that the fact he alerted Royal Ahold executives at the time of the company's acquisition of USF that his controls for promotional allowance income were not good negates the inference of scienter. This argument is not persuasive when con-

sidered with the other facts alleged by plaintiffs demonstrating that Miller knew about or perhaps put in place the improper bookkeeping methods as early as 1989, and at least by 1997, well before the 2000 acquisition by Royal Ahold. The facts outlined above, including the allegations concerning Miller's role as CEO and his generous bonus compensation, considered together, support a strong inference that Miller participated in the deceptive and manipulative promotional allowance accounting scheme at USF with knowledge or at least reckless disregard. Accordingly, plaintiffs have stated a claim against Miller for violation Rule 10b–5(a) and (c).

### 5. *Michael Resnick*

The plaintiffs do not allege that Resnick signed any documents filed with the SEC or made any public statements which were materially false or misleading. Instead, plaintiffs attempt to state a a a § 10(b) and Rule 10b–5 claim against Resnick by alleging that "[a]s CFO of USF, he knowingly or recklessly participated in the preparation of USF's and Ahold's false financials which he unquestionably knew would be disseminated to the investing public." (Pls.' Mem. in Opp'n to Domestic Defs.' Motions to Dismiss at 37) (citing ¶¶ 8, 785, 802, 808). The complaint, however, does not allege any facts that would raise a strong inference that Resnick knew or recklessly disregarded the fact that the promotional allowance numbers were false, or that he knowingly or recklessly approved the false financial data for inclusion in USF and Royal Ahold financial reports.[39] The plaintiffs instead rely on group pleading and conclusory allegations

---

**39.** The court is aware that after the amended complaint was filed, Resnick was indicted by the U.S. Attorney in the Southern District of New York on several counts of conspiracy to commit securities fraud, to falsify financial records, and to make false filings with the

SEC. The plaintiffs' complaint, however, does not provide any specific factual allegations to support a strong inference that Resnick played a role in the fraud or knowingly or recklessly approved the false financial results.

to assert that because Resnick was the Chief Financial Officer of USF, and he reviewed and approved USF's financial reporting, he must have been involved with the fraud. (¶¶ 92, 785.) This does not meet the heightened pleading requirements of the PSLRA and Rule 9(b) and therefore the claims against Resnick will be dismissed.

### 6. *Robert G. Tobin*

 Viewing the allegations against Tobin in their totality demonstrates that the plaintiffs have failed to plead facts sufficient to create a strong inference of scienter and, as a result, the § 10(b) and Rule 10b–5 claims against Tobin must be dismissed. While the complaint alleges multiple false and misleading statements by Tobin, most of these are best characterized as immaterial and forward looking.[40] Tobin signed only one SEC document that may validly be considered, the December 29, 2000 Registration Statement (Form F–3 and S–3), which plaintiffs allege contained false and misleading financial results for fiscal year 2000. (¶ 534.) The issue thus becomes whether there is a strong inference that Tobin acted with the requisite scienter when he signed the allegedly false and misleading registration statement on December 29, 2000.

The plaintiffs argue that, as President and CEO of Ahold USA, Tobin must have known of the fraud and lack of internal controls at USF due to the pervasiveness, magnitude, duration, and scope of the scheme, especially since Miller, the president and CEO of USF, reported directly to Tobin. In addition, there were two red flags the plaintiffs believe should have alerted Tobin, as a member of Royal Ahold's Executive Board, to the control problems and fraud at USF. First, Miller notified Royal Ahold "at the time of the acquisition on April 1, 2000, that USF had 'poor systems' and that the USF 'systems controlling my PA is not good and needed attention.'" (¶¶ 17, 272, 274.) Second, on July 24, 2000, Deloitte & Touche sent a memo to the Royal Ahold Executive Board notifying the board that USF had weak internal controls following the recent acquisition and merger. (*See* July 13, 2004 Entwistle Aff., Ex. 5.) While the memo from Deloitte on July 24, 2000, like the notification from Miller, warned Royal Ahold's Executive Board that USF had weak internal controls, it also discussed the ways in which those problems were being addressed. Rather than creating a strong inference that Tobin was aware of fraud at USF, the memo leads to an inference that Tobin was aware there was a potential for fraud, but also that action was being taken to remedy the problem. These two red flags, standing alone, do not support a strong inference that by December 29, 2000, Tobin acted with fraudulent intent or recklessness when he signed the registration statement.

### 7. *William J. Grize*

With respect to Grize, the complaint fails to allege misleading statements with

---

**40.** For example, Tobin's statement that "[w]e anticipate total synergy savings of over USD 30 million in year one, growing to over USD 60 million in year two" (¶ 502), is a projection of future performance not worded as a guarantee. Similarly, his statement "[f]or Ahold, the planned acquisition of U.S. Foodservice is a major strategic leap forward" (¶ 461), is immaterial puffery. The only statement by Tobin that might arguably be considered actionable is his August 16, 2000 claim that "[w]e are very pleased with operations at U.S. Foodservice," (¶ 502), because it might amount to a material omission. Assuming it could be considered material, the facts alleged do not establish Tobin's scienter at the time of the statement. Additionally, the plaintiffs do not allege Tobin's participation in a fraudulent scheme or device with sufficient particularity in order to state a Rule 10b–5(a) or (c) claim.

particularity and to state facts creating a strong inference of scienter. Other than his positions as President and CEO of Ahold USA and an Executive Board member of Royal Ahold, which began in September 2001, and the fact that he signed some SEC filings, very little is alleged. Consequently, Grize's motion to dismiss the § 10(b) and Rule 10b–5 claims against him will be granted.

### 8. The Deloitte Defendants

The plaintiffs allege that Deloitte & Touche LLP ("Deloitte U.S.") and Deloitte & Touche Accountants ("Deloitte Netherlands") violated § 10(b) and Rule 10b–5(a), (b) and (c) when they certified Royal Ahold's financial results without qualification for the company's statements and annual reports from 1999 through 2001. The plaintiffs allege that the Deloitte defendants knew or recklessly disregarded the fact that Royal Ahold's financial results were materially overstated and in violation of Dutch and U.S. GAAP due to the improper consolidation of joint venture revenue and inflated promotional allowances. Therefore, the plaintiffs argue, the De-

loitte defendants should be held liable for all misstatements of Royal Ahold's financial results as well as false assertions that the financial statements conformed with Dutch and U.S. GAAP and GAAS.[41] (¶¶ 740–744.) The plaintiffs' allegations, however, fail to support a strong inference that Deloitte U.S. and Deloitte Netherlands acted with scienter; accordingly, the § 10(b) and Rule 10b–5 claims asserted against them will be dismissed.

 As outlined above, the § 10(b) and Rule 10(b)–5 claims against the Deloitte defendants must meet the pleading requirements of the PSLRA. Plaintiffs attempt to satisfy the scienter requirement for the Deloitte defendants by alleging that the auditors acted recklessly in certifying Royal Ahold's financial results. In order for recklessness to provide a strong inference of scienter as defined by the PSLRA, plaintiffs must allege facts demonstrating that "the accounting practices were so deficient that the audit amounted to no audit at all or that ... no reasonable accountant would have made the same decisions if confronted with the same facts."

**41.** Despite plaintiffs' arguments to the contrary, Deloitte U.S. and Deloitte Netherlands are legally distinct, autonomous firms and will be treated as such. The plaintiffs assert that Deloitte U.S. and Deloitte Netherlands should be viewed as one entity because the firms "operated as a single auditing firm in auditing Ahold's annual financial statements" and therefore both entities should be held fully liable for financial misstatements stemming from Royal Ahold's U.S. operations as well as its international joint ventures. (¶ 753.) In support of this view, the plaintiffs point out that Deloitte U.S. auditors were responsible for auditing USF and other Royal Ahold subsidiaries in the U.S. and that these results were then forwarded to Deloitte Netherlands for incorporation in the Ahold annual reports. (¶ 753.) The plaintiffs also cite the fact that Deloitte U.S. served as a "file reviewer" for Deloitte Netherlands to make sure that audited financial statements conformed with

U.S. GAAP before they were incorporated in SEC filings. (¶ 751.) These facts show at most that the two firms "acted as a source of information" for one another and coordinated efforts; they do not support a finding that the two firms operated as one entity. See In re AM International, Inc. Sec. Litig., 606 F.Supp. 600, 607 (S.D.N.Y.1985). Plaintiffs' emphasis on the facts that the two firms shared a brand name and the corporate website described a "global" firm are similarly unavailing. It is well recognized that "[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name." Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, No. 03 Civ. 0613 GBD, 2004 WL 112948, *3 (S.D.N.Y. Jan.22, 2004) (citing In re Lernout & Hauspie Sec. Litig., 230 F.Supp.2d 152, 170 (D.Mass.2002)).

*Zucker v. Sasaki,* 963 F.Supp. 301, 307 (S.D.N.Y.1997) (internal quotations and citations omitted). The "mere misapplication of accounting principles [such as GAAP and GAAS [42]] by an independent auditor does not establish scienter." *Id.*[43] The plaintiffs must instead allege facts demonstrating that "the *nature* of those violations was such that scienter is properly inferred." *In re MicroStrategy,* 115 F.Supp.2d at 651. Violations that would contribute to a finding of scienter may include the auditor's reckless disregard of "red flags," or known risk factors that the auditor should have heeded and in response modified its audit process or opinion. *See, e.g., In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* Nos. 1500, 02 Civ. 5575, 2004 WL 992991, *34, n. 51 (S.D.N.Y.2004).

■ The plaintiffs allege that the Deloitte defendants violated the professional standards proscribed by GAAP and GAAS and recklessly disregarded numerous red flags concerning both the promotional allowances fraud and the improper joint venture consolidation. First, the plaintiffs allege that the Deloitte defendants knew about the lack of internal controls at USF as early as 2000 yet failed to subsequently modify their audit plans or qualify their opinions. In support of this allegation, the plaintiffs point out that on September 4, 2000, Royal Ahold's Audit Committee discussed the need to tighten internal controls related to promotional allowances at USF. (¶ 763.) Plaintiffs allege that the Deloitte defendants participated in the Audit Committee meetings and reviewed the Committee's minutes as part of their audit planning process. (*Id.*) The plaintiffs also rely on the July 24, 2000 letter from Deloitte Netherlands to the Royal Ahold Executive Board in which Deloitte reported an $11 million accounting fraud at USF's Buffalo division and a necessary $90 million restatement of vendor income by USF in its April 1, 2000 financial report. (July 13, 2004 Entwistle Aff., Ex. 5).[44] Notably,

---

**42.** "GAAS" refers to the Generally Accepted Accounting Standards which govern the conduct of external audits by public accountants.

**43.** The plaintiffs' contention that this represents "an elevated legal standard for pleading scienter against accountants that is not the standard under the PSLRA" is misplaced. (*See* Pls.' Mem. in Opp'n to the Motions of the Deloitte Defendants at 6.) Courts consistently construe the PSLRA to require such specificity in order to establish scienter on the part of independent auditors. For example, the very case plaintiffs rely on as authority that the "PSLRA's pleading requirements do not distinguish between corporate defendants and accountants," went on to apply the *Zucker* standard from the Southern District of New York. *See In re MicroStrategy,* 115 F.Supp.2d at 650.

**44.** The July 24, 2000 letter is not mentioned anywhere in the plaintiffs' complaint. The Deloitte defendants argue that it should not be considered by the court because it represents a new allegation not raised in the complaint. *Hayes v. Whitman,* 264 F.3d 1017, 1025 (10th Cir.2001)("While it might be appropriate for a court to consider additional facts or legal theories asserted in a response brief to a motion to dismiss if they were consistent with the facts and theories advanced in the complaint, a court may not consider allegations or theories that are inconsistent with those pleaded in the complaint.") (citations omitted); *Zachair, Ltd. v. Driggs,* 965 F.Supp. 741, 748, n. 4 (D.Md. 1997) ("...[the plaintiff] is bound by allegations in the complaint and cannot, through the use of motion briefs, amend the complaint"). While it is true that the plaintiffs do not explicitly cite the July 24, 2000 letter in their complaint, they do speak generally about Deloitte's "due diligence" work in relation to Royal Ahold's USF acquisition as a basis for Deloitte's early awareness of accounting problems with USF. (¶¶ 9, 17.) Further, the Deloitte defendants do not dispute the authenticity of the July 24, 2000 letter. It is more practical to consider the letter for purposes of these motions than to require an amendment to the complaint. Consistent

both problems relate back to accounting practices prior to Royal Ahold's acquisition of USF, at which time Deloitte U.S. was not USF's auditor. The letter itself does not demonstrate that either Deloitte defendant disregarded the "red flag" of prior accounting problems at some USF divisions. Rather, the letter shows that Deloitte U.S. conducted a forensic audit of the Buffalo scheme, that the culpable individuals behind the fraud were fired, and that because of Deloitte's concern about the weak internal controls at USF, Deloitte implemented additional oversight and confirmation procedures. In fact, the $90 million negative adjustment to USF's income statement (which again, related to practices prior to Royal Ahold's acquisition of USF and prior to Deloitte's role as accountant for the company) came about as a result of Deloitte's recommendation that USF abandon its historically "very aggressive income recognition" policy in favor of a more conservative approach. Thus, the Deloitte defendants' "awareness" of prior problems at USF can hardly be viewed as making them complicit in the subsequent fraudulent accounting problems given that Deloitte was actively raising the issue of weak internal controls with

Royal Ahold's management and implementing additional confirmation procedures to address the promotional allowance audit risk.

The plaintiffs also allege that USF CFO Ernie Smith "alerted" Deloitte about the vendor rebate fraud at USF in 2001 and that Deloitte "ignored" his warning (¶¶ 4, 19), yet this allegation is not supported by the record.[45] In their opposition to the Deloitte defendants' motions to dismiss, the plaintiffs rely on four documents that were not originally referenced in their complaint: (1) an April 12, 2001 memorandum from Ernie Smith to Meurs (July 13, 2004 Entwistle Aff., Ex. 8); (2) a May 23, 2001 memorandum from Royal Ahold's Thijs Smit to Meurs reporting on an internal investigation of Ernie Smith's departure, internal controls, and promotional allowances issues at USF (July 13, 2004 Entwistle Aff., Ex. 6); (3) a February 26, 2003 e-mail message from Ernie Smith's former assistant Joyce Horney to de Ruiter (July 13, 2004 Entwistle Aff., Ex. 7); and (4) a March 5, 2001 e-mail message from Paul Ekelschot to Meurs regarding Ernie Smith's departure (July 13, 2004 Entwistle Aff., Ex. 9).[46] There is no evi-

---

with the other allegations in the plaintiffs' complaint, the July 24, 2000 letter demonstrates that the Deloitte defendants were aware of weak internal controls at USF and that it adjusted its audit plans and procedures as a result. Likewise consistent with the complaint, however, the letter does not establish that the Deloitte Defendants were recklessly disregarding audit risks or actively participating in the vendor rebate fraud.

**45.** Deloitte U.S. filed a Rule 11 motion to strike this allegation and other allegations that James Copeland "supervised and coordinated all of Deloitte's work" for Royal Ahold. The court reserved judgment on Deloitte U.S.'s motion to strike until review of this motion to dismiss. The plaintiffs offer no evidence to refute Copeland's affidavit which declares that he served only in an advisory

capacity for Royal Ahold and other large clients and that he did not "coordinate and supervise the work on the Ahold audits." (See Deloitte U.S. Motion to Strike, Ex. 1.) The court agrees with the defendants that the plaintiffs' allegations pertaining to Smith and Copeland lack sufficient evidentiary support, and therefore they will be stricken and dismissed along with the rest of the § 10(b) and Rule 10b–5 claims against the Deloitte defendants. Rule 11 sanctions, however, are not warranted.

**46.** For the reasons discussed *supra* in note 44, the court will consider these documents because they relate to and are not inconsistent with the allegations in the complaint. As with the July 24, 2000 letter, however, the e-mail messages and memoranda do not alter the outcome of the scienter analysis.

dence that either of the Deloitte defendants ever received any of these communications. Even if they did, none of these documents supports the plaintiffs' allegation that Ernie Smith told Deloitte about vendor rebate fraud at USF and that Deloitte subsequently ignored his warning. The Ernie Smith memorandum to Meurs primarily concerns past and present internal control problems and improper promotional allowance income recognition, as well as financial adjustments made as a result of USF's practices prior to Royal Ahold's acquisition of the company. Nowhere does Smith mention Deloitte & Touche or suggest they were aware of any deliberate wrongdoing. When Smith discusses the financial adjustments made to remedy past accounting errors, he explicitly refers to the liability of "previous auditors of USF." Similarly, the internal memorandum from Smit to Meurs discusses Ernie Smith's departure, and the company's concern over inadequate controls at USF. The only mention of Deloitte & Touche is that the U.S. auditors agreed that the "allowance tracking mechanisms within [USF] are not adequate" and that in an effort to verify the promotional allowances, "Deloitte & Touche confirmed, without exception, approximately 56% of the April 2000 and 52% of the December 2000 total promotional allowance balance through confirmations and subsequent cash receipts." (July 13, 2004 Entwistle Aff., Ex. 6.) Both the February 26, 2003 e-mail message from Joyce Homey, Smith's former assistant, to de Ruiter and the March 5, 2001 Ekelschot e-mail message to Meurs recounted Smith's concerns about accounting practices related to promotional allowances, but neither message mentioned whether Smith had alerted Deloitte & Touche about his concerns. In short, nothing that plaintiffs point to supports their claim that the Deloitte defendants

knew about or recklessly disregarded any "red flag" raised by Smith.

The plaintiffs allege numerous other "red flag" warnings which they contend the Deloitte defendants recklessly disregarded. First, the plaintiffs allege that the high management turnover at USF from 1997 to 2001 must have alerted the Deloitte defendants that there was a higher than normal risk for accounting improprieties. (¶ 783.) The complaint, however, does not plead particular facts to explain why the Deloitte Defendants should have concluded the high turnover was the result of fraud rather than another reason. Further, the plaintiffs allege that the Deloitte defendants ignored the increased risk that management would misstate Royal Ahold's financial results because their bonus and compensation structure was linked to earnings results and because Royal Ahold was relying on an inflated stock price to fund its acquisitions. (*Id.*) It is not uncommon, however, for large, publicly held companies to tie compensation to earnings results or to have aggressive growth strategies, and plaintiffs do not allege that these circumstances provided a motive for the Deloitte defendants to participate in the alleged fraud. *See In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1334 (M.D.Fla. 2002) (rejecting plaintiffs' contention that a company's "aggressive growth strategy" was a sufficient "red flag" and noting that there was "no assertion that [the auditor] itself had a motive to participate in the alleged fraud").

The plaintiffs allege that the Deloitte defendants violated Dutch and U.S. GAAS provisions by failing to appropriately plan and modify audits given their awareness of internal control weaknesses at USF. (¶¶ 756–765.) They contend this alleged oversight was particularly egregious because Deloitte & Touche, as the "dominant accounting firm in the grocery and food-

service industries," had already encountered vendor rebate problems with several other foodservice clients and therefore knew that vendor rebates were a significant audit risk issue. (¶¶ 766, 9.) According to plaintiffs, the Deloitte defendants failed to approach the USF audit with the appropriate degree of "skepticism" and obtain sufficient evidentiary material to confirm management's representations as is required by the GAAS when an auditor knows that its client has weak or unreliable internal controls. (¶¶ 758, 769.) These allegations, however, are contradicted by other allegations in the plaintiffs' complaint, which demonstrate that the Deloitte defendants had in fact encouraged Royal Ahold management to improve USF's internal controls and had implemented additional procedures to confirm the vendor rebate amounts. The plaintiffs repeatedly quote from the May 8, 2003 conference call in which Royal Ahold's interim CFO Dudley Eustace told the press that Deloitte flagged the inadequate internal control problem "in every report." (¶¶ 485, 513, 535, 570, 594, 637, 664, 684, 705, 757.) As plaintiffs themselves acknowledge in their complaint, "Deloitte was required to communicate internal control failures noted during the audits to Ahold's Audit Committee since it is a 'reportable condition' under Dutch GAAS and U.S. GAAS (AU §§ 325 and 380.01 and NAS § 400(49))." (¶ 757.) The plaintiffs also allege that Deloitte U.S. sent letters to USF suppliers requesting confirmation of rebate amounts payable or owed to USF. (¶¶ 770–771.) These allegations do not support a strong inference that Deloitte was recklessly disregarding the problem of weak internal controls at USF, rather they demonstrate that the Deloitte Defendants were acting in accordance with applicable professional standards which advised that when an auditor is faced with auditing a client with weak controls and high risk, the auditor

"should consider confirming the terms of the transaction with the other parties in addition to examining documentation held by the entity...." (*See* Deloitte U.S. Mot. to Dismiss at 17) (citing Codification of Accounting Standards and Procedures, Statement on Auditing Standards No. 1, § 330.08 (American Inst. of Certified Pub. Accountants 1972)). Indeed, the plaintiffs' complaint acknowledges that it was Deloitte U.S.'s confirmation process that first uncovered the vendor rebate fraud in February 2003. (*See* ¶ 204: "In conjunction with the fiscal 2002 audit of USF, [Royal Ahold's] auditors, D & T, discovered in February 2003 through its confirmation process that certain accrued vendor allowance receivable balances purportedly due from vendors were overstated.") (quoting from the 2002 Form 20–F).

The plaintiffs contend, however, that Deloitte U.S.'s audit confirmation process was deficient because they "knowingly and wrongfully sent these Audit Confirmation Letters to sales executives at the vendors," individuals who had a motive to misrepresent the vendor rebate amounts, rather than to accounting department personnel. (¶ 770.) In support of this allegation, the plaintiffs rely on a section within AU § 330, the GAAS provision which covers audit confirmation procedures. Yet as Deloitte U.S. point outs, this provision directs auditors to send confirmation requests "to a third party who the auditor believes is knowledgeable about the information to be confirmed. For example...[an] official who is responsible for the financial institution's relationship with the client or is knowledgeable about the transactions or arrangements." AU § 330.26. Deloitte U.S. apparently operated within their professional standards when they elected to send the confirmation letters to the sales representatives. Plaintiffs contend that the Deloitte defendants

should have sought corroborating evidence for the confirmation letters (¶ 771), yet " '[e]ven if [the auditor] should have done more to attempt to uncover and disclose the alleged fraud, without factual allegations tending to establish knowledge of those practices on [the auditor's] part,' an auditor's failure to do more is 'legally insufficient.' " *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 218 (S.D.N.Y.1999) (quoting *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y. 1988)); *see also In re Software Toolworks Inc.,* 50 F.3d 615, 627 (9th Cir.1994) (affirming district court's holding that the auditors' review of the client's licensing agreements with vendors and outside confirmations of these agreements refuted a strong inference of scienter and that "[p]laintiffs' contention that [the auditor] should have performed further inquiries and investigations, arguing with the benefit of hindsight, does not establish that the audit was reckless.").

Furthermore, the plaintiffs' complaint alleges more than once that the Deloitte defendants were deliberately deceived regarding the true status of the vendor rebates. (¶¶ 47, 204, 232.) The complaint quotes from Royal Ahold's 2002 Form 20–F which states that:

> [a]s part of the fraud, certain members of USF management and other employees interfered with the audit confirmation process for vendor allowance receivables from vendors, concealed vendor contracts and their true terms, made misrepresentations regarding the absence of prepayments from vendors, and caused the creation of certain inaccurate accounting records.

(¶ 47.) The complaint also quotes from an interview with interim CFO Dudley Eustace who explained that USF executives "created false figures for promotional allowances" which were then "supported by false confirmations from people working within the suppliers' companies." (¶ 240.) These allegations conflict with the plaintiffs' assertions that the Deloitte defendants must have known about the fraud or recklessly disregarded it. Based on these inconsistencies in the complaint, it is impossible to draw a "strong inference" that the Deloitte defendants knew about or recklessly disregarded the vendor rebate fraud at USF. *See In re Livent,* 78 F.Supp.2d at 217–18 (holding that plaintiffs failed to establish scienter where the complaint contained allegations demonstrating that the auditor's client "went to considerable lengths to conceal the truth" from the auditors).

Additionally, the plaintiffs allege that the Deloitte defendants' extensive relationship with Royal Ahold compromised its ability to aggressively seek the truth from company management and conduct its audits with the appropriate level of independence. Specifically, the plaintiffs assert that "Deloitte had effectively abandoned its independence in connection with Ahold because of Deloitte's consulting, tax, advisory, risk management, due diligence and other non-audit work." (¶ 22.) The plaintiffs' allegations do not particularly state the extent to which the Deloitte defendants benefitted economically from any consulting or "non-audit" work, and conclusory allegations that the auditors stood to gain financially by participating in or recklessly disregarding the client company's fraud are not sufficient under the PSLRA's heightened pleading standard. *See, e.g., Reiger v. Price Waterhouse Coopers LLP,* 117 F.Supp.2d 1003, 1007 (S.D.Cal.2000) (stating that a "large independent accountant will rarely, if ever, have any rational economic incentive to participate in its client's fraud" because an "accountant's success depends on maintaining a reputation for honesty and integrity"); *In re*

*Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y.1999) (holding that "generalized economic interests" such as "receipt of compensation and the maintenance of a profitable professional business relationship" does not constitute a sufficient motive for purposes of pleading scienter) (citations omitted). *See also In re MicroStrategy*, 115 F.Supp.2d at 655 (noting that in order to find that an auditor's lack of independence from its client supports a strong inference of scienter, the plaintiffs must allege "more than just a desire to receive compensation for professional auditing duties"). For example, in *In re MicroStrategy*, the auditors had agreed to sell their client company's products and to serve as a consultant with regard to those products, thereby earning " 'substantial financial rewards,' including $188,000 in licencing fees and an undisclosed amount for consulting fees." *Id.* at 654. The product and service contracts required a long-term commitment from the company, and therefore purchasers would be less likely to enter into the contracts unless there was "clear assurance of the Company's financial health." *Id.* at 655. The plaintiffs argued that this arrangement meant that the auditors had a "direct stake" in the continued success and perceived profitability of the company. *Id.* The court agreed with the plaintiffs that such an arrangement compromised the auditor's independence and was corroborative of a strong inference of scienter on the part of the defendant auditors. *Id.* at 655–56. The plaintiffs in this case, however, do not allege particular facts that indicate the Deloitte defendants had a "direct stake" in Royal Ahold's financial results.

The plaintiffs also allege that Deloitte U.S. was particularly compromised because it served as the internal auditor for Royal Ahold. (¶ 750.) The plaintiffs allege that "Deloitte's staff were literally 'camped out' in a conference room at USF" yet they failed to correct the lack of internal controls or to "report on and correct" the promotional allowance fraud. (¶ 8.) As discussed previously, however, the plaintiffs also repeatedly acknowledge in their complaint that the Deloitte defendants reported the problem of weak internal controls at USF in "every report" to the Royal Ahold management. (¶¶ 485, 513, 535, 570, 594, 637, 664, 684, 705, 757.) The plaintiffs' conflicting allegations do not support a "strong inference" that the Deloitte defendants were somehow complicit in the alleged fraud or purposefully turned a blind eye to it. While Deloitte's repeated recognition of the internal controls problem may at best support a finding that the Deloitte defendants were negligent in handling a known audit risk, it does not suggest they were reckless or acting with fraudulent intent. *See, e.g., Reiger*, 117 F.Supp.2d at 1009 (stating that the auditor's failure to inquire further about the client's contract documents "may show negligence, but it does not suggest awareness of fraud.").

Similarly, the fact that Deloitte U.S. performed internal audit services for USF for several months during 2000 and 2001 does not provide sufficient basis to infer that the Deloitte defendants were aware of and recklessly disregarded the vendor rebate fraud, *see In re Stone & Webster, Inc., Sec. Litig.*, 253 F.Supp.2d 102, 133–34 (D.Mass.2003) (holding that allegations that auditors "were regularly present at [the company's] corporate headquarters throughout the year and had continual access to and knowledge of [the company's] private and confidential corporate financial and business information," is not enough to establish scienter), particularly, where as here, the plaintiffs' complaint also alleges that the Deloitte defendants were purposely deceived by the individuals perpetrating the fraud. As to the claim that the De-

loitte U.S. team compromised its independence by serving on USF's internal audit staff, Deloitte U.S. counters that only the Deloitte U.S. internal audit staff undertook this assignment, not its external audit team, and that under the then applicable professional standards, such an arrangement was acceptable. (*See* Deloitte U.S. Reply Mem. of Law in Further Supp. of its Mot. to Dismiss at 13.)

Finally, the plaintiffs argue that the magnitude and pervasiveness of the fraud provides a strong inference that the Deloitte defendants must have been reckless in their audits of Royal Ahold. The vendor rebate fraud at USF resulted in Royal Ahold making an $885 million restatement. While it is true that courts have found that substantial restatements can support a strong inference of scienter on the part of the auditors, such findings are usually coupled with other compelling factors, such as the reckless disregard of red flags or evidence that the auditors had compromised their independence. *See, e.g., In re MicroStrategy,* 115 F.Supp.2d at 651–56 (concluding that the magnitude of the restatement and the GAAP violations, as well the auditors' disregard for red flags and failure to maintain an independent relationship, supported a strong inference of scienter); *In re Sunbeam Sec. Litig.,* 89 F.Supp.2d 1326, 1345 (S.D.Fla.1999) (finding the sheer magnitude of the company's restatement combined with the auditors' failure to recognize multiple red flags, including the existence of weak internal controls, and appropriately plan and modify its audit, established scienter); *Carley Capital Group v. Deloitte & Touche, LLP,* 27 F.Supp.2d 1324, 1339–1341 (N.D.Ga. 1998) (holding that the drastic overstatement of financial results coupled with the

allegations that the auditor defendants "were heavily involved in the management" of the company and had violated numerous GAAP and GAAS provisions provided "strong circumstantial evidence of reckless or conscious misbehavior"). While this case does involve a massive financial restatement, this fact alone cannot establish scienter on the part of the Deloitte defendants. The restatement resulted from fraud originating at USF which was actively concealed from the auditors. Where, as here, "the magnitude of the fraud was accompanied by the thoroughness of its concealment," scienter will not be inferred on the part of the auditor. *In re Livent,* 78 F.Supp.2d at 217.

The plaintiffs likewise fail to plead scienter with respect to the Deloitte defendants' review of the joint venture consolidation. The plaintiffs argue that the Deloitte defendants knew or recklessly disregarded the fact that Royal Ahold improperly consolidated joint venture revenue in violation of U.S. and Dutch GAAP. Under these prevailing accounting standards, a company may only consolidate joint venture revenue if it has control over the entity. (¶ 724) (citing GAR § 214:103a and NCC § 2:24b). Control can be demonstrated by majority ownership or by evidence that one party has the power to dictate decisions for the partnership. (*See* Accounting Research Bulletin No. 51, Consolidated Financial Statements, Deloitte U.S. Mot. to Dismiss, Ex. O and SEC Release No. 33–6641, 17 C.F.R. § 210.3A–02, Ex. P.) In the instant case, Royal Ahold represented that it had decision-making control over five separate joint ventures in which the company owned only a 50 % interest (or 49% in the case of one).[47] Royal Ahold

47. The five joint ventures implicated here are JMR, Bompreco, Disco, Paiz Ahold, and ICA. The JMR joint venture was created in 1992

and operated in Portugal. (¶¶ 320–321.) Royal Ahold owned a 49% stake in JMR, and the governing documents provided for joint con-

was able to justify consolidation by providing "control letters" signed by Royal Ahold executives and senior representatives from the joint venture partners which stated that in the event of a dispute Royal Ahold's view would govern. (¶ 338.) The control letters for ICA, Bompreco, DAIH, and Paiz Ahold were negated by secret "side letters" that stated that Royal Ahold and its partner had not actually agreed to grant decision-making authority to Royal Ahold.[48] (¶¶ 305, 306.) The plaintiffs simultaneously contend that the Deloitte defendants recklessly approved the consolidation despite knowing it was improper to do so, and that the Deloitte defendants encouraged the control letter and side letter scheme by asking Royal Ahold to provide evidence of its control over the joint ventures. The analysis shows that these allegations are insufficient to establish scienter on the part of either of the Deloitte defendants.

The plaintiffs argue that from as early as 1998, the Deloitte defendants knew there was a problem with Royal Ahold's consolidation of joint ventures, yet the Deloitte defendants continued to sign off on Royal Ahold's consolidation. To support this allegation, plaintiffs rely on two letters: (1) the August 24, 1998 letter from Deloitte Netherlands to Meurs, and (2) the April 13, 2000 letter from Deloitte Nether-

lands to Meurs and the Royal Ahold Executive Board. (*See* July 13, 2004 Entwistle Aff., Ex. 2 and Ex. 3.) The August 24, 1998 letter stated that "after consultation with our U.S. National Office, [we concluded] that consolidation for the majority of the Ahold joint ventures was not acceptable under U.S. GAAP [for fiscal year 1997]." [49] (July 13, 2004 Entwistle Aff., Ex. 2.) The letter explained that Deloitte Netherlands had approved the past consolidation because of Royal Ahold's representations that the joint venture agreements would be modified to demonstrate the company's control over the partnership, but that any future consolidations would need to be fully substantiated by an evidence file demonstrating Royal Ahold's control, something that Deloitte Netherlands had already requested and that Royal Ahold was preparing. The letter also stated that due to the increased materiality of the joint ventures, if Royal Ahold did not provide sufficient evidentiary support for its control over the joint ventures, a pro-active restatement would be warranted to correct the financial reports filed with the SEC.

The April 13, 2000 letter from Deloitte Netherlands to the Royal Ahold Executive Board and Meurs stated that "[a]fter some agitated discussions [regarding consolidation]...[o]ur National Office in the USA has permitted us to issue our opinion on

---

trol by Royal Ahold and its Portuguese partner. (¶¶ 321, 322.) The Bompreco joint venture was established in Brazil in November 1996. (¶ 355.) Royal Ahold held 50% of the voting shares and 50.1% of the total capital of Bompreco until it acquired a majority interest and control over Bompreco in July 2000. (¶¶ 356, 725.) The DAIH joint venture was a South American operation established in January 1998. (¶ 361.) Royal Ahold owned a 50% interest in the DAIH joint venture until it acquired majority control over DAIH in August 2002. (¶¶ 363, 365.) Paiz Ahold was a Central American joint venture established in December 1999. (¶ 343.) Initially Royal Ahold owned 50% of Paiz Ahold, (*Id.*) and

then a 33⅓ % stake after January 1, 2002. (¶ 354.) In April 2000 Royal Ahold acquired a 50% interest in the ICA joint venture which operated in Scandinavia. (¶ 179.)

48. The complaint only contains particular facts regarding the execution of a control letter and a contradictory side letter for the ICA joint venture. The facts pertaining to the other joint ventures are alleged generally.

49. The only two disputed joint ventures in the present case existing at this time were the JMR and Bompreco partnerships.

the 20–F for the year ended January 2, 2000 based on your representations that side letters would be obtained from your joint venture partners." (July 13, 2004 Entwistle Aff., Ex. 3.) The letter asked for control letters (called "side letters" in this exhibit) as well as a fact file for the JMR and DAIH joint ventures as evidence that Royal Ahold truly had control over the joint ventures and therefore could consolidate them. (*Id.*) Deloitte Netherlands explained that the control letters should be signed by individuals with "the necessary level of authority" from the joint venture partners and from Royal Ahold. (*Id.*)[50]

The August 1998 and April 2000 letters show that the Deloitte defendants were seeking confirmation that Royal Ahold did indeed have the requisite degree of control over the joint ventures to justify consolidation. These letters do not demonstrate, as plaintiffs suggest, that the Deloitte defendants recklessly encouraged Royal Ahold to "manufacture" evidence of control. The record shows that Royal Ahold eventually provided control letters which purported to grant control to Royal Ahold for the Bompreco, DAIH, Paiz Ahold, and ICA joint ventures, but not for JMR. (¶¶ 306, 342.) The plaintiffs contend that none of these control letters should have been relied upon and that the ICA control letter in particular was inherently "suspicious" and should not have been accepted by the Deloitte defendants. (¶¶ 24, 342.)

Plaintiffs' assertion that the Deloitte defendants "suggested the use of side letters to obscure the truth" about Royal Ahold's control over the joint ventures does not withstand scrutiny. (¶ 4.) Under the applicable accounting guidelines, a company may only consolidate a joint venture if it can show that it exercises control over the joint entity. (¶ 724) (citing Dutch GAAP provisions GAR § 214.103a and NCC § 2:24a(1)). Normally, control is evidenced by majority ownership, but it can also be established by showing that one party has the power to direct the joint venture's decisions.[51] Therefore, when Royal Ahold wished to consolidate joint ventures in which it did not own a majority share, in order to comply with their professional standards the Deloitte defendants were required to seek proof that Royal Ahold did indeed exercise control over the joint ventures. By asking for an evidence file or a control letter, the Deloitte Defendants were not encouraging a fraudulent scheme, rather, they were adhering to their professional guidelines. Evidence obtained from third parties, such as the joint venture control letters, is considered more reliable than management representations alone. *See* AU § 326.21(a) ("When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity."). *See also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (holding that the auditors' provision of "evidence indicating that the accounting decisions were reasonable negates the plaintiffs' attempt to establish scienter").

The plaintiffs contend that the "questionable" nature and timing of the ICA

---

**50.** Apparently a satisfactory control letter with regard to Bompreco already had been provided. (*See* July 13, 2004 Entwistle Aff., Ex. 3.)

**51.** SFAS No. 94 governs consolidation and the related Regulation S–X defines "controlled by" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise." 17 C.F.R. § 210.1–02(g). (*See* Deloitte U.S. Reply Mem. in Further Supp. of its Mot. to Dismiss at 21, n. 16.)

control letter should have been a red flag warning the Deloitte defendants that Royal Ahold was fraudulently representing its control over all joint ventures. (¶ 342.) Royal Ahold acquired a 50% interest in the Scandinavian ICA joint venture in April 2000. (¶ 179.) The plaintiffs allege that Deloitte "warned" Royal Ahold that its fifty percent interest in ICA could not be consolidated (¶ 336), and the April 13, 2000 letter from Deloitte Netherlands mentions that the auditors would like to discuss "how Ahold should account for this joint venture." Soon after, Meurs drafted a control letter dated May 2, 2000, which was signed by Andreae on behalf of Royal Ahold and by Fahlin on behalf of one of the ICA partners. (¶¶ 338, 339.) The control letter stated that although the ICA joint venture was a partnership, in the event of a dispute, Royal Ahold's view would govern. (¶ 339.) This letter was, however, in the words of the plaintiffs, "neutralized" by a separate side letter also signed by Andreae and Fahlin, confirming that the other ICA partners "did not agree that Ahold had the right to impose its views in the event of a disagreement over the operations of the ICA joint venture." (¶ 339.)

The plaintiffs themselves acknowledge that the second set of "side letters" that negated the control letters for ICA, Bompreco, DAIH, and Paiz Ahold were concealed from Deloitte. In their complaint, the plaintiffs quote from the Royal Ahold Supervisory Board's report to shareholders, which states that: "[t]he investigation into the joint venture letters found that there had been *concealment of side letters* from Ahold's Supervisory Board, Audit Committee and our auditors, Deloitte & Touche and that the consolidation of these joint ventures into Ahold's financial statements had been in error." (¶ 313.) If Deloitte were complicit in the joint venture fraud, as the plaintiffs repeatedly suggest

in their opposition brief, there would be no reason for the Royal Ahold executives to conceal the side letters from the Deloitte defendants. Plaintiffs' allegations do not support a strong inference that Deloitte Netherlands was acting with scienter when it approved Royal Ahold's consolidation of its joint ventures. *In re Sunterra Corp.*, 199 F.Supp.2d at 1338 ("[B]ecause an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client.") (citation omitted).

The plaintiffs argue that the Deloitte defendants should not have signed off on consolidating JMR, because the August 1998 and April 2000 letters establish that Royal Ahold never provided Deloitte with evidence that it controlled JMR. Deloitte Netherlands argues that from the beginning Royal Ahold represented to the public that "based on its direct managerial role, representation on JMR's board of directors and stockholders' agreements, Ahold includes [JMR] in the Company's consolidated financial statements." (*See* Dunst Dec., Ex. B at 13 and Ex. C at 14) (quoting Royal Ahold's 1997 and 1999 20-F). Therefore, Deloitte cannot be said to have purposely misled the public regarding Royal Ahold's ability to consolidate JMR. Moreover, both Deloitte defendants argue that because JMR only accounted for approximately 5% of Royal Ahold's total revenue in fiscal year 1999, less than 4% in fiscal year 2000, and less than 3% in fiscal year 2001, any financial misstatement resulting from consolidating JMR was immaterial as a matter of law. *See, e.g., Glassman v. Computervision Corp.*, 90 F.3d 617, 633, n. 26 (1st Cir.1996) (holding that alleged misstatements ranging from 3% to 9% regarding the projected backlog of orders were immaterial); *In re First Union*

*Corp. Sec. Litig.*, 128 F.Supp.2d 871, 895 (W.D.N.C.2001) (alleged understatement of losses amounted to only 2.1% of operating earnings and 2.8% of earnings and was therefore immaterial). While it may be that the Deloitte defendants were negligent in continuing to allow the consolidation of JMR based only on the representations made by Royal Ahold executives rather than additional external evidence, this judgment call regarding a relatively small portion of Royal Ahold's financial results does not support a strong inference of recklessness by the Deloitte defendants.

Examined collectively, the plaintiffs allegations do not support a strong inference that the Deloitte defendants knew or recklessly disregarded that Royal Ahold's financial statements were materially misstated due to the overstated promotional allowances and the improper consolidation of joint venture revenue. Some of the "red flags" relied on by plaintiffs demonstrate that the Deloitte defendants were aware of weak internal controls at USF and the need to independently verify the vendor rebate amounts, but they do not establish "an egregious refusal to see the obvious, or to investigate the doubtful," giving rise to a strong inference of recklessness. *In re Oxford Health Plans, Inc.*, 51 F.Supp.2d at 295 (quotations and citations omitted). Similarly, the fact that the Deloitte defendants failed to discover the secret side letters negating the control letters does not indicate recklessness by the auditors, especially where, as here, the plaintiffs' complaint itself includes statements acknowledging that the Deloitte defendants were purposely misled by Royal Ahold executives. Accordingly, the § 10(b) and Rule 10b–5 claims against Deloitte U.S. and Deloitte Netherlands will be dismissed. Likewise, because the plaintiffs have failed to allege facts demonstrating scienter, let alone that the Deloitte defendants engaged in "deceptive or manipulative" conduct, the plaintiffs' Rule 10b–5(a) and (c) claims will be dismissed.

### 9. *Ahold USA*

■ The § 10(b) and Rule 10b–5 claims against Ahold USA must be dismissed because the complaint fails to allege facts sufficient to create a strong inference of scienter. In their attempt to create an inference of scienter, the plaintiffs allege that Ahold USA knew about the accounting fraud that occurred at its subsidiaries, Tops and Giant–Carlisle. The complaint, however, offers no factual allegations or red flags supporting this conclusion. Instead, the plaintiffs rely on the fact that the companies share a parent-subsidiary relationship. It cannot simply be assumed that Ahold USA, as the parent company, was aware of or reckless in not knowing about the fraud at its subsidiaries, Tops and Giant–Carlisle. *See Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 151 (3rd Cir.2004); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir.1999); *Chill v. General Electric Co.*, 101 F.3d 263, 270–71 (2nd Cir.1996). In addition, the plaintiffs argue that because Tobin and Grize, who both served as President of Ahold USA, were allegedly aware of the fraud at USF,[52] they should have been aware of the similar fraud that took place at Tops and Giant–Carlisle. As noted earlier, *see supra* Part II(E)(6) and (7), however, the complaint failed to allege facts to support a strong inference of scienter by Tobin or Grize. As a result, Ahold USA's motion to dismiss the § 10(b) and Rule 10b–5 claims will be granted.

### 10. *Ahold USA Holdings*

The complaint is completely devoid of any factual allegations that could create a

---

**52.** USF is a wholly owned subsidiary of Royal Ahold and is not a subsidiary of Ahold USA.

strong inference of scienter with respect to Ahold USA Holdings. In fact, beyond the allegation that it serves as Royal Ahold's holding company in the U.S. and "coordinated the activities of Ahold's United States regional retail operating companies" (¶ 60), including Tops and Giant–Carlisle, the complaint contains no factual allegations concerning Ahold USA Holdings. Therefore, the § 10(b) and Rule 10b–5 claims against Ahold USA Holdings must be dismissed.

### F. Royal Ahold Defendants' Motions to Strike

 In their motion to dismiss, the Royal Ahold defendants argue that the allegations concerning the fraud at Disco, the fraud at Tops and Giant–Carlisle, and certain statements concerning Royal Ahold's integration of its acquisitions should be stricken.[53] Motions to strike may serve a valuable purpose when they allow courts and parties to avoid wasting time and resources on immaterial matters. "Such motions are disfavored, however, and usually should be denied unless the allegations 'have no possible relation to the controversy and may cause prejudice to one of the parties.'" *Graff v. Prime Retail, Inc.,* 172 F.Supp.2d 721, 731 (D.Md. 2001) (quoting 5A Wright & Miller, *Federal Practice and Procedure* §§ 1382 (2d ed.1990)).

The Royal Ahold Defendants argue that the allegations should be stricken because they are immaterial. The defendants also argue that the allegations concerning the fraud that took place at Disco, Tops, and Giant–Carlisle, should be stricken because the plaintiffs have not adequately pled scienter with respect to such fraud. The proper inquiry on a motion to strike, how-

ever, is not whether the defendants acted with scienter, but instead, whether the allegations pertaining to such fraud are materially relevant to the plaintiffs' claims. Under the Federal Rules of Civil Procedure, courts have the discretion to strike from any pleading "any redundant, immaterial, impertinent or scandalous matter." Fed.R.Civ.P. 12(f). Therefore, in deciding the Royal Ahold Defendants' motion to strike certain allegations, I will consider whether the allegations at issue are material to the claims brought by the plaintiffs.

#### 1. *Disco*

 In January 1998, Royal Ahold established Disco Ahold International Holdings N.V. [DAIH], a 50/50 joint venture with Velox Retail Holdings [VRH]. At the outset of the joint venture, DAIH controlled 50.35% of Disco, and on November 13, 1998, DAIH purchased the remaining portions of Disco. In July 2001, Royal Ahold acquired additional shares of DAIH from VRH, increasing its ownership percentage to 55.9%. Following VRH's default on a debt, in August 2002 Royal Ahold assumed full ownership of DAIH, including its subsidiary, Disco. (¶ 165.) The plaintiffs allege that in its 2002 Form 20–F, Royal Ahold admitted that its internal investigation of Disco's operations revealed fraud because of a "series of suspicious transactions, some of which involved the use of fictitious invoices to conceal or mischaracterize payments, or payments that were otherwise improperly documented." (¶ 313.) Royal Ahold's financial restatement following the fraud at Disco amounted to a difference of 8 million euros on its pre-tax earnings. (¶ 256.) In total, the wrongdoing at Disco inflated Royal Ahold's pre-tax earnings by 0.48% for 2000

---

**53.** Van der Hoeven and Meurs adopted the Royal Ahold defendants' motion to strike ar-

guments as well.

and 2001. (*See* Royal Ahold Defs.' Mot. to Dismiss at 31.) The defendants argue that the fraud at Disco should be stricken as immaterial because it amounted to such a small percentage of Royal Ahold's pre-tax earnings.

The Supreme Court has rejected the use of a strict numerical formula or a bright-line test for materiality, stating that "[a]ny approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive and underinclusive." *Basic Inc. v. Levinson*, 485 U.S. 224, 236, n. 14, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In addition, though it lacks the force of law, "the SEC has commented that various '[q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162–63 (2nd Cir.2000) (quoting SEC Staff Accounting Bulletin No. 99, 17 C.F.R. pt. 211, subpt. B). As a result, questions of materiality concerning fraud should not be decided quantitatively based on a bright-line cutoff but instead, the "total mix of information" should be looked at qualitatively.

While not outcome determinative, the fact that the fraud at Disco amounted to such a minuscule portion of Royal Ahold's pre-tax earnings indicates that it is unlikely such information would have "significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 232, 108 S.Ct. 978. *See also Hillson*, 42 F.3d at 219 (holding that a company's income prediction, which was off by only 0.5%, was immaterial); *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 895 (W.D.N.C. 2001) (holding that losses of understatement of "a mere 2.1 percent of operating earnings" are immaterial). In addition to the relatively small financial impact of the fraud at Disco, it is also unimportant with respect to the central issues in this case. Disco, which owns supermarkets in Argentina, is an overseas subsidiary of Royal Ahold. The fraud at Disco is not linked to the improper consolidations or joint ventures that took place at Royal Ahold or to the fraudulent promotional allowances at USF. Consequently, because the fraud at Disco amounted to only 0.48% of Royal Ahold's pre-tax earnings and is unrelated to the alleged fraud at Royal Ahold and USF, the allegations concerning Disco are immaterial as a matter of law and the Royal Ahold defendants' motion to strike such allegations will be granted.

### 2. Tops and Giant–Carlisle

The vendor allowance fraud that took place at Tops and Giant–Carlisle was remarkably similar to the fraud that took place at USF. (*See, e.g.,* ¶ 35.) In its 2002 Form 20–F, Royal Ahold disclosed that its internal investigation revealed that the accounting fraud at Tops "consisted of intentional improper recognition of vendor allowances and pervasive earnings management, including the recording of unsupported vendor allowance income, premature recognition of contract signing fees and vendor allowance billings, overbillings to vendors and the improper holding of company funds at vendors, as well as other instances of earnings management" and the fraud at Giant–Carlisle "consisted of pervasive earnings management, including the intentional deferral of earned vendor allowance receivables and vendor allowance accrued reserves, as well as the improper holding of company funds at vendors." (¶ 35.) Similarly, the fraud at USF involved "fictitious and overstated vendor allowance receivables and improper or premature recognition of vendor allowances and an understatement of cost of goods sold." (*Id.*) As a result, the fraud at Tops and Giant–Carlisle may be material to understanding and proving

the fraud that took place at USF, and the defendants' motion to strike the allegations concerning Tops and Giant–Carlisle will be denied.[54]

### 3. Statements Concerning Royal Ahold's Integration of Its Acquisitions

 The plaintiffs have alleged that the defendants made false and misleading statements regarding the integration of Royal Ahold's acquisitions. In response, the Royal Ahold defendants argue that those statements should be stricken because they are immaterial puffery and, therefore, are not actionable. As discussed earlier, the plaintiffs have adequately stated a claim under Rule 10b–5(b) against Royal Ahold and certain individual defendants based on false statements and SEC filings made by the defendants. While some of the statements cited by plaintiffs will not be actionable, at this stage of the proceedings, I need not address each individual statement allegedly made by the defendants to make that determination. The defendants' motion to strike these allegations will be denied.

### G. Section 11 and Section 12

Plaintiffs also bring claims under § 11 and § 12(a)(2) of the Securities Act of 1933 based on allegedly false and misleading statements in the registration statement and the prospectuses associated with the September 2001 Global Offering.[55] All defendants except Royal Ahold argue that the claims should be dismissed because the plaintiffs have failed to plead their § 11 and § 12 claims with the particularity required for allegations of fraud by Fed. R.Civ.P. 9(b). The defendants also argue that the plaintiffs have failed to state a claim under § 11 because they have not adequately demonstrated that the Royal Ahold shares they purchased are traceable to the allegedly false or misleading registration statements. Likewise, the defendants argue that the plaintiffs have failed to state a claim under § 12 because they have not adequately pled that they directly purchased shares from or were solicited by the various defendants.

Under § 11 of the Securities Act of 1933, any person acquiring a security issued pursuant to a materially false or misleading registration statement may recover damages. Section 11 imposes liability when "any part of the registration statement, when such part became effective, contained an untrue statement of material fact" or a material omission. 15 U.S.C. § 77k(a). "[A]ny person acquiring such security" may sue certain enumerated persons, such as those who signed the registration statement, directors, accountants, and underwriters. *Id.* Unlike the antifraud provision § 10(b) which requires plaintiffs to prove scienter and reliance on the misleading statement, § 11 has generally been regarded as imposing a negligence or strict liability standard. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security

---

**54.** This should not be taken as a ruling on the scope of discovery and how it may be limited in regard to Tops and Giant–Carlisle.

**55.** The plaintiffs bring § 11 claims against Royal Ahold, Deloitte Netherlands, the lead underwriters, the global underwriters, Van der Hoeven, Meurs, de Ruiter, Miller, Andreae, Fahlin, Tobin, and Grize (Count IV). The plaintiffs are suing Royal Ahold, the lead underwriters, the global underwriters, Van der Hoeven, and Meurs for violations of § 12(a)(2) (Count V). The claims against the global underwriters, however, are being dismissed for lack of subject matter jurisdiction. *See supra* Part II(C)(2). Likewise, the claims against Fahlin and de Ruiter, are being dismissed for lack of personal jurisdiction. *See supra* Part II(B)(2) and (4).

issued pursuant to a registration statement, he need only show a material. misstatement or omission to establish his *prima facie* case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.") (citing *Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544, 575 (E.D.N.Y.1971) and 15 U.S.C. § 77k(b)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (distinguishing the negligence standard under § 11 from the intentional conduct required under § 10(b)). *See also In re Global Crossing, Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 195 (S.D.N.Y. 2003) ("No intent to defraud need be alleged under section 11.").

■ Courts have construed § 11 narrowly, holding that only plaintiffs who can trace their shares to the particular false or misleading registration statement may benefit from the strict liability imposed by § 11. *See, e.g., Lee v. Ernst & Young LLP*, 294 F.3d 969, 976–977 (8th Cir.2002) (a cause of action under § 11 "exists for any person who purchased a security that was originally registered under the allegedly defective registration statement-so long as the security was indeed issued under *that* registration statement and not another."); *Barnes v. Osofsky*, 373. F.2d 269, 272 (2d Cir.1967) (reasoning that § 11 was meant to provide a remedy only for those who purchased shares pursuant to a particular registration statement, whereas other provisions which contain some form of a scienter requirement are not limited to newly registered securities); *In re Global Crossing*, 313 F.Supp.2d at 207–208

(holding that only plaintiffs who purchased shares under the misleading registration statement had standing under § 11, noting that "[t]hose who purchased in the open market shares that were properly registered in an earlier offering are relegated to the securities fraud remedies that include [scienter and reliance] requirements"); *Kirkwood v. Taylor*, 590 F.Supp. 1375, 1378 (D.Minn.1984) (noting that the "[s]trict application of the tracing requirement...is consistent with the statutory scheme").[56] Courts have recognized, however, that because shares are often traded and purchased electronically by brokers, it may be difficult to trace purchased shares back to the original registration statements. This is particularly true when the company has a number of outstanding shares already issued, rather than a finite universe of shares issued pursuant to one registration statement in an initial public offering. *See, e.g., Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 286 (3d Cir.1992) (stating that "[b]efore discovery takes place, however, it is impossible for plaintiffs to know whether their shares were newly issued or were purchased in the secondary market."); *Barnes*, 373 F.2d at 271–272 (acknowledging that tracing can be complicated in part because "most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares"); *In re Initial Public Offering Sec. Litig.*, Nos. 21 MC 92, 01 Civ. 3857, 01 Civ. 8408, 2004 WL 2297401, *38 (S.D.N.Y. Oct.13, 2004) (limiting plaintiffs' § 11 class period to exclude all purchases made after untraceable

---

**56.** Courts have reasoned that because § 11 provides a remedy to "any person acquiring such security," standing should not be limited to those individuals who purchased securities in an initial public offering; standing also exists for aftermarket purchasers who satisfy the tracing requirement. *See, e.g., Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 872–73 (5th Cir.2003); *DeMaria v. Andersen*, 318 F.3d 170, 175–178 (2d Cir.2003); *Lee v. Ernst & Young LLP*, 294 F.3d 969, 977 (8th Cir.2002); *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir.1999); *Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 585 (W.D.Tex.2002).

securities entered the market). Therefore, at the pleading stage, "[p]laintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to a false registration statement have been held sufficient to state a claim." *In re Global Crossing*, 313 F.Supp.2d at 208 (citing *Shapiro*, 964 F.2d at 286; *In re Crazy Eddie, Sec. Litig.*, 747 F.Supp. 850, 854–55 (E.D.N.Y.1990); *In re AES Corp. Sec. Litig.*, 825 F.Supp. 578, 592 (S.D.N.Y. 1993)). In class action suits, in order to properly plead a § 11 claim, "a named plaintiff must have purchased shares traceable to the challenged offering." *In re Global Crossing*, 313 F.Supp.2d at 207.

█ Section 12(a)(2) of the Securities Act provides a remedy for a person who purchases a security from another person who offered or sold such security "by means of a prospectus...which includes an untrue statement of material fact" or a material omission. 15 U.S.C. § 77l(a)(2). Section 12(a)(2) also has been regarded as imposing a negligence standard. *See Hershey v. MNC Financial, Inc.*, 774 F.Supp. 367, 375 (D.Md.1991). Under § 12(a)(2), standing is limited to those persons who purchased securities pursuant to public offerings made via a prospectus, and does not extend to individuals who purchased securities under private sales contracts. *Gustafson v. Alloyd, Inc.*, 513 U.S. 561, 580–84, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The Supreme Court has interpreted "offers or sells" to apply to any person who passes title or interest in a security to a buyer for value or solicits an offer to buy a security. *Pinter v. Dahl*, 486 U.S. 622, 642–51, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (focusing on the "defendant's relationship with the plaintiff-purchaser" and rejecting the "substantial factor" test to determine liability for fear that this approach would expose lawyers, accountants and other professionals ancillary to the sales transaction to liability under § 12). *See also Gasner v. Bd. of Sup'rs of the County of Dinwiddie*, 103 F.3d 351, 365 (4th Cir.1996) (acknowledging the *Pinter* holding); *In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F.Supp. 860, 865 (D.Md. 1991) (noting that although the *Pinter* court was interpreting the meaning of a statutory seller within the context of § 12(1), the Second, Third, Fifth and Ninth Circuits have extended the holding to § 12(a)(2)). The *Pinter* holding limited § 12(a)(2) liability to "immediate sellers," or those who were directly involved in the actual solicitation of a securities purchase. 486 U.S. at 644, n. 21, 108 S.Ct. 2063. The Supreme Court emphasized that "[t]he solicitation of a buyer is perhaps the most critical stage of the selling transaction...brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors." *Id.* at 646, 108 S.Ct. 2063. The *Pinter* "immediate seller" requirement has been interpreted to mean that in a firm commitment underwriting, where the issuer of securities sells shares to underwriters who in turn resell the shares to the public, the issuer and its agents can only be liable under § 12(a)(2) if they " 'successfully solicit[ed]' " the plaintiff's purchase of securities," and were " 'motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner.' " *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) (quoting *Pinter*, 486 U.S. at 647, 108 S.Ct. 2063). Accordingly, "neither involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of *relationship between defendant and plain-*

*tiff* that could establish statutory seller status." *Id.* at 1216. See *also Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 871 (5th Cir.2003) (holding that in a firm commitment underwriting, "[t]he issuer may only be liable under § 12(a)(2) if the plaintiff alleges 'that an issuer's role was not the usual one; that it went farther and became a vendor's agent.' ") (citations omitted); *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1120 (D.Nev.1998) (plaintiffs must prove that "[d]efendants solicited the purchase of the securities, as described in *Pinter,* even though those securities were 'sold' by various underwriting firms.") (citations omitted); *PPM America, Inc., v. Marriott Corp.,* 853 F.Supp. 860, 875 (D.Md.1994) (finding on summary judgment that plaintiffs could not hold issuers liable under § 12(a)(2) because they purchased their shares from underwriters in a firm committment underwriting). *But see Kensington Capital Management v. Oakley, Inc.,* No. SACV97–808GLTEEX, 1999 WL 816964, *5 (C.D.Cal.1999) (refusing to follow *PPM* and holding that an issuer may be considered a statutory seller in a firm commitment underwriting) (citations omitted).

In some instances, courts have acknowledged that determining whether a defendant qualifies as a statutory seller under § 12(a)(2) is a "question of fact, not properly decided on a motion to dismiss." *In re Stratosphere,* 1 F.Supp.2d at 1120. *See also In re Paracelsus Corp.,* 6 F.Supp.2d 626, 632 (S.D.Tex.1998) (observing that "[t]he determinations of a 'seller' under the leading cases that have interpreted Section 12 . . . have been rather fact intensive questions," and therefore should be considered "in an evidentiary context rather than on a bare pleading") (citations omitted).

■ Before determining whether the plaintiffs have standing to sue under § 11 and § 12, I will discuss whether Rule 9(b)

applies to these claims. Because § 11 and § 12 are based in negligence and do not include a scienter requirement, *Newcome v. Esrey,* 862 F.2d 1099, 1106 (4th Cir. 1988), it is generally recognized that Fed. R.Civ.P. 9(b) does not apply to such claims. *See In re USEC Sec. Litig.,* 190 F.Supp.2d 808, 826 (D.Md.2002) ("[A] plaintiff is not required under § 11 to plead or prove fraud. Liability under § 11 is virtually absolute even for innocent misstatements.") (citing *Huddleston,* 459 U.S. at 382, 103 S.Ct. 683); *In re Jiffy Lube Sec. Litig.,* 772 F.Supp. 258, 260 (D.Md.1991) ("Section 11 sounds in negligence, not fraud, and therefore, is not subject to the particularity requirements of Fed.R.Civ.P. 9(b)."). While recognizing that scienter is not an element of § 11 and § 12, many circuit courts and at least one court in this district have nonetheless required that the plaintiffs' allegations be pled with particularity pursuant to Fed.R.Civ.P. 9(b) when the plaintiff's claims sound in fraud. *See Rombach v. Chang,* 355 F.3d 164, 170–71 (2d Cir.2004); *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1404–05 (9th Cir.1996); *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d Cir.1992); *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990); *Hershey v. MNC Financial, Inc.,* 774 F.Supp. 367, 376 (D.Md.1991) (holding that Rule 9(b) applies to § 11 and § 12 claims when these claims are essentially "averments of fraud"). In so holding, courts have applied Rule 9(b) when plaintiffs nominally assert their § 11 and § 12 claims "do not sound in fraud" but make no effort to support such claims with non-fraud or negligence allegations. *In re Stac Elecs. Sec. Litig.,* 89 F.3d at 1405 n. 2 ("nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus."). *See also In re Ultrafem*

*Inc. Sec. Litig.*, 91 F.Supp.2d 678, 690–91 (S.D.N.Y.2000) (applying Rule 9(b) where "plaintiffs make little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint"). *Cf. In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir.1997) (reversing lower court and holding that Rule 9(b) did not apply because the plaintiffs' § 11 and § 12 claims expressly disavowed any claim of fraud and because § 11 and § 12 do not require fraud as an element).

The Section 11 and 12 defendants (minus Royal Ahold) urge the court to apply the heightened pleading standard of Rule 9(b) and to find that the plaintiffs have failed to plead their § 11 and § 12 claims with sufficient particularity. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The plaintiffs contend that Rule 9(b) is wholly inapplicable to § 11 and § 12 because they have not alleged fraud for those claims, and that even if Rule 9(b) did apply, they have met its requirements. I agree with the plaintiffs. First, I find the § 11 and § 12 claims are not based on allegations of fraud, and therefore Rule 9(b) does not apply to them. The plaintiffs' complaint states: "for the purposes of [Section 11 and Section 12 claims], Lead Plaintiffs expressly exclude any allegation that could be construed as alleging fraud or intentional or reckless misconduct. [These claims are] not based on and [do] not sound in fraud." (¶ 827.) If this is all plaintiffs had done to avoid Rule 9(b), the court would be inclined to find Rule 9(b) applies. However, in pleading their § 11 and § 12 claims, the plaintiffs selected certain paragraphs from the complaint that specified in what ways the September 2001 Offering documents were untrue and misleading as well as paragraphs that described the role of the

§ 11 and § 12 defendants. (¶¶ 827, 839.) Therefore, the complaint sets out particular allegations, not fraud based, which are sufficient to support § 11 and § 12 claims. Defendants argue that simply by pleading the September 2001 Global Offering documents contained "untrue statements of material fact," (*See, e.g.,* ¶¶ 604–07, 830) and the documents were "materially false and misleading," (*See, e.g.,* ¶¶ 625, 830) the plaintiffs have alleged fraud. The court disagrees. The plaintiffs are employing the statutory language of § 11 and § 12, *see* 15 U.S.C. § 77k(a) and 15 U.S.C. § 77*l*(a)(2), and both of these provisions impose a strict liability or negligence standard. *See Hochfelder*, 425 U.S. at 208, 96 S.Ct. 1375; *Hershey*, 774 F.Supp. at 375. It is hard to imagine what else plaintiffs could do, short of filing an entirely separate complaint, to differentiate their § 11 and § 12 pleadings from the allegations supporting their § 10(b) and Rule 10b–5 claims. As the Eighth Circuit reasoned, "§ 11 does not require proof of fraud for recovery," and "a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading.'" *In re NationsMart*, 130 F.3d at 315 (citations omitted).

 Considering the issue of traceability, however, plaintiffs have not adequately stated a claim under § 11. The complaint alleges that "Lead Plaintiff COPERA purchased Ahold common stock at artificially inflated prices on foreign exchanges during the Class Period, including shares purchased pursuant to the registration and prospectus issued in connection with Ahold's September 2001 Global Offering, and suffered more than $16 million in loss-

es thereby." [57] (¶ 55.) Typically, such a straightforward averment would be sufficient to state a § 11 claim. In this case, however, the Royal Ahold common shares sold overseas were offered pursuant to Regulation S, the SEC regulation which exempts "offers and sales that occur outside the United States" from the registration requirements of § 5 of the Securities Act of 1933. 17 C.F.R. § 230.901. The September 2001 Prospectus Supplement stated that "[o]ffers and sales of common shares and ADSs outside the United States are being made pursuant to this prospectus supplement and the attached prospectus pursuant to Regulation S under the Securities Act and not pursuant to the Registration Statements." (*See* July 28, 2004 Entwistle Aff., Ex. 3 at S–30.)

Therefore, when plaintiffs allege they bought shares "on foreign exchanges" in the September 2001 Global Offering, they are essentially stating they bought unregistered shares. Because § 11 liability is premised on purchases made pursuant to a registration statement containing an untrue statement of material fact or a material omission, plaintiffs have no claim under § 11.

Plaintiffs argue that the Royal Ahold shares sold overseas in the September 2001 Global Offering were already registered under the December 29, 2000 Registration Statement, and that the subsequent September 2001 Prospectus Supplement could not, as a matter of law, "de-register" them. (*See* Pls.' Mem. in Opp'n to the Lead Underwriters' Mot. to Dismiss at 11–14.) The plaintiffs also argue that because the September 2001 Global Offering consisted of sales and offers made both in the United States and overseas, the offering could not qualify as an "offshore transaction" exempting the overseas shares from registration under Regulation S. (*Id.*)

The December 29, 2000 Registration Statement was a "shelf" registration statement. As the lead underwriter defendants explain, a shelf registration statement generally contains basic information about a company and "a specific maximum dollar value of securities, typically without identifying any specific security" that the company plans to issue "from time to time at indeterminate prices." (*See* Lead Underwriters' Resp. in Supp. of Mot. to Dismiss at 7.) When the issuer wants to offer registered securities, the issuer "takes off the shelf" specific securities by preparing a prospectus supplement that provides information about those securities. It is only after the prospectus supplement is completed that those securities can be sold. (*Id.*) *See generally Shaw*, 82 F.3d at 1208 (explaining the shelf registration process); Loss & Seligman, *Securities Regulation*, Vol. I, Chapt. 2, p. 369 (1998) (explaining that shelf registration statements permit an issuer to take advantage of market conditions and incur lower issuing costs). The December 29, 2000 Registration Statement listed a variety of debt and equity securities that could be offered, as well as a maximum dollar value of $3.95 billion, but it did not specify quantities or prices for specific securities or when they would be offered. (*See* July 28, 2004 Entwistle Aff., Ex. 1) Only the September 2001 Prospectus Supplement contained specific information about the type of securities to be offered (ADSs and common shares) and the price for each ($ 28.3814 and 31.9 euros respectively). (*See* July 28 Entwistle Aff.,

**57.** After the issues had been fully briefed and after oral argument, the plaintiffs submitted documents in an effort to prove that they purchased shares from the underwriter defendants in the September 2001 Global Offering, and the defendants disputed the late submission of evidence. In issuing this opinion, I have not referred to or relied on any of the recently submitted documents related to the § 11 claim and § 12(a)(2) claims.

Ex., 3.) As mentioned previously, the September 2001 Prospectus Supplement specified that the securities offered outside the United States were being offered pursuant to the prospectus supplement and not to the registration statement. (*See* July 28, 2004 Entwistle Aff., Ex. 3 at S–30.) Thus, on the face of the offering documents, it appears that any shares purchased by plaintiffs overseas would not be traceable to the December 29, 2000 Registration Statement.

The plaintiffs argue that the September 2001 Global Offering cannot be separated into one offering made overseas pursuant only to the September 2001 Prospectus Supplement, and one offering in the United States pursuant to both the September 2001 Prospectus and the December 29, 2000 Registration Statement. They contend the September 2001 Global Offering should be viewed as one integrated offering made pursuant to the December 29, 2000 Registration Statement. (*See* Pls.' Mem. in Opp'n to the Lead Underwriters' Mot. to Dismiss at 15). In support of their argument, plaintiffs rely on Regulation D, the SEC regulation which exempts certain non-public offerings from registration requirements. (*Id.*) (citing *Non–Public Offering Exemption*, Securities Act Release No. 4552 (Nov. 9, 1962) (July 28, 2004 Entwistle Aff., Ex. 10) and *Regulation D–Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933,* 17 C.F.R. § 230.502 (July 28, 2004 Entwistle Aff., Ex. 11)). The SEC has issued guidance to determine whether a series of offerings purportedly made under Regulation D should be "integrated" and viewed as one public or private transaction in order to determine whether the issuer can validly claim that all the securities were offered in a non-public transaction. (*See Non–Public Offering Exemption,* Securities Act Release No. 4552 (Nov. 9, 1962)

(July 28, 2004 Entwistle Aff., Ex. 10)). Plaintiffs' reliance on the Regulation D "integration" factors is misplaced; the defendants made the overseas offering pursuant to Regulation S, not Regulation D. The plaintiffs do not provide any authority to support their claim that the defendants could not simultaneously offer shares in the United States pursuant to a shelf registration statement and shares overseas pursuant to Regulation S. The lead underwriter defendants point out that Regulation S explicitly recognizes that "[o]ffshore transactions made in compliance with Regulation S will not be integrated with registered domestic offerings or domestic offerings that satisfy the requirements for an exemption from registration under the Securities Act, *even if undertaken contemporaneously.*" (*See* SEC Release No. 6863 (April 24, 1990)) (emphasis added). In separate guidance for Regulation D, the SEC has also articulated a general policy against integrating Regulation S offerings with other simultaneous offerings. (*See* 17 C.F.R. § 230.502, "[g]enerally, transactions otherwise meeting the requirements of an exemption will not be integrated with simultaneous offerings being made outside the United States in compliance with Regulation S.") Thus, it appears that the overseas component of the September 2001 Global Offering is not required to be integrated with the registered domestic offering.

The plaintiffs also argue that the defendants cannot claim the Regulation S exemption because they participated in "directed selling efforts" in the United States when they filed slide presentations and press releases with the SEC promoting the benefits of Royal Ahold's aquisition of Bruno's and Alliant in connection with the September 2001 Global Offering. Because Regulation S applies only to offshore transactions, that is, offers and sales made

outside the United States, the Regulation prohibits directed selling efforts, defined as "any activit[ies] undertaken for the purpose of . . . conditioning the market in the United States for any securities being offered in reliance on this Regulation S." 17 C.F.R. § 230.902(c)(1). It is not necessary to analyze whether the defendants engaged in any directed selling efforts in violation of Regulation S. As the lead underwriter defendants correctly note, even if the defendants violated the directed selling efforts prohibited in Regulation S offerings, it would not subject the defendants to § 11 liability. Participating in directed selling efforts would not somehow convert unregistered shares into registered shares. Rather, the defendants could be liable for violating the § 5 registration provisions of the Securities Act. Indeed, Regulation S states that it "relate[s] solely to the application of Section 5 of the Securities Act of 1933 . . . and not to antifraud or other provisions of the federal securities laws." 17 C.F.R. § 230.901, Prelim. Note 1.

During oral argument plaintiffs did not contest the lead underwriter defendants explanation of the shelf registration process and did not provide any authority to support their claim that an issuer cannot conduct a simultaneous offering of registered shares in the United States, issued pursuant to a shelf registration statement, and unregistered shares overseas pursuant to Regulation S. Therefore the defendants' motions to dismiss the plaintiffs' § 11 claim will be granted.

■ The plaintiffs also fail to state a claim under § 12(a)(2), because they have not alleged they purchased shares from or were solicited by either Royal Ahold, the lead underwriters or Meurs and Van der Hoeven. The plaintiffs' complaint alleges that each of these defendants "draft[ed], revis[ed] and/or approv[ed] the September 2001 Prospectus Supplement" and "jointly orchestrat[ed] all activities necessary to effect the sale of these securities to the investing public, by issuing the securities, promoting the securities and/or supervising their distribution and ultimate sale to the investing public." (¶ 842.) The complaint also alleges that each of these defendants was motivated to participate in the September 2001 Global Offering by their own financial interest. (¶¶ 595, 599.) But nowhere in the complaint do plaintiffs allege they purchased Royal Ahold shares from or were solicited by Royal Ahold, the lead underwriters, or Van der Hoeven and Meurs. During oral argument plaintiffs' counsel stated that COPERA "purchased its shares through agents, agent banks in Europe." (*See* September 23, 2004 Motions Hearing Transcript at 45.) Section 12(a)(2) provides that any person who "offers or sells a security" by means of a false or misleading "prospectus or oral communication" shall be liable "to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2). It is possible to hold an issuer liable as a statutory seller under § 12(a)(2) when there has been a firm commitment underwriting, *see Shaw*, 82 F.3d at 1215–16, but only if there has been sufficient activity to constitute "solicitation." Mere participation in the preparation of the prospectus will not trigger § 12(a)(2) liability. *Id.* In order to state a claim under § 12(a)(2), the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser. *Pinter*, 486 U.S. at 651, 108 S.Ct. 2063. Because plaintiffs have failed to do so, their

§ 12(a)(2) claims will be dismissed.[58] Considering the recent exchange of correspondence and documents, however, the dismissal will be stayed for 60 days within which plaintiffs may seek leave to amend and replead the § 12(a)(2) claims, if they can do so consistent with this opinion.

### H. Control Person Liability Under Section 20(a) and Section 15

■ The plaintiffs charge each of the named individual defendants with control person liability under § 20(a) of the Exchange Act (Count III) and § 15 of the Securities Act (Count VI).[59] Section 20(a) imposes liability on individuals who act as control persons over those who violate § 10(b).[60] To establish a claim under § 20(a) the plaintiffs must allege (1) control by the defendant (2) over a primary

violator of § 10(b). *In re MicroStrategy*, 115 F.Supp.2d at 661. Section 15 provides similar liability in relationship to § 11 and § 12 violations.[61] "In order to establish a prima facie Section 15 claim, a plaintiff need only establish (1) control, and (2) an underlying violation of Section 11 (or Section 12(a)(2))." *In re Initial Public Offering*, 241 F.Supp.2d at 352. Because plaintiffs have failed to state a claim under § 11, § 15 liability will only arise if plaintiffs successfully state a claim under § 12(a)(2).

The defendants argue that a third element, culpable participation, is required to state a claim for control person liability. *See In re Criimi Mae*, 94 F.Supp.2d at 657 (noting that to state a claim for control person liability under § 20(a), a plaintiff must allege "a primary violation by the

---

58. Plaintiffs have adequately pled that the September 2001 Prospectus Supplement was false and misleading. The September 2001 Prospectus Supplement contained a section entitled "Selected Financial Information of Royal Ahold" which summarized net sales and net income for fiscal years 1996 through the first half of 2001. (¶ 607) (citing to p. S–21.) It also incorporated by reference the Form 20–F for the fiscal year ended December 31, 2000. (¶ 600) As the plaintiffs' complaint repeatedly indicates, Royal Ahold later admitted these financial statements were incorrect due to accounting irregularities and intentional manipulation of financial results. The plaintiffs also allege that Royal Ahold falsely represented that the financial statements, which were incorporated in the September 2001 Prospectus Supplement, were prepared in accordance with accounting principles generally accepted in the Netherlands. (¶ 715.)

59. The § 20(a) claims against Boonstra, de Ruiter, and Fahlin, as well as the § 15 claim against Boonstra and de Ruiter, will be dismissed because the court lacks personal jurisdiction over these individuals. *See supra* Part II(B).

60. Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

61. Section 15 of the Securities Act states:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [section 11 and 12], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77o.

controlled person and control of the primary violator by the targeted defendant, and ... that the controlling person was in some sense a culpable participant in the fraud perpetrated by the controlled person") (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2nd Cir.1996)).[62] In response, the plaintiffs argue that they are not required to plead culpable participation, relying on *In re MicroStrategy*, 115 F.Supp.2d at 660, which stated that "the language of the Exchange Act in general and Section 20(a) in particular compel the conclusion that Plaintiffs do not have to plead culpable participation in their Complaint to state a claim under Section 20(a)."

 It is clear under Fourth Circuit law that liability under Section 20(a) ultimately may be imposed only on those "who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person." *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir.1979). The *Carpenter* opinion, however, also notes that "[i]n order to satisfy the requirement of good faith it is necessary for the controlling person to show that some precautionary measures were taken to prevent an injury caused by an employee." *Id.* *Carpenter* does not directly address or resolve the question of what must be pled to survive a motion to dismiss. Based on the language of § 20(a), which states an affirmative defense for defendants who act in good faith, I agree with the court in *In re MicroStrategy* that plaintiffs are not required to allege "culpa-

ble participation" beyond the facts of control and the underlying violation by the controlled person in order to state a claim.[63] Further, because nothing in the statute requires that the control person himself act with scienter or be directly liable for the fraud, I agree with the courts that have concluded neither the PSLRA nor Rule 9(b)'s heightened pleading standards apply to control person claims; rather it is sufficient to satisfy Rule 8.[64] *See In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 415 (S.D.N.Y.2003) (stating "the extent to which the control must be alleged will be governed by Rule 8's pleading standard"); *In re Initial Public Offering*, 241 F.Supp.2d at 354, 396 (stating "Section 15 claims need only be pleaded under Rule 8; a defendant is only entitled to notice that she allegedly controlled an entity that violated Section 11" and "Section 20(a) must therefore be pleaded only in accordance with Rule 8(a). Neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim").

To state a control person liability claim, under either § 20(a) or § 15, the plaintiffs must allege that the defendants acted as control persons over primary violators of § 10(b), or § 12. Under both § 15 and § 20(a), control has the same meaning. *In re Initial Public Offering*, 241 F.Supp.2d at 393. As the court in *In re MicroStrategy* explained:

The SEC defines "control" as "possession, direct or indirect of the power to

---

**62.** This statement was not essential to the holding in *In Criimi Mae*, however, as the court dismissed the § 20(a) claims for failure to state the underlying § 10(b) claim. 94 F.Supp.2d at 662.

**63.** Even if I were to find that § 20(a) required plaintiffs to plead culpable participation in order to survive a motion to dismiss, the

plaintiffs have met this burden with respect to Van der Hoeven, Meurs, Andreae, Lee, and Kaiser because they adequately pled primary violations of § 10(b) and Rule 10b–5 against these individuals. *See supra* Part II(E).

**64.** Rule 9(b) or the PSLRA may, of course, apply to pleading the underlying violation.

direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2. A plaintiff satisfies the control requirement under this definition by pleading facts showing that the controlling defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability."

115 F.Supp.2d at 661 (quoting *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir.1996)). Furthermore, determining whether an individual is a control person presents a "complex factual question," *SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir.1974), and "as such, it is 'not ordinarily subject to resolution on a motion to dismiss,' dismissal is appropriate only when 'a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.'" *In re MicroStrategy*, 115 F.Supp.2d at 661 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir.1998)). *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir.2002); *In re Cable & Wireless*, 321 F.Supp.2d 749, 775 (E.D.Va.2004).

In *In re Initial Public Offering*, 241 F.Supp.2d at 352, the plaintiffs alleged "[e]ach of the Individual Defendants was a control person of the Issuer with respect to the IPO [and]...[a]s a result, the Individual Defendants are liable under Section 15 of the Securities Act for the Issuer's primary violation of Section 11 of the Securities Act," and the court held that allegation, in combination with the allegations supporting the underlying § 11 claims, provided the defendants with adequate notice of the claims against them. Similarly, the court in *MicroStrategy* was persuaded

the control person claims were adequately pled because the complaint alleged the "positions within the Company of each Control Group Defendant; that these Defendants prepared, reviewed executed, and disseminated...public reports and/or press releases issued by, and otherwise acted on behalf of MicroStrategy; and that these Defendants possessed significant voting power by virtue of their holdings of securities in MicroStrategy." *MicroStrategy*, 115 F.Supp.2d at 661 (citations omitted).

■ The plaintiffs' complaint alleges that Van der Hoeven, Meurs, de Ruiter, Andreae, Tobin, Grize and Miller acted as control persons for Royal Ahold (¶ 824); that Tobin and Grize were control persons for Ahold USA (*Id.*); and that Miller, Resnick, Kaiser and Lee acted as control persons for USF (*Id.*). In support of their § 20(a) claim, the plaintiffs allege that these individuals had "direct and supervisory involvement in the day-to-day operations" of the companies (¶ 825), and that they "influenc[ed] and control[led], directly or indirectly, the decision-making of [the companies], including the content and dissemination of the various statements and SEC filings that Lead Plaintiffs allege are false and misleading." (¶ 824.)

The plaintiffs have pled "facts from which it can reasonably be inferred the defendant[s] w[ere] control person[s]." *MicroStrategy*, 115 F.Supp.2d at 661. The plaintiffs have adequately pled that Van der Hoeven, Meurs, Andreae, Tobin, Grize and Miller were all control persons for Royal Ahold. Each served on Royal Ahold's Executive Board, the body directly responsible for managing the company, for some portion of the class period and each is alleged to have participated in controlling, directly and indirectly, Royal Ahold's corporate policies and decision making.

(*See* ¶ 852.) Additionally, the complaint adequately alleges that Miller, Kaiser, and Resnick were all control persons for USF. Miller is alleged to have controlled Kaiser, who served as a USF marketing manager, and Kaiser is alleged to have controlled Lee, who served as a USF purchasing executive.[65] (¶¶ 82–94.) Resnick is alleged to be a control person of USF because as USF's CFO, "Resnick reviewed and approved USF's Class Period financial reporting and participated in the preparation of USF's and Ahold's financial reports and statements." (¶¶ 92–93.) Therefore, the plaintiffs' complaint satisfies the pleading standard under Rule 8 to establish that the individual defendants were control persons.

In addition to pleading that the individual defendants are control persons, the plaintiffs must also allege that the individual defendants controlled the primary violators of § 10(b) in order to satisfy the requirements of § 20(a). Miller, Resnick, and Kaiser are all alleged to be control persons of USF and the complaint adequately states an underlying § 10(b) claim against USF and controlled individuals at USF.[66] Similarly, Van der Hoeven, Meurs, Andreae, Tobin, Grize, and Miller are all alleged to be control persons of Royal Ahold and the complaint clearly states an underlying Rule 10(b) claim against Royal Ahold and controlled individuals at Royal Ahold.[67] Therefore, the plaintiffs' complaint adequately states a control person claim under § 20(a) against Miller, Resnick, Kaiser, Van der Hoeven, Meurs, Andreae, Tobin, and Grize and the individual defendants' motions to dismiss this claim will be denied.[68]

To establish control person liability under § 15 of the Exchange Act, the plaintiffs must adequately allege that the individual defendants acted as control persons over the primary violators of § 12(a)(2). As previously discussed, the complaint adequately alleges that defendants Van der Hoeven, Meurs, Tobin, Grize, Andreae, Resnick, Kaiser, and Miller were control persons. The plaintiffs, however, have failed to state a claim under § 11 or § 12(a)(2) and as a result, the plaintiffs have also failed to state a claim under § 15. As with the plaintiffs' § 12(a)(2) claims, however, the plaintiffs' § 15 claims will be dismissed with 60 days to seek leave to amend. To the extent that the

65. The complaint does not provide any factual allegations demonstrating that Lee acted as a control person for USF. Therefore, Lee's motion to dismiss the § 20 and § 15 claims will be granted.

66. As demonstrated in Part II(E)(3) of this opinion, the complaint meets the pleading standards of Rule 9(b) and the PSLRA in stating a § 10(b) and Rule 10b–5 claim against USF employee Kaiser. Additionally, the complaint sufficiently states a claim for § 10(b) and Rule 10b–5 violations against USF as a corporation and individual Lee, though these claims were not specifically addressed in this opinion because USF did not file a motion to dismiss the § 10(b) claims against it.

67. As demonstrated in Part II(E)(1) and (2) of this opinion, the complaint meets the pleading standards of Rule 9(b) and the PSLRA in stating a claim against Royal Ahold individuals Van der Hoeven, Meurs, and Andreae. Additionally, the complaint sufficiently states a claim for Rule 10b–5 violations against Royal Ahold as a corporation, though these claims were not specifically addressed in this opinion because Royal Ahold has not filed a motion to dismiss the 10(b) claims against it.

68. The complaint also alleges that Tobin and Grize are both liable under Section 20(a) as control persons of Ahold USA. Nonetheless, since the complaint fails to adequately state an underlying 10(b) claim against Ahold USA or the controlled individuals at Ahold USA, *see supra* Part II(E)(9), Tobin and Grize cannot be subject to § 20(a) liability based on their positions as control persons for Ahold USA.

plaintiffs are able to state a claim against controlled persons under § 12(a)(2) following leave to amend, the plaintiffs may be able to state a claim for control person liability under § 15.

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss and motions to strike will be granted in part and denied in part, as detailed in the order that follows.

### ORDER

For the reasons stated in the foregoing Memorandum, it is hereby **ORDERED** that:

1. the Fed.R.Civ.P. 12(b)(2) motions to dismiss for lack of personal jurisdiction submitted by foreign individual defendants Fahlin, Boonstra, and de Ruiter are **Granted**. The motions to dismiss for lack of personal jurisdiction submitted by foreign individual defendants Van der Hoeven, Meurs, and Andreae are **Denied**;

2. the Fed.R.Civ.P. 12(b)(1) motions submitted by all defendants to dismiss the claims of foreign purchasers of Royal Ahold shares on foreign exchanges for lack of subject matter jurisdiction are **Denied**;

3. the global underwriter defendants' Fed.R.Civ.P. 12(b)(1) motion to dismiss the § 11 and § 12(a)(2) claims for lack of subject matter jurisdiction is **Granted**;

4. the Fed.R.Civ.P. 12(b)(6) motions submitted by all defendants to dismiss all allegations concerning conduct that predates July 30, 1999 as barred by the statute of limitations are **Granted**;

5. the Fed.R.Civ.P. 12(b)(6) motions to dismiss the § 10(b) and Rule 10b–5 claims submitted by defendants Tobin, Grize, Resnick, Deloitte & Touche LLP ("Deloitte U.S."), Deloitte & Touche Accountants ("Deloitte Netherlands"), Ahold USA and Ahold USA Holdings are **Granted**.

The motions to dismiss the § 10(b) and Rule 10b–5 claims submitted by defendants Kaiser, Lee, Andreae, and Meurs are **Denied**. Van der Hoeven's motion to dismiss the § 10(b) and Rule 10b–5(b) claims is **Denied**; his motion to dismiss the § 10(b) and Rule 10b–5(a) and (c) claims is **Granted** Miller's motion to dismiss the § 10(b) and Rule 10b–5(b) claims is **Granted**, but his motion to dismiss the Rule 10b–5(a) and (c) claims is **Denied**;

6. the Deloitte & Touche LLP ("Deloitte U.S.") Fed.R.Civ.P. 11 motion to strike certain allegations is **Granted**;

7. the Royal Ahold defendants' (along with individual defendants Van der Hoeven and Meurs) Fed.R.Civ.P. 12(f) motion to strike all allegations concerning misconduct at Ahold USA subsidiaries Tops and Giant–Carlisle and allegations concerning the realization of synergies and the integration of acquisitions is **Denied**; their motion to strike all allegations concerning accounting irregularities with the Argentine subsidiary Disco is **Granted**;

8. the Fed.R.Civ.P. 12(b)(6) motions to dismiss the § 11 and § 12(a)(2) claims submitted by Royal Ahold, the lead underwriters, the Deloitte defendants, and the individual defendants are **Granted**; the plaintiffs are granted 60 days to seek leave to amend the § 12(a)(2) claims; and

9. the Fed.R.Civ.P. 12(b)(6) motions to dismiss the control person liability claims under § 20(a) submitted by defendants Miller, Resnick, Kaiser, Van der Hoeven, Meurs, Andreae, Tobin, and Grize are **Denied**; Lee's motion to dismiss the § 20(a) claim is **Granted**; all motions to dismiss the § 15 claims are **Granted**; and the plaintiffs are granted 60 days to seek leave to amend the § 15 claims.